## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DOW JONES & COMPANY, INC.   )
200 Liberty St.   )
New York, New York  10281   )
  )     **Civil Action No. 1:06CV01014**
       Plaintiff,   )
  )
      v.   )     **Judge James Robertson**
  )
ABLAISE LTD ("Ablaise")   )
40 Queen Anne Street   )
London W1G 9EL,   )
United Kingdom   )
and   )
GENERAL INVENTIONS   )
INSTITUTE A, INC., ("GIIA")   )
Craigmuir Chambers, P.O. Box 71   )
Town Road   )
Tortola, British Virgin Islands   )
  )
_____Defendants._____)

DOW JONES REUTERS   )
BUSINESS INTERACTIVE, LLC.   )
200 Liberty St.   )
New York, New York  10281   )
  )     **Civil Action No. 1:06CV01015**
       Plaintiff,   )
      v.   )     **Judge James Robertson**
  )
ABLAISE and GIIA   )
_____Defendants._____)

## MOTION OF PLAINTIFFS DOW JONES & COMPANY, INC. AND DOW JONES REUTERS BUSINESS INTERACTIVE, LLC CONCERNING CLAIM CONSTRUCTION

Pursuant to this Court's Orders of November 3, 2006 and December 28, 2006,

**PLAINTIFFS DOW JONES & COMPANY, INC. AND DOW JONES REUTERS**

**BUSINESS INTERACTIVE, LLC** hereby move for a <u>Markman</u> Order construing the claims of

the patents-in-suit in accordance with the accompanying Brief.

ROTHWELL, FIGG, ERNST & MANBECK

/s/ Steven Lieberman
Steven Lieberman (439783)
Joseph A. Hynds  (440464)
Brian Rosenbloom (461413)
1425 K Street, NW; Suite 800
Washington, DC  20005
Tel: (202) 783-6040
*Attorneys for Plaintiff*
*Dow Jones & Company, Inc.*

DORSEY & WHITNEY, L.L.P.

Creighton R. Magid (476961)
1001 Pennsylvania Avenue, NW
Suite 400
Washington, DC 20004-2505
Tel: (202) 442-3555
*Attorneys for Plaintiff*
*Dow Jones Reuters Business Interactive,*
*LLC*

January 5, 2007

2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DOW JONES & COMPANY, INC.  )
200 Liberty St.  )
New York, New York 10281  )
  )      **Civil Action No. 1:06CV01014**
       Plaintiff,  )
  v.  )      **Judge James Robertson**
  )
ABLAISE LTD ("Ablaise")  )
40 Queen Anne Street  )
London W1G 9EL,  )
United Kingdom  )
and  )
GENERAL INVENTIONS  )
INSTITUTE A, INC., ("GIIA")  )
Craigmuir Chambers, P.O. Box 71  )
Town Road  )
Tortola, British Virgin Islands  )
  )
_____Defendants._____)

DOW JONES REUTERS  )
BUSINESS INTERACTIVE, LLC.  )
200 Liberty St.  )
New York, New York 10281  )
  )      **Civil Action No. 1:06CV01015**
       Plaintiff,  )
  v.  )      **Judge James Robertson**
  )
ABLAISE and GIIA  )
_____Defendants._____)

## OPENING BRIEF OF PLAINTIFFS DOW JONES & COMPANY, INC. AND DOW JONES REUTERS BUSINESS INTERACTIVE, LLC CONCERNING CLAIM CONSTRUCTION

ROTHWELL, FIGG, ERNST &
MANBECK

Steven Lieberman (439783)
Joseph A. Hynds  (440464)
Brian Rosenbloom (461413)
1425 K Street, NW; Suite 800
Washington, DC  20005
Tel: (202) 783-6040
*Attorneys for Plaintiff*
*Dow Jones & Company, Inc.*

DORSEY & WHITNEY, L.L.P.

Creighton R. Magid (476961)
1001 Pennsylvania Avenue, NW
Suite 400
Washington, DC 20004-2505
Tel: (202) 442-3555
*Attorneys for Plaintiff*
*Dow Jones Reuters Business Interactive,*
*LLC*

January 5, 2007

# TABLE OF CONTENTS

NATURE OF THE PROCEEDINGS ......................................................................... 1

INTRODUCTION ................................................................................................... 2

    A.    Background ................................................................................................ 2

    B.    Brief Description of the Patented Technology and Prior Art Technology ............... 4

    C.    Claim Terms at Issue ............................................................................... 11

SUMMARY OF PROPOSED CLAIM CONSTRUCTIONS ....................................... 12

    A.    Terms from the '737 Patent: ...................................................................... 13

    B.    Terms from the '530 Patent: ...................................................................... 14

ARGUMENT ......................................................................................................... 15

I.     LEGAL STANDARDS GOVERNING CLAIM CONSTRUCTION ........................... 15

II.    CONSTRUCTION OF TERMS IN CLAIMS OF THE '737 PATENT ...................... 18

    A.    Claim 1 .................................................................................................. 18

          1.    "Displayed at a browsing device" .................................................... 18

          2.    "Storing executable functions" ........................................................ 19

          3.    "In response to identifying a request for specified content data and a user identifier; (a) … (e) …" .................................................................. 23

              a.    The webpage is generated in response to a request from a browsing device. .......................................... 23/23

              b.    The request from the browsing device must include a format identifier that is separate and distinct from the user identifier. ........................ 25

          4.    "Receiving format identifiers identifying the type of formatting required" ...... 29

              a.    "Receiving format identifiers" .................................................. 29

              b.    "A format identifier identifying the type of formatting required" ............ 31

5.  "Selecting a set of stored functions in dependence upon a received format identifier and said read user information" ...................................................36

    a.  "Selecting a set of stored functions." ..................................................... 36

    b.  "In dependence upon a received format identifier and said read user information" ................................................................................................ 38

    c.  "A received format identifier" ............................................................. 40

6.  "Executing said set of functions to generate viewable data comprising said selected content data and formatting data" ....................................................40

III.  CONSTRUCTION OF TERMS IN CLAIMS OF THE '530 PATENT ......................... 42

A.  Claim 1 ................................................................................................................. 42

1.  "Identifying requests from browsing devices that define a request for specified viewable data, said request including formatting type identification data" ...................................................................................... 42

2.  "Maintaining a plurality of formatting types of data defining respectively corresponding predetermined formats for portions of said viewable data" ..................................................................................................44

3.  "Selecting a specific one of said types of formatting data in response to said formatting type identification data" .................................................45

# TABLE OF AUTHORITIES

## Cases

Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1330 (Fed. Cir. 2003) ................. 18

Applera Corp. v. Micromass UK Ltd., 186 F. Supp. 2d 487 (D. Del. 2002) ................................. 31

Bell Atl. Network Servs. v. Covad Communs. Group, Inc., 262 F.3d 1258, 1269
    (Fed. Cir. 2001) ........................................................................................................ 18

CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG, 224 F.3d 1308, 1317
    (Fed. Cir. 2000) ........................................................................................................ 32

Cooper Cameron Corp. v. Kvaerner Oilfield Prods., 291 F.3d 1317, 1323 (Fed. Cir. 2002)....... 18

Gemstar-TV Guide Int'l, Inc. v. ITC, 383 F.3d 1352, 1364 (Fed. Cir. 2004) .............................. 16

Innova/Pure Water, Inc. v. Safari Water Filtration Sys., 381 F.3d 1111, 1116 (Fed. Cir. 2004) . 16

Irdeto Access, Inc. v. Echostar Satellite Corp., 383 F.3d 1295, 1300 (Fed. Cir. 2004) ............... 18

Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1347 (Fed. Cir. 1998) ........................................... 15

Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996) ..................................................... 15

Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995) .............................. 17

Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed. Cir. 2005) ................................ 17

On Demand Mach. Corp. v. Ingram Indus., 442 F.3d 1331, 1340 (Fed. Cir. 2006) ..................... 18

Papst Licensing GmbH v. Sunonwealth Elec. Mach., 2004 U.S. Dist. Lexis 4402, *24
    (N.D. Ill. 2004) ........................................................................................................ 31

Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005), cert. denied,
    126 S.Ct. 1332 (2006) ................................................................................................ 15

Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309 (Fed. Cir. 1999) .................... 18

Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001) ..................................... 19

Superior Fireplace Co., v. Majestic Prods. Co., 270 F. 3d 1358, 1375-76 (Fed. Cir. 2001) ........ 31

Techs., v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir.), cert. denied, 516 U.S. 987 (1995).. 17

Unitherm Food Sys. v. Swift-Eckrich, Inc., 375 F.3d 1341, 1351 (Fed. Cir. 2004)..................... 17

Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ............................ 15

Wang Labs., Inc. v. Am. Online, Inc., 197 F.3d 1377, 1383 (Fed. Cir. 1999) ........................... 18

**Statutes**

35 U.S.C. § 112, para 1 .................................................................................................... 16

## NATURE OF THE PROCEEDINGS

These are actions instituted by Plaintiffs, Dow Jones & Company ("Dow Jones") and Dow Jones Reuters Business Interactive, LLC d/b/a Factiva ("Factiva"), against Defendants Ablaise Ltd. ("Ablaise") and General Inventions Institute A ("GIIA"), seeking a declaratory judgment that U.S. Patent No. 6,961,737 (the "'737 patent") (Rosenbloom Decl. Exh. A) and U.S. Patent No. 6,295,530 (the "'530 patent") (Rosenbloom Decl. Exh. B) (collectively the "Patents") are invalid and/or not-infringed by the Plaintiffs.[1]

Pursuant to this Court's Scheduling Orders, Dow Jones and Factiva submit this Opening Brief concerning claim construction in preparation for the Markman hearing scheduled in both cases on May 17, 2007.

As set forth below, Dow Jones and Factiva ask this Court to construe nine phrases found in the independent claims of the two patents in suit (six in the '737 patent and three in the '530 patent). The proposed claim constructions are based on the plain language of the claims themselves, the language of the common specification of the two patents and statements made by the patent applicants during the prosecution of those two applications. Construction of these terms as outlined below will, Plaintiffs submit, permit this Court to rule on summary judgment that neither Dow Jones nor Factiva infringes any claims of the patents-in-suit.[2]

---

[1] In its complaint for Declaratory Relief, Factiva seeks a declaratory judgment of non-infringement and invalidity only with respect to the '737 patent. Defendants' counterclaim in that action asserts only that Factiva infringes the '737 patent.

[2] As a matter of law, if an accused infringer does not infringe an independent claim then it cannot infringe a claim which depends from that independent claim, since such dependent claim is necessarily not broader than the independent claim from which it depends.

## INTRODUCTION

### A.    Background

The '737 and '530 patents are business method patents related to the personalization of web pages. [3] Ablaise accuses the Wall Street Journal (WSJ) website (www.wsj.com) and the MarketWatch website (www.marketwatch.com), both of which are owned by Dow Jones, of infringing the '737 patent. Although Ablaise's counterclaim also identifies the '530 patent as being infringed by Dow Jones, Ablaise has yet to identify any particular product or feature that it contends infringes the '530 patent. Ablaise also accuses the Factiva website (www.factiva.com) of infringing the '737 patent.

With respect to the WSJ website, Ablaise accuses the "My Online Journal" feature of infringing the '737 patent. The "My Online Journal" feature enables a user to create a personalized electronic newspaper by specifying the type of content the user would like to read as well as the ordering of the content on the page. For example, a user may specify that he would like his personalized newspaper to include: (a) all stories that mention IBM, (b) columns written by Walt Mossberg, and (c) stories related to computer hardware. The user can further specify that he would like the Mossberg columns to appear first, the IBM stories to appear second, and the computer hardware stories to appear last.

With respect to the MarketWatch website, Ablaise accuses the "My Portfolio" feature of infringing the '737 patent. The "My Portfolio" feature enables a user to retrieve data from a

---

[3] The '737 patent issued from U.S. Pat. Application No. 09/920,803 (the "'737 Application") and is a continuation of the '530 patent, which issued from U.S. Pat. Application No. 08/647,769 (the "'530 Application"), which claims priority to GB Patent No. 9509828, filed on May 15, 1995. The drawings and written description (what is commonly referred to as the "specifications") for the '737 and '530 patents appear to be identical. For this reason, reference in this brief to the specifications of the two patents will typically be made only by citing to the relevant material in the '737 Patent. The '737 and '530 Patents are attached to the accompanying declaration of Brian Rosenbloom ("Rosenbloom Decl.") as Exhibits A and B respectively.

2

database of stock information by executing a specific database query (or "view") that was previously created and saved by the user.

Finally, Ablaise accuses the Factiva website of infringing the '737 Patent. The Factiva website permits users to retrieve data pertaining to topics of interest from a database of information maintained by Factiva. The user is able to specify and save his or her topics of interest. Thereafter, the user can track the latest news concerning the specified topics by visiting the Factiva website.

Ablaise is a patent holding company whose

"sole business is the licensing and enforcement of its alleged patent rights. . . . [Ablaise does] not make or sell any products or provide any services beyond [its] activities relating to [its] alleged patent portfolio."

Defendants' Answer, Counterclaims and Jury Demand ("Answer") at paragraph 10.

In addition to accusing Dow Jones and Factiva of infringing the Patents, Ablaise has sent patent infringement notice letters to scores of entities that provide websites with personalization features. Ablaise has brought patent infringement suits against several of these entities, including Salesforce.com, E-Trade, CDW Corp., J&R Electronics, Lycos, Bank of America, and Wegmans Food Market. Based on Ablaise's accusations of infringement, it appears Ablaise has taken the position that any website that personalizes a web page based on stored user preference information infringes at least the '737 patent.

Like Dow Jones and Factiva, several of the entities that have received the infringement notice letters have filed declaratory judgment actions seeking a judgment that the Patents are invalid and/or not infringed. Currently, the '737 and '530 patents are involved in 6 active litigations (two in California, one in Massachusetts, two in the District of Columbia, and one in

3

Delaware). A <u>Markman</u> hearing has not been held yet in any of these pending litigations, nor has any <u>Markman</u> hearing been held in any of the litigations that have settled.

**B.      Brief Description of the Patented Technology and Prior Art Technology**

The '737 and '530 patents describe a "web server" that is programmed to generate web pages dynamically. A "web server" is simply a computer that is connected to the Internet and configured to receive requests from web browsers (e.g., the Internet Explorer web browser provided by Microsoft or the Netscape web browser). In response to receiving a request from a web browser, the web server transmits a hypertext markup language (HTML) file (or "web page") to the requesting web browser. A web browser is sometimes referred to as simply a "client," and a web server is sometimes referred to as simply a "server."

When the World-Wide-Web ("Web") was first created in about 1990, the requests transmitted by a web browser to a web server merely identified a specific HTML file stored at the web server. The web server would respond to the request by simply retrieving the identified HTML file and transmitting the file to the browser. This process is illustrated in the diagram below.



In this illustration, the end user has a personal computer (PC) that executes a web browser. The end user may cause the web browser to transmit a request to the web server by, for example, clicking on a hyperlink. The request identifies a specific HTML file (<u>i.e.</u>, HTML file

4

#1).  The server, in response to receiving the request, retrieves the identified HTML file (i.e., HTML file #1) from the file storage device (e.g., computer hard drive) and transmits the file to the browser running on the end user's PC.  The browser will then process the HTML file and display the web page defined by the HTML file.

As illustrated and described above, when the Web was first created, all web pages were *static* (i.e., the web pages were stored in pre-existing HTML files).  As the name implies, these pre-existing HTML files typically contained text interspersed with HTML commands or "tags", some of which define a hyperlink to another pre-existing HTML file.  When a user clicked on the hyperlink, the browser would send a request identifying the HTML file to a web server.  In this way, web pages were "linked" together and a user could browse (or "surf") the Web by following these links.  See Kevin Hughes, Entering the World-Wide Web: A Guide to Cyberspace, ACM SIGLINK Newsletter Vol. III, No. 1, 4-8 (1994) (Rosenbloom Decl. Exh. C).

Shortly after the creation of the Web (at least as early as 1993), people began creating "gateway" programs that enabled an end user to use his web browser to access information stored in a database, as opposed to stored in a static HTML file.[4]  Indeed, the '737 Patent specifically discusses that gateway programs were in the prior art.  See Rosenbloom Decl. Exh. A at Col. 8, lines 24-29.  The way these "gateway" programs worked is as follows.  An end user would cause his/her browser to transmit a request to the web server as usual, but the request would identify a specific gateway program rather than a specific pre-existing HTML file.  Typically, the request would also identify the user as well as the information the end user wanted

---

[4] See Steve Putz, Interactive information services using World-Wide Web hypertext, Computer Networks and ISDN Systems, 27, 273-280 (1994) (Rosenbloom Decl. Exh. D);  Charles Ames et al., Automating Testbed Documentation and Database Access  Using World Wide Web (WWW) Tools, Third International Symposium on Space Mission Operations and Ground Data Systems Part 2, NASA CP-3281 (1994) (Rosenbloom Decl. Exh. E); and Posting of Jim Davis to www-talk entitled a Gateway to the U Mich Geography server (Nov. 18, 1992) available at http://ksi.cpsc.ucalgary.ca/archives/WWW-TALK/www-talk-1992.messages/307.html (Rosenbloom Decl. Exh. F).

to access from the database. The web server, in response to receiving the request, would pass the request to the identified gateway program and then wait for a response from the gateway. While the web server waits for the response, the gateway retrieves the requested data from the database and formats the data by adding HTML tags to the data, thereby creating an HTML document (i.e., a web page) dynamically. The gateway then provides the dynamically generated HTML document to the web server, which simply relays the HTML document to the end user's web browser. This process is illustrated in the diagram below.



In this illustration, the end user causes the web browser to transmit a request to the web server, which request identifies a specific gateway (i.e., gateway #3). The web server, in response to receiving the request, passes the request to the gateway. After receiving the request, the gateway retrieves data from a database and formats the data by adding HTML tags to the data, thereby creating an HTML file. This gateway-generated HTML file is provided to the web server, which relays the HTML file to the end user's web browser. The browser will then process the HTML file and display the web page defined by the HTML file. In this manner, a person can use a standard web browser to access information stored in any database (e.g., a database located half-way around the world). See Rosenbloom Decl. Exh. C.

The '737 and '530 patents describe a web server that generates HTML files dynamically in much the same manner as described above with respect to the gateways. However, instead of

6

using a gateway program to retrieve data from a database and add HTML tags to the data, the system disclosed in the Patents uses an indexed "string of formatting functions," which the Patents refer to as an indexed "function string."[5]

A function string consists of a list of formatting functions, and a formatting function consists of a set of instructions ("function steps"), each of which, when executed, produces a small portion of a web page. See Rosenbloom Decl. Exh. A at Col. 13, lines 3-4 ("The formatting functions are arranged to generate small portions of HTML code"). According to the Patents, a table (a.k.a., a "string list store," see Rosenbloom Decl. Exh. A at Figure 11) is used to store and index the function strings.[6] This feature of the Patents is illustrated below.

| String List Store | |
|---|---|
| Index | Function String |
| 001 | FS1 (f1, f2, f4) |
| 002 | FS2 (f5, f7) |
| 003 | FS3 (f1,f9,f11) |

As the above table indicates, three indexed function strings (i.e., function string FS1, FS2, and FS3) are stored in the example "string list store." As further illustrated, function string FS1 includes formatting functions f1, f2, and f4, and is associated with index value 001; function string FS2 includes formatting functions f5 and f7, and is associated with index value 002; and function string FS3 includes formatting functions f1, f9 and f11, and is associated with index value 003.

---

[5] Rosenbloom Decl. Exh. A ('737 Patent) at Col. 13, lines 10-11 ("HTML code is produced by sequentially executing a string of formatting functions and the pre-processing step consists of arranging such function strings such that a particular function string, arranged to generate a HTML page, may be quickly sought and executed during on-line operation.").

[6] Rosenbloom Decl. Exh. A at Col. 15, lines 24-28 ("Thus, the string list store 1103 includes a string index portion 1106 and the actual string list portion 1107. Function strings are added to the string list portion 1107 at step 907 of FIG. 9 with their related index reference being added to portion 1106 at step 908.").

In order for the system disclosed in the Patents to generate an HTML file dynamically using an indexed function string, the system requires that the request transmitted from the web browser include an index value associated with the function string.  <u>See</u> Rosenbloom Decl. Exh. A at Col. 18, lines 24-28.  When the web server receives such a request, the web server (1) retrieves from the "string list store" the function string associated with the index value, (2) executes the function string, thereby generating an HTML file, and (3) transmits the generated HTML file to the requesting web browser.  Thus, for example, if a request from a web browser includes index value 002, then the web server, in response to receiving the request, would retrieve and execute function string FS2 (<u>i.e.</u>, the function string that is associated with index value 002), thereby generating a particular HTML file.

The specification of the Patents teaches that the feature of indexing function strings is a critical feature of the invention.  Specifically, after the '737 Patent describes several different web page personalization capabilities of the disclosed web server, it states:

> [i]t can be appreciated that the possibilities are endless …. [t]his is
> all provided by the fact that the actual HTML pages supplied back
> to the users are generated "on-the-fly" <u>by indexing</u> locations within
> databases.

Rosenbloom Decl. Exh. A at Col. 17, line 66-Col. 18, line 2 (emphasis added).  Thus, the specification makes clear that indexing is a critical feature of the invention.

Although gateway programs that generated web pages dynamically were in common use prior to the effective filing date of the patents in suit (<u>i.e.</u>, May 1995)[7], the patent applicants contend they were the first to conceive a web server that could generate a web page dynamically,

---

[7] <u>See</u> footnote 2, <i>supra</i>; <u>see</u> <u>also</u> Jason Romney, <u>The Pharisees Have Entered The Net</u>, The Age, Sept. 27, 1994 at 24 ("The dictionary features a 'particularly nifty interface … with text pages being tailored to each user on the fly.'") (Rosenbloom Decl. Exh. G); and Posting of Rebecca Sims to utexas.class.tc659b-edge , entitled <u>Japan Window</u> (March 31, 1995) ("To deal [with] the dynamic nature of the event information … 'virtual' pages generated on the fly. ") (Rosenbloom Decl. Exh. H).

as opposed to merely retrieving from storage a pre-created web page (i.e., a static web page). Specifically, the '737 patent states, "[p]reviously, *all* HTML pages were constructed and stored as such, thereby making them available when requests were issued by clients." See Rosenbloom Decl. Exh. A at Col. 10, lines 56-58 (emphasis added); and Col. 4, lines 58-59 (discussing the prior art and noting that in the prior art "each [web] page viewed by a client *must be pre-created* ....") (emphasis added). The applicants termed this allegedly new feature of generating a web page dynamically as generating a web page "on-the-fly." See id. at Col. 5, lines 21-24 ("In accordance with the said [sic] invention, it is not necessary to store all output files [i.e., web pages] as predefined HTML files. HTML output instructions are generated 'on-the-fly' in response to requests made by users."). However, the applicants were not the first to coin the phrase "on-the-fly" in connection with the dynamic generation of web pages.[8]

Furthermore, the advantages that flow from generating web pages on-the-fly were well recognized in the prior art prior to May 1995. For example, a message posted to a newsgroup in Feb. 1995 in connection with a discussion specifically about the advantages of generating web pages dynamically, stated:

> Dynamically generated HTML pages are extremely useful when displaying database contents on the Web. Rather than having thousands of unmaintainable HTML pages, it is better to use a database (whatever it may be) and display results of searches dynamically into HTML templates giving the user uniform interface via the Web.
>
> Also, this way - a cosmetic change to the page - such as change in express button layout or fixing a typo requires only modification of a single HTML file (template).

---

[8] See Posting of Mike Kelsey to comp.infosystems.www.providers (Nov. 10, 1994) (describing the website for the White House -- not an institution at the forefront of technological innovation -- using the common gateway interface (CGI) to generate pages "on the fly") (Rosenbloom Decl. Exh. I); see also Rosenbloom Decl. Exh. G (describing a website in which pages are "tailored to each user on the fly."); and Mike W. Miller, World Wide Web Development at Notre Dame: It's Easier to Ask Forgiveness Than Permission, Proceedings of the 22nd annual ACM SIGUCCS conference on User services (ACM Press 1994) at 169-172 ("We are developing a mechanism to serve custom home pages for users, generated on the fly ....") (Rosenbloom Decl. Exh. J).

Posting of Jiri Muselik to newsgroup comp.infosystems.www.providers (Feb. 5, 1995) (Rosenbloom Decl. Exh. K); see, also Rosenbloom Decl. Exh. D at 274 (noting that a web server configured to generate web pages dynamically is able to provide "customized user interfaces.").

Moreover, prior to May 1995, it was well known to use the technique of generating web pages on-the-fly to tailor a web page based on the preferences of the user requesting the web page. For example, prior to May 1995, a web page based electronic newspaper, which was developed by undergraduates at MIT and called "Fishwrap," automatically learned each user's newspaper section preferences and, for each user, personalized the web pages by laying out the news sections according to the user's section preferences. See Douglas B. Koen, Automated Restructuring of an Electronic Newspaper, SB EECS Thesis, MIT, Cambridge MA, May 1994 (Rosenbloom Decl. Exh. L). If one user liked to read the sports section first, then, for that user, the system would create a web page on-the-fly so that the sports news is presented at the top of the page, whereas, if another user prefers to read the comics first, then the page created for that user would have the comics positioned at the top of the web page.

If the description of the Fishwrap system sounds familiar to the description of the "My Online Journal" feature of the WSJ website, which Ablaise contends infringes the '737 patent, that is because the "My Online Journal" feature of the WSJ website is substantively identical to the Fishwrap system. As discussed above, the "My Online Journal" feature of the WSJ website creates and structures a personalized newspaper on-the-fly based on a user's stored preference information. Accordingly, if any claim of the '530 or '737 patent is construed to read on the My Online Journal feature, then that claim would be anticipated by the Fishwrap personalized online newspaper.

### C.    Claim Terms at Issue

Claim 1 of the '737 patent and claim 1 of the '530 patent are exemplary of the asserted

claims and contain all of the terms that need construction in this case.  Claim 1 of the '737 patent

provides:

> A method for serving pages of viewable data to browsing devices connected to a network, wherein a page of said viewable data comprises content data defining text and/or graphics and formatting data which specifies locations of said text and/or graphics within a page, and said viewable data is <u>displayed at a browsing device</u> such that locations of said text and/or graphics depend on said formatting data, said method comprising:
>
> identifying requests from browsing devices that define a request for specified content data;
>
> storing content data;
>
> <u>storing executable functions;</u>
>
> maintaining a user database comprising information relating to user preferences; and
>
> <u>in response to identifying a request for specified content data and a user identifier;</u>
>> (a) reading user preference information from said user database in response to a received user identifier;
>> (b) selecting stored content data in dependence upon the content data specified in a received request;
>> (c) <u>receiving format identifiers identifying the type of formatting required;</u>
>> (d) <u>selecting a set of stored functions in dependence upon a received format identifier and said read user information;</u> and
>> (e) <u>executing said set of functions to generate viewable data comprising said selected content data and formatting data.</u>

Rosenbloom Decl. Exh. A at Col. 19, line 65 – Col. 20, line 26 (emphasis added).

Claim 1 of the '530 patent provides:

> A method of serving output signals from a serving device to a plurality of browsing devices connected to a network, wherein said output signals represent commands executable by a browsing device so as to display viewable data in accordance with a specified page format; said method comprising steps of:
>
> <u>identifying requests from browsing devices that define a request for specified viewable data, said request including formatting type identification data;</u>
>
> <u>maintaining a plurality of formatting types of data defining respectively corresponding predetermined formats for portions of said viewable data;</u>

11

storing content data representing said viewable data;
selecting a specific part of said content data representing specific
    viewable data;
selecting a specific one of said types of formatting data in response
    to said formatting type identification data;
processing said content data and said formatting types of data so as
    to combine said selected part of said content data with said
    specific one of said types of formatting data, and for outputting
    processed viewable data with executable instructions; and
supplying output signals to the requesting browsing device derived
    from said output processed data,
in which said output signals represent commands executable by a
    browsing device so as to display said specific viewable data in
    accordance with a first specified page format when a first type
    of formatting data is selected and in a second specified page
    format when a second type of formatting data is selected.

Rosenbloom Decl. Exh. B at Col. 19, line 55 – Col. 20, line 19 (emphasis added).

## SUMMARY OF PROPOSED CLAIM CONSTRUCTIONS

As demonstrated in this brief, the claims of the '737 patent, when properly interpreted,

cover generating web pages "on-the-fly" in response to a request from a web browser by

selecting an indexed set of formatting functions that is identified by a format identifier included

in the request. The format identifier is separate and distinct from a user identifier, which is also

received from the web browser, and user preference information maintained by the web server.

The indexed set of formatting functions determines the content and appearance of the page.

Similarly, as demonstrated in this brief, the claims of the '530 patent, when properly

interpreted, cover generating web pages "on-the-fly" in response to a request from a web

browser by selecting from a table a file structure identified by an identifier included in the

request. The selected file structure determines the content and appearance of the page.

Dow Jones and Factiva request this Court to construe the claim terms identified below in

accordance with their plain meaning, the manner in which they are defined in the specification of

the two patents, and the statements made by the patent applicants during the prosecution of these

12

applications. Specifically, Dow Jones and Factiva ask this Court to construe the following terms
of the '737 and '530 patents to have the following meanings:

A.    **Terms from the '737 Patent:**

1.  **"Displayed at a browsing device"** means "visually represented on the screen of a
    browsing device."

2.  **"Storing executable functions"** means "storing a universal set of all the available
    functions, wherein each function has a name and comprises a set of function steps,
    each of which, when executed, creates a portion of code."

3.  **"In response to identifying a request for specified content data and a user
    identifier; (a) ... (e) ..."** means "performing steps (a) through (e) in response to
    identifying a request for specified content data and a user identifier, wherein the
    request was transmitted by a browsing device and includes a format identifier that is
    separate and distinct from the user identifier."

4.  **"Receiving format identifiers identifying the type of formatting required"** means
    "receiving two or more format identifiers, wherein the format identifiers are included
    in said identified request for specified content data and each format identifier is a
    sequence of one or more characters that uniquely identifies an indexed function
    string."

5.  **"Selecting a set of stored functions in dependence upon a received format
    identifier and said read user information"** means "selecting a particular indexed
    function string from a set of indexed function strings, wherein the selection is
    dependent on both a received format identifier <u>and</u> said read user information, which
    are separate and distinct." Accordingly, if a system selects the particular indexed

function string in dependence solely upon a format identifier or solely upon read user information, then that system is not covered by the claim.

6. **"Executing said set of functions to generate viewable data comprising said selected content data and formatting data"** means "executing the selected set of functions, wherein the execution of the selected function set causes formatting data to be combined with the selected content data, thereby generating viewable data, which formatting data specifies the location of the content data within a page."

**B.    Terms from the '530 Patent:**

1. **"Identifying requests from browsing devices that define a request for specified viewable data, said request including formatting type identification data"** means "identifying a request from a browsing device, wherein the request includes an identifier identifying certain viewable data and an identifier identifying a certain file structure."

2. **"Maintaining a plurality of formatting types of data defining respectively corresponding predetermined formats for portions of said viewable data"** means "storing, in a table, two or more file structures, each file structure defining a format for portions of the viewable data."

3. **"Selecting a specific one of said types of formatting data in response to said formatting type identification data"** means "choosing, from among the two or more file structures stored in the table, the file structure identified by the file structure identifier included in the request."

14

## ARGUMENT

### I.    LEGAL STANDARDS GOVERNING CLAIM CONSTRUCTION

The scope of a patent is determined by the enumerated claims set forth at the end of the patent. See Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1347 (Fed. Cir. 1998). "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005), cert. denied, 126 S.Ct. 1332 (2006) (citation omitted). A necessary first step in analyzing the infringement and validity of the patents-in-suit is for the Court to determine what the claims mean. Interpreting the claims of a patent is a question of law for the Court. Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).

Claim interpretation begins with the words of the claims. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). "Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." Phillips, 415 F.3d at 1314. The words of a claim are generally to be accorded their "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of invention." Phillips, 415 F.3d at 1313. See also Innova/Pure Water, Inc. v. Safari Water Filtration Sys., 381 F.3d 1111, 1116 (Fed. Cir. 2004) ("A court construing a patent claim seeks to accord a claim the meaning it would have to a person of ordinary skill in the art at the time of the invention.").

As recognized by the Federal Circuit in Phillips:

> the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.' Innova, 381 F.3d at 1116. Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.' Id.; see also

Gemstar-TV Guide Int'l, Inc. v. ITC, 383 F.3d 1352, 1364 (Fed. Cir. 2004); Vitronics, 90 F.3d at 1582-83; Markman, 52 F.3d at 979-80.

Phillips, 415 F.3d. at 1314.

In Phillips, the Federal Circuit reaffirmed the importance of the specification when interpreting claims. "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" Id. at 1315 (citation omitted). The importance of the specification in claim construction derives from the statutory requirement that the specification describe the claimed invention in "full, clear, concise, and exact terms." 35 U.S.C. § 112, para 1; Phillips, 415 F.3d at 1316. The specification is of particular importance because "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." Phillips, 415 F.3d at 1313.

In addition to consulting the patent specification, the court should also consider the patent's prosecution history. The prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it otherwise would be." Phillips, 415 F.3d. at 1317. See also Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term … in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."). Often the prosecution history is of critical significance in determining the meaning of the claims. Vitronics, 90 F.3d at 1582; Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995). "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during

prosecution." Southwall Techs., v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir.), cert. denied, 516 U.S. 987 (1995). Moreover, as in the specification, a patent application can indicate in the prosecution history that a term should have a special meaning. Vitronics, 90 F.3d at 1582.

Evidence other than the claims, the specification and prosecution history ("extrinsic evidence") may be admissible to explain scientific principles, the meaning of technical terms and terms of art, and demonstrate the state of prior art. See Markman, 52 F.3d at 980; and Phillips, 415 F.3d at 1317; Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309 (Fed. Cir. 1999). Extrinsic evidence, however, "may not be used to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history." Bell Atl. Network Servs. v. Covad Communs. Group, Inc., 262 F.3d 1258, 1269 (Fed. Cir. 2001).

If the "disputed term has 'no previous meaning to those of ordinary skill in the prior art, its meaning, then, must be found elsewhere in the patent.'" Irdeto Access, Inc. v. Echostar Satellite Corp., 383 F.3d 1295, 1300 (Fed. Cir. 2004) (citation omitted). Absent an accepted meaning in the art, a term is construed only as broadly as provided for by the patent. Id.; see also On Demand Mach. Corp. v. Ingram Indus., 442 F.3d 1331, 1340 (Fed. Cir. 2006), cert. denied, 127 S.Ct. 683 (2006) ("[T]he role of the specification is to describe and enable the invention. In turn, the claims cannot be of broader scope than the invention that is set forth in the specification."); and Cooper Cameron Corp. v. Kvaerner Oilfield Prods., 291 F.3d 1317, 1323 (Fed. Cir. 2002) ("[I]n Gentry, we applied and merely expounded upon the unremarkable proposition that a broad claim is invalid when the entirety of the specification clearly indicates that the invention is of a much narrower scope.").

Claims must be construed the same way for the issues of infringement and validity. Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1330 (Fed. Cir. 2003). In addition,

17

when different claims of patent recite the same terms or phrases, those terms and phrases must be interpreted in the same way in each claim. Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001).

## II.    CONSTRUCTION OF TERMS IN CLAIMS OF THE '737 PATENT

### A.    Claim 1

#### 1. "Displayed at a browsing device"

The term "displayed at a browsing device" would be understood by the person of ordinary skill in the art at the time of the invention to mean "visually represented on the screen of a browsing device." Support for this interpretation is found in the claim language and in the ordinary meaning of the word "displayed."

"Display" means "a visual representation of data, as on a computer video screen." Webster's New World Dictionary, Third College Edition, 1988. Nothing in the claims, specification or file history indicate that this term has a special meaning in the '737 patent. Rather, all the intrinsic sources to be consulted in construing the meaning of a claim term confirm that the term "displayed at a browsing device" should be given its ordinary and customary meaning.

The context of the claim itself confirms that the Plaintiffs' construction is proper. For example, the preamble of claim 1 of the '737 patent states, "said *viewable data* is displayed at a browsing device." Rosenbloom Decl. Exh. A at Col. 20, lines 2-3. Viewable data is, by its very nature, capable of being visually represented on the screen of the browsing device and seen by the user. The specification further confirms this construction by demonstrating that the "viewable data" is visually represented on the screen of the browsing device: "FIG. 7 illustrates a typical display shown on the visual display unit identified in FIG. 6, in response to instructions

being supplied to the user from a server." Id. at Col. 6, lines 3-5. The specification also states, "[t]he video signal is supplied to the monitor 602, resulting in the human viewable information being displayed on the monitor in a form derived from the HTML instructions supplied to the browser as executed by the browser itself." Id. at Col. 9, lines 54-58. Finally, the file history does not indicate that the term "displayed at a browsing device" should be construed to mean anything other than "visually represented on the screen of a browsing device."

## 2. "Storing executable functions"[9]

The term "storing executable functions" would be understood by the person of ordinary skill in the art at the time of the invention to mean "storing a universal set of all available functions, wherein each function has a name and consists of a set of function steps (i.e., instructions), each of which, when executed, creates a portion of code (e.g., HTML code)." Support for this interpretation is found in the specification of the '737 patent and the ordinary meaning of the term "function."

The '737 patent specification provides that the described system creates web pages "on-the-fly" by: (1) storing a universal family set of all available functions, and (2) executing a list of functions (i.e., a "function string") selected from the universal set of functions in response to a request from a browser. Specifically, the specification states,

> In accordance with the present system, it is possible for … the HTML instructions [i.e., web page] to be generated on-the-fly, as requests are made by browsing clients. Thus, the generation of [a web page] … becomes an automated technical process performed in response to strings of code generated functions stored at the server.
>
> HTML output pages are created by assembling portions of HTML instructions …
>
> Each portion of output HTML instructions is created by executing a particular function. This function is arranged to … [retrieve] viewable

---

[9] This term also appears in independent claim 4 of the '737 patent.