# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DOW JONES & COMPANY, INC. )
200 Liberty St. )
New York, New York  10281 )
 )    **Civil Action No. 1:06CV01014**
    Plaintiff, )
   v. )    **Judge James Robertson**
 )
ABLAISE LTD ("Ablaise") )
40 Queen Anne Street )
London W1G 9EL, )
United Kingdom )
and )
GENERAL INVENTIONS )
INSTITUTE A, INC., ("GIIA") )
Craigmuir Chambers, P.O. Box 71 )
Town Road )
Tortola, British Virgin Islands )
 )
    Defendants. )

DOW JONES REUTERS )
BUSINESS INTERACTIVE, LLC. )
200 Liberty St. )
New York, New York  10281 )
 )    **Civil Action No. 1:06CV01015**
    Plaintiff, )
   v. )    **Judge James Robertson**
 )
ABLAISE and GIIA )
    Defendants. )

## MOTION OF PLAINTIFFS DOW JONES & COMPANY, INC. AND DOW JONES REUTERS BUSINESS INTERACTIVE, LLC CONCERNING CLAIM CONSTRUCTION

Pursuant to this Court's Orders of November 3, 2006 and December 28, 2006,

**PLAINTIFFS DOW JONES & COMPANY, INC. AND DOW JONES REUTERS**

**BUSINESS INTERACTIVE, LLC** hereby move for a <u>Markman</u> Order construing the claims of

the patents-in-suit in accordance with the accompanying Brief.

ROTHWELL, FIGG, ERNST & MANBECK

/s/ Steven Lieberman
Steven Lieberman (439783)
Joseph A. Hynds  (440464)
Brian Rosenbloom (461413)
1425 K Street, NW; Suite 800
Washington, DC  20005
Tel: (202) 783-6040
*Attorneys for Plaintiff*
*Dow Jones & Company, Inc.*

DORSEY & WHITNEY, L.L.P.

Creighton R. Magid (476961)
1001 Pennsylvania Avenue, NW
Suite 400
Washington, DC 20004-2505
Tel: (202) 442-3555
*Attorneys for Plaintiff*
*Dow Jones Reuters Business Interactive,*
*LLC*

January 5, 2007

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DOW JONES & COMPANY, INC.  )
200 Liberty St.  )
New York, New York  10281  )
  )    **Civil Action No. 1:06CV01014**
      Plaintiff,  )
    v.  )    **Judge James Robertson**
  )
ABLAISE LTD ("Ablaise")  )
40 Queen Anne Street  )
London W1G 9EL,  )
United Kingdom  )
and  )
GENERAL INVENTIONS  )
INSTITUTE A, INC., ("GIIA")  )
Craigmuir Chambers, P.O. Box 71  )
Town Road  )
Tortola, British Virgin Islands  )
  )
_____Defendants._____)

DOW JONES REUTERS  )
BUSINESS INTERACTIVE, LLC.  )
200 Liberty St.  )
New York, New York  10281  )
  )    **Civil Action No. 1:06CV01015**
      Plaintiff,  )
    v.  )    **Judge James Robertson**
  )
ABLAISE and GIIA  )
_____Defendants._____)

## OPENING BRIEF OF PLAINTIFFS DOW JONES & COMPANY, INC. AND DOW JONES REUTERS BUSINESS INTERACTIVE, LLC CONCERNING CLAIM CONSTRUCTION

ROTHWELL, FIGG, ERNST &
MANBECK

Steven Lieberman (439783)
Joseph A. Hynds  (440464)
Brian Rosenbloom (461413)
1425 K Street, NW; Suite 800
Washington, DC  20005
Tel: (202) 783-6040
*Attorneys for Plaintiff*
*Dow Jones & Company, Inc.*

DORSEY & WHITNEY, L.L.P.

Creighton R. Magid (476961)
1001 Pennsylvania Avenue, NW
Suite 400
Washington, DC 20004-2505
Tel: (202) 442-3555
*Attorneys for Plaintiff*
*Dow Jones Reuters Business Interactive,*
*LLC*

January 5, 2007

## TABLE OF CONTENTS

NATURE OF THE PROCEEDINGS ................................................................. 1

INTRODUCTION ........................................................................................ 2

    A.    Background ....................................................................................... 2

    B.    Brief Description of the Patented Technology and Prior Art Technology ................ 4

    C.    Claim Terms at Issue ...................................................................... 11

SUMMARY OF PROPOSED CLAIM CONSTRUCTIONS ....................................... 12

    A.    Terms from the '737 Patent: ............................................................ 13

    B.    Terms from the '530 Patent: ............................................................ 14

ARGUMENT ............................................................................................. 15

I.     LEGAL STANDARDS GOVERNING CLAIM CONSTRUCTION ........................... 15

II.    CONSTRUCTION OF TERMS IN CLAIMS OF THE '737 PATENT ....................... 18

    A.    Claim 1 ....................................................................................... 18

           1.    "Displayed at a browsing device" ............................................. 18

           2.    "Storing executable functions" ................................................. 19

           3.    "In response to identifying a request for specified content data and a user
               identifier; (a) ... (e) ..." ........................................................ 23

               a.    The webpage is generated in response to a request ...................... 23
                    from a browsing device ........................................................ 23

               b.    The request from the browsing device must include a format identifier that
                    is separate and distinct from the user identifier. ........................ 25

           4.    "Receiving format identifiers identifying the type of formatting required" ...... 29

               a.    "Receiving format identifiers" ............................................... 29

               b.    "A format identifier identifying the type of formatting required" ............... 31

5. "Selecting a set of stored functions in dependence upon a received format identifier and said read user information" ...................................................36

   a. "Selecting a set of stored functions." ...................................................... 36

   b. "In dependence upon a received format identifier and said read user information" ................................................................................. 38

   c. "A received format identifier" ............................................................ 40

6. "Executing said set of functions to generate viewable data comprising said selected content data and formatting data" ...................................................40

III. CONSTRUCTION OF TERMS IN CLAIMS OF THE '530 PATENT .......................... 42

   A. Claim 1 ...................................................................................................... 42

     1. "Identifying requests from browsing devices that define a request for specified viewable data, said request including formatting type identification data" ...................................................................................... 42

     2. "Maintaining a plurality of formatting types of data defining respectively corresponding predetermined formats for portions of said viewable data" .........................................................................................44

     3. "Selecting a specific one of said types of formatting data in response to said formatting type identification data" ................................................45

# TABLE OF AUTHORITIES

## Cases

Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1330 (Fed. Cir. 2003) ................. 18

Applera Corp. v. Micromass UK Ltd., 186 F. Supp. 2d 487 (D. Del. 2002) ................................ 31

Bell Atl. Network Servs. v. Covad Communs. Group, Inc., 262 F.3d 1258, 1269
    (Fed. Cir. 2001) ......................................................................................................................... 18

CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG, 224 F.3d 1308, 1317
    (Fed. Cir. 2000) ......................................................................................................................... 32

Cooper Cameron Corp. v. Kvaerner Oilfield Prods., 291 F.3d 1317, 1323 (Fed. Cir. 2002) ....... 18

Gemstar-TV Guide Int'l, Inc. v. ITC, 383 F.3d 1352, 1364 (Fed. Cir. 2004) ............................. 16

Innova/Pure Water, Inc. v. Safari Water Filtration Sys., 381 F.3d 1111, 1116 (Fed. Cir. 2004) . 16

Irdeto Access, Inc. v. Echostar Satellite Corp., 383 F.3d 1295, 1300 (Fed. Cir. 2004) ............... 18

Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1347 (Fed. Cir. 1998) .......................................... 15

Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996) .................................................... 15

Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995) .............................. 17

Medrad, Inc. v. MRI Devices Corp., 401 F.3d 1313, 1319 (Fed. Cir. 2005) ............................... 17

On Demand Mach. Corp. v. Ingram Indus., 442 F.3d 1331, 1340 (Fed. Cir. 2006) .................... 18

Papst Licensing GmbH v. Sunonwealth Elec. Mach., 2004 U.S. Dist. Lexis 4402, *24
    (N.D. Ill. 2004) ......................................................................................................................... 31

Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005), cert. denied,
    126 S.Ct. 1332 (2006) ............................................................................................................... 15

Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309 (Fed. Cir. 1999) .................... 18

Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001) ..................................... 19

Superior Fireplace Co., v. Majestic Prods. Co., 270 F. 3d 1358, 1375-76 (Fed. Cir. 2001) ........ 31

Techs., v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir.), cert. denied, 516 U.S. 987 (1995).. 17

Unitherm Food Sys. v. Swift-Eckrich, Inc., 375 F.3d 1341, 1351 (Fed. Cir. 2004)..................... 17

Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ............................. 15

Wang Labs., Inc. v. Am. Online, Inc., 197 F.3d 1377, 1383 (Fed. Cir. 1999) ............................ 18

**Statutes**

35 U.S.C. § 112, para 1 ....................................................................................................... 16

## NATURE OF THE PROCEEDINGS

These are actions instituted by Plaintiffs, Dow Jones & Company ("Dow Jones") and Dow Jones Reuters Business Interactive, LLC d/b/a Factiva ("Factiva"), against Defendants Ablaise Ltd. ("Ablaise") and General Inventions Institute A ("GIIA"), seeking a declaratory judgment that U.S. Patent No. 6,961,737 (the "'737 patent") (Rosenbloom Decl. Exh. A) and U.S. Patent No. 6,295,530 (the "'530 patent") (Rosenbloom Decl. Exh. B) (collectively the "Patents") are invalid and/or not-infringed by the Plaintiffs.[1]

Pursuant to this Court's Scheduling Orders, Dow Jones and Factiva submit this Opening Brief concerning claim construction in preparation for the Markman hearing scheduled in both cases on May 17, 2007.

As set forth below, Dow Jones and Factiva ask this Court to construe nine phrases found in the independent claims of the two patents in suit (six in the '737 patent and three in the '530 patent). The proposed claim constructions are based on the plain language of the claims themselves, the language of the common specification of the two patents and statements made by the patent applicants during the prosecution of those two applications. Construction of these terms as outlined below will, Plaintiffs submit, permit this Court to rule on summary judgment that neither Dow Jones nor Factiva infringes any claims of the patents-in-suit.[2]

---

[1] In its complaint for Declaratory Relief, Factiva seeks a declaratory judgment of non-infringement and invalidity only with respect to the '737 patent. Defendants' counterclaim in that action asserts only that Factiva infringes the '737 patent.

[2] As a matter of law, if an accused infringer does not infringe an independent claim then it cannot infringe a claim which depends from that independent claim, since such dependent claim is necessarily not broader than the independent claim from which it depends.

## INTRODUCTION

### A.     Background

The '737 and '530 patents are business method patents related to the personalization of web pages. [3] Ablaise accuses the Wall Street Journal (WSJ) website (www.wsj.com) and the MarketWatch website (www.marketwatch.com), both of which are owned by Dow Jones, of infringing the '737 patent. Although Ablaise's counterclaim also identifies the '530 patent as being infringed by Dow Jones, Ablaise has yet to identify any particular product or feature that it contends infringes the '530 patent. Ablaise also accuses the Factiva website (www.factiva.com) of infringing the '737 patent.

With respect to the WSJ website, Ablaise accuses the "My Online Journal" feature of infringing the '737 patent. The "My Online Journal" feature enables a user to create a personalized electronic newspaper by specifying the type of content the user would like to read as well as the ordering of the content on the page. For example, a user may specify that he would like his personalized newspaper to include: (a) all stories that mention IBM, (b) columns written by Walt Mossberg, and (c) stories related to computer hardware. The user can further specify that he would like the Mossberg columns to appear first, the IBM stories to appear second, and the computer hardware stories to appear last.

With respect to the MarketWatch website, Ablaise accuses the "My Portfolio" feature of infringing the '737 patent. The "My Portfolio" feature enables a user to retrieve data from a

---

[3] The '737 patent issued from U.S. Pat. Application No. 09/920,803 (the "'737 Application") and is a continuation of the '530 patent, which issued from U.S. Pat. Application No. 08/647,769 (the "'530 Application"), which claims priority to GB Patent No. 9509828, filed on May 15, 1995. The drawings and written description (what is commonly referred to as the "specifications") for the '737 and '530 patents appear to be identical. For this reason, reference in this brief to the specifications of the two patents will typically be made only by citing to the relevant material in the '737 Patent. The '737 and '530 Patents are attached to the accompanying declaration of Brian Rosenbloom ("Rosenbloom Decl.") as Exhibits A and B respectively.

database of stock information by executing a specific database query (or "view") that was previously created and saved by the user.

Finally, Ablaise accuses the Factiva website of infringing the '737 Patent. The Factiva website permits users to retrieve data pertaining to topics of interest from a database of information maintained by Factiva. The user is able to specify and save his or her topics of interest. Thereafter, the user can track the latest news concerning the specified topics by visiting the Factiva website.

Ablaise is a patent holding company whose

> "sole business is the licensing and enforcement of its alleged patent rights. . . . [Ablaise does] not make or sell any products or provide any services beyond [its] activities relating to [its] alleged patent portfolio."

Defendants' Answer, Counterclaims and Jury Demand ("Answer") at paragraph 10.

In addition to accusing Dow Jones and Factiva of infringing the Patents, Ablaise has sent patent infringement notice letters to scores of entities that provide websites with personalization features. Ablaise has brought patent infringement suits against several of these entities, including Salesforce.com, E-Trade, CDW Corp., J&R Electronics, Lycos, Bank of America, and Wegmans Food Market. Based on Ablaise's accusations of infringement, it appears Ablaise has taken the position that any website that personalizes a web page based on stored user preference information infringes at least the '737 patent.

Like Dow Jones and Factiva, several of the entities that have received the infringement notice letters have filed declaratory judgment actions seeking a judgment that the Patents are invalid and/or not infringed. Currently, the '737 and '530 patents are involved in 6 active litigations (two in California, one in Massachusetts, two in the District of Columbia, and one in

3

Delaware). A <u>Markman</u> hearing has not been held yet in any of these pending litigations, nor has any <u>Markman</u> hearing been held in any of the litigations that have settled.

**B.    Brief Description of the Patented Technology and Prior Art Technology**

The '737 and '530 patents describe a "web server" that is programmed to generate web pages dynamically. A "web server" is simply a computer that is connected to the Internet and configured to receive requests from web browsers (e.g., the Internet Explorer web browser provided by Microsoft or the Netscape web browser). In response to receiving a request from a web browser, the web server transmits a hypertext markup language (HTML) file (or "web page") to the requesting web browser. A web browser is sometimes referred to as simply a "client," and a web server is sometimes referred to as simply a "server."

When the World-Wide-Web ("Web") was first created in about 1990, the requests transmitted by a web browser to a web server merely identified a specific HTML file stored at the web server. The web server would respond to the request by simply retrieving the identified HTML file and transmitting the file to the browser. This process is illustrated in the diagram below.



In this illustration, the end user has a personal computer (PC) that executes a web browser. The end user may cause the web browser to transmit a request to the web server by, for example, clicking on a hyperlink. The request identifies a specific HTML file (<u>i.e.</u>, HTML file

4

#1).  The server, in response to receiving the request, retrieves the identified HTML file (i.e.,

HTML file #1) from the file storage device (e.g., computer hard drive) and transmits the file to

the browser running on the end user's PC.  The browser will then process the HTML file and

display the web page defined by the HTML file.

As illustrated and described above, when the Web was first created, all web pages were

static (i.e., the web pages were stored in pre-existing HTML files).  As the name implies, these

pre-existing HTML files typically contained text interspersed with HTML commands or "tags",

some of which define a hyperlink to another pre-existing HTML file.  When a user clicked on the

hyperlink, the browser would send a request identifying the HTML file to a web server.  In this

way, web pages were "linked" together and a user could browse (or "surf") the Web by

following these links.  See Kevin Hughes, Entering the World-Wide Web: A Guide to

Cyberspace, ACM SIGLINK Newsletter Vol. III, No. 1, 4-8 (1994) (Rosenbloom Decl. Exh. C).

Shortly after the creation of the Web (at least as early as 1993), people began creating

"gateway" programs that enabled an end user to use his web browser to access information

stored in a database, as opposed to stored in a static HTML file.[4]  Indeed, the '737 Patent

specifically discusses that gateway programs were in the prior art.  See Rosenbloom Decl. Exh.

A at Col. 8, lines 24-29.  The way these "gateway" programs worked is as follows.  An end user

would cause his/her browser to transmit a request to the web server as usual, but the request

would identify a specific gateway program rather than a specific pre-existing HTML file.

Typically, the request would also identify the user as well as the information the end user wanted

---

[4] See Steve Putz, Interactive information services using World-Wide Web hypertext, Computer Networks and ISDN
Systems, 27, 273-280 (1994) (Rosenbloom Decl. Exh. D);  Charles Ames et al., Automating Testbed Documentation
and Database Access  Using World Wide Web (WWW) Tools, Third International Symposium on Space Mission
Operations and Ground Data Systems Part 2, NASA CP-3281 (1994) (Rosenbloom Decl. Exh. E); and Posting of
Jim Davis to www-talk entitled a Gateway to the U Mich Geography server (Nov. 18, 1992) available at
http://ksi.cpsc.ucalgary.ca/archives/WWW-TALK/www-talk-1992.messages/307.html (Rosenbloom Decl. Exh. F).

to access from the database. The web server, in response to receiving the request, would pass the request to the identified gateway program and then wait for a response from the gateway. While the web server waits for the response, the gateway retrieves the requested data from the database and formats the data by adding HTML tags to the data, thereby creating an HTML document (i.e., a web page) dynamically. The gateway then provides the dynamically generated HTML document to the web server, which simply relays the HTML document to the end user's web browser. This process is illustrated in the diagram below.



In this illustration, the end user causes the web browser to transmit a request to the web server, which request identifies a specific gateway (i.e., gateway #3). The web server, in response to receiving the request, passes the request to the gateway. After receiving the request, the gateway retrieves data from a database and formats the data by adding HTML tags to the data, thereby creating an HTML file. This gateway-generated HTML file is provided to the web server, which relays the HTML file to the end user's web browser. The browser will then process the HTML file and display the web page defined by the HTML file. In this manner, a person can use a standard web browser to access information stored in any database (e.g., a database located half-way around the world). See Rosenbloom Decl. Exh. C.

The '737 and '530 patents describe a web server that generates HTML files dynamically in much the same manner as described above with respect to the gateways. However, instead of

using a gateway program to retrieve data from a database and add HTML tags to the data, the system disclosed in the Patents uses an indexed "string of formatting functions," which the Patents refer to as an indexed "function string."[5]

A function string consists of a list of formatting functions, and a formatting function consists of a set of instructions ("function steps"), each of which, when executed, produces a small portion of a web page.  See Rosenbloom Decl. Exh. A at Col. 13, lines 3-4 ("The formatting functions are arranged to generate small portions of HTML code").  According to the Patents, a table (a.k.a., a "string list store," see Rosenbloom Decl. Exh. A at Figure 11) is used to store and index the function strings.[6]  This feature of the Patents is illustrated below.

| String List Store | |
|---|---|
| Index | Function String |
| 001 | FS1 (f1, f2, f4) |
| 002 | FS2 (f5, f7) |
| 003 | FS3 (f1,f9,f11) |

As the above table indicates, three indexed function strings (i.e., function string FS1, FS2, and FS3) are stored in the example "string list store."  As further illustrated, function string FS1 includes formatting functions f1, f2, and f4, and is associated with index value 001; function string FS2 includes formatting functions f5 and f7, and is associated with index value 002; and function string FS3 includes formatting functions f1, f9 and f11, and is associated with index value 003.

---

[5] Rosenbloom Decl. Exh. A ('737 Patent) at Col. 13, lines 10-11 ("HTML code is produced by sequentially executing a string of formatting functions and the pre-processing step consists of arranging such function strings such that a particular function string, arranged to generate a HTML page, may be quickly sought and executed during on-line operation.").
[6] Rosenbloom Decl. Exh. A at Col. 15, lines 24-28 ("Thus, the string list store 1103 includes a string index portion 1106 and the actual string list portion 1107. Function strings are added to the string list portion 1107 at step 907 of FIG. 9 with their related index reference being added to portion 1106 at step 908.").

In order for the system disclosed in the Patents to generate an HTML file dynamically using an indexed function string, the system requires that the request transmitted from the web browser include an index value associated with the function string. <u>See</u> Rosenbloom Decl. Exh. A at Col. 18, lines 24-28. When the web server receives such a request, the web server (1) retrieves from the "string list store" the function string associated with the index value, (2) executes the function string, thereby generating an HTML file, and (3) transmits the generated HTML file to the requesting web browser. Thus, for example, if a request from a web browser includes index value 002, then the web server, in response to receiving the request, would retrieve and execute function string FS2 (<u>i.e.</u>, the function string that is associated with index value 002), thereby generating a particular HTML file.

The specification of the Patents teaches that the feature of indexing function strings is a critical feature of the invention. Specifically, after the '737 Patent describes several different web page personalization capabilities of the disclosed web server, it states:

> [i]t can be appreciated that the possibilities are endless .... [t]his is all provided by the fact that the actual HTML pages supplied back to the users are generated "on-the-fly" <u>by indexing</u> locations within databases.

Rosenbloom Decl. Exh. A at Col. 17, line 66-Col. 18, line 2 (emphasis added). Thus, the specification makes clear that indexing is a critical feature of the invention.

Although gateway programs that generated web pages dynamically were in common use prior to the effective filing date of the patents in suit (<u>i.e.</u>, May 1995)[7], the patent applicants contend they were the first to conceive a web server that could generate a web page dynamically,

---

[7] <u>See</u> footnote 2, *supra*; <u>see</u> also Jason Romney, <u>The Pharisees Have Entered The Net</u>, The Age, Sept. 27, 1994 at 24 ("The dictionary features a 'particularly nifty interface ... with text pages being tailored to each user on the fly.'") (Rosenbloom Decl. Exh. G); and Posting of Rebecca Sims to utexas.class.tc659b-edge , entitled <u>Japan Window</u> (March 31, 1995) ("To deal [with] the dynamic nature of the event information ... 'virtual' pages generated on the fly. ") (Rosenbloom Decl. Exh. H).

as opposed to merely retrieving from storage a pre-created web page (i.e., a static web page).

Specifically, the '737 patent states, "[p]reviously, *all* HTML pages were constructed and stored

as such, thereby making them available when requests were issued by clients." See Rosenbloom

Decl. Exh. A at Col. 10, lines 56-58 (emphasis added); and Col. 4, lines 58-59 (discussing the

prior art and noting that in the prior art "each [web] page viewed by a client *must be pre-created*

...") (emphasis added). The applicants termed this allegedly new feature of generating a web

page dynamically as generating a web page "on-the-fly." See id. at Col. 5, lines 21-24 ("In

accordance with the said [sic] invention, it is not necessary to store all output files [i.e., web

pages] as predefined HTML files. HTML output instructions are generated 'on-the-fly' in

response to requests made by users."). However, the applicants were not the first to coin the

phrase "on-the-fly" in connection with the dynamic generation of web pages.[8]

    Furthermore, the advantages that flow from generating web pages on-the-fly were well

recognized in the prior art prior to May 1995. For example, a message posted to a newsgroup in

Feb. 1995 in connection with a discussion specifically about the advantages of generating web

pages dynamically, stated:

> Dynamically generated HTML pages are extremely useful when
> displaying database contents on the Web. Rather than having
> thousands of unmaintainable HTML pages, it is better to use a
> database (whatever it may be) and display results of searches
> dynamically into HTML templates giving the user uniform
> interface via the Web.
>
> Also, this way - a cosmetic change to the page - such as change in
> express button layout or fixing a typo requires only modification of
> a single HTML file (template).

---

[8] See Posting of Mike Kelsey to comp.infosystems.www.providers (Nov. 10, 1994) (describing the website for the White House -- not an institution at the forefront of technological innovation -- using the common gateway interface (CGI) to generate pages "on the fly") (Rosenbloom Decl. Exh. I); see also Rosenbloom Decl. Exh. G (describing a website in which pages are "tailored to each user on the fly."); and Mike W. Miller, World Wide Web Development at Notre Dame: It's Easier to Ask Forgiveness Than Permission, Proceedings of the 22nd annual ACM SIGUCCS conference on User services (ACM Press 1994) at 169-172 ("We are developing a mechanism to serve custom home pages for users, generated on the fly ....") (Rosenbloom Decl. Exh. J).

Posting of Jiri Muselik to newsgroup comp.infosystems.www.providers (Feb. 5, 1995) (Rosenbloom Decl. Exh. K); see, also Rosenbloom Decl. Exh. D at 274 (noting that a web server configured to generate web pages dynamically is able to provide "customized user interfaces.").

Moreover, prior to May 1995, it was well known to use the technique of generating web pages on-the-fly to tailor a web page based on the preferences of the user requesting the web page. For example, prior to May 1995, a web page based electronic newspaper, which was developed by undergraduates at MIT and called "Fishwrap," automatically learned each user's newspaper section preferences and, for each user, personalized the web pages by laying out the news sections according to the user's section preferences. See Douglas B. Koen, Automated Restructuring of an Electronic Newspaper, SB EECS Thesis, MIT, Cambridge MA, May 1994 (Rosenbloom Decl. Exh. L). If one user liked to read the sports section first, then, for that user, the system would create a web page on-the-fly so that the sports news is presented at the top of the page, whereas, if another user prefers to read the comics first, then the page created for that user would have the comics positioned at the top of the web page.

If the description of the Fishwrap system sounds familiar to the description of the "My Online Journal" feature of the WSJ website, which Ablaise contends infringes the '737 patent, that is because the "My Online Journal" feature of the WSJ website is substantively identical to the Fishwrap system. As discussed above, the "My Online Journal" feature of the WSJ website creates and structures a personalized newspaper on-the-fly based on a user's stored preference information. Accordingly, if any claim of the '530 or '737 patent is construed to read on the My Online Journal feature, then that claim would be anticipated by the Fishwrap personalized online newspaper.

### C.    Claim Terms at Issue

Claim 1 of the '737 patent and claim 1 of the '530 patent are exemplary of the asserted

claims and contain all of the terms that need construction in this case.  Claim 1 of the '737 patent

provides:

> A method for serving pages of viewable data to browsing devices connected to a
> network, wherein a page of said viewable data comprises content data defining text
> and/or graphics and formatting data which specifies locations of said text and/or
> graphics within a page, and said viewable data is displayed at a browsing device such
> that locations of said text and/or graphics depend on said formatting data, said method
> comprising:
> identifying requests from browsing devices that define a request for specified
>     content data;
> storing content data;
> storing executable functions;
> maintaining a user database comprising information relating to user preferences;
>     and
> in response to identifying a request for specified content data and a user identifier;
>     (a) reading user preference information from said user database in response to
>         a received user identifier;
>     (b) selecting stored content data in dependence upon the content data specified
>         in a received request;
>     (c) receiving format identifiers identifying the type of formatting required;
>     (d) selecting a set of stored functions in dependence upon a received format
>         identifier and said read user information; and
>     (e) executing said set of functions to generate viewable data comprising said
>         selected content data and formatting data.

Rosenbloom Decl. Exh. A at Col. 19, line 65 – Col. 20, line 26 (emphasis added).

Claim 1 of the '530 patent provides:

> A method of serving output signals from a serving device to a
> plurality of browsing devices connected to a network, wherein said
> output signals represent commands executable by a browsing device
> so as to display viewable data in accordance with a specified page
> format; said method comprising steps of:
> identifying requests from browsing devices that define a request
>     for specified viewable data, said request including formatting
>     type identification data;
> maintaining a plurality of formatting types of data defining
>     respectively corresponding predetermined formats for portions
>     of said viewable data;

storing content data representing said viewable data;

selecting a specific part of said content data representing specific viewable data;

selecting a specific one of said types of formatting data in response to said formatting type identification data;

processing said content data and said formatting types of data so as to combine said selected part of said content data with said specific one of said types of formatting data, and for outputting processed viewable data with executable instructions; and

supplying output signals to the requesting browsing device derived from said output processed data,

in which said output signals represent commands executable by a browsing device so as to display said specific viewable data in accordance with a first specified page format when a first type of formatting data is selected and in a second specified page format when a second type of formatting data is selected.

Rosenbloom Decl. Exh. B at Col. 19, line 55 – Col. 20, line 19 (emphasis added).

## SUMMARY OF PROPOSED CLAIM CONSTRUCTIONS

As demonstrated in this brief, the claims of the '737 patent, when properly interpreted, cover generating web pages "on-the-fly" in response to a request from a web browser by selecting an indexed set of formatting functions that is identified by a format identifier included in the request. The format identifier is separate and distinct from a user identifier, which is also received from the web browser, and user preference information maintained by the web server. The indexed set of formatting functions determines the content and appearance of the page.

Similarly, as demonstrated in this brief, the claims of the '530 patent, when properly interpreted, cover generating web pages "on-the-fly" in response to a request from a web browser by selecting from a table a file structure identified by an identifier included in the request. The selected file structure determines the content and appearance of the page.

Dow Jones and Factiva request this Court to construe the claim terms identified below in accordance with their plain meaning, the manner in which they are defined in the specification of the two patents, and the statements made by the patent applicants during the prosecution of these

12

applications. Specifically, Dow Jones and Factiva ask this Court to construe the following terms of the '737 and '530 patents to have the following meanings:

**A.    Terms from the '737 Patent:**

1. **"Displayed at a browsing device"** means "visually represented on the screen of a browsing device."

2. **"Storing executable functions"** means "storing a universal set of all the available functions, wherein each function has a name and comprises a set of function steps, each of which, when executed, creates a portion of code."

3. **"In response to identifying a request for specified content data and a user identifier; (a) ... (e) ..."** means "performing steps (a) through (e) in response to identifying a request for specified content data and a user identifier, wherein the request was transmitted by a browsing device and includes a format identifier that is separate and distinct from the user identifier."

4. **"Receiving format identifiers identifying the type of formatting required"** means "receiving two or more format identifiers, wherein the format identifiers are included in said identified request for specified content data and each format identifier is a sequence of one or more characters that uniquely identifies an indexed function string."

5. **"Selecting a set of stored functions in dependence upon a received format identifier and said read user information"** means "selecting a particular indexed function string from a set of indexed function strings, wherein the selection is dependent on both a received format identifier <u>and</u> said read user information, which are separate and distinct." Accordingly, if a system selects the particular indexed

function string in dependence solely upon a format identifier or solely upon read user information, then that system is not covered by the claim.

6. **"Executing said set of functions to generate viewable data comprising said selected content data and formatting data"** means "executing the selected set of functions, wherein the execution of the selected function set causes formatting data to be combined with the selected content data, thereby generating viewable data, which formatting data specifies the location of the content data within a page."

**B.    Terms from the '530 Patent:**

1. **"Identifying requests from browsing devices that define a request for specified viewable data, said request including formatting type identification data"** means "identifying a request from a browsing device, wherein the request includes an identifier identifying certain viewable data and an identifier identifying a certain file structure."

2. **"Maintaining a plurality of formatting types of data defining respectively corresponding predetermined formats for portions of said viewable data"** means "storing, in a table, two or more file structures, each file structure defining a format for portions of the viewable data."

3. **"Selecting a specific one of said types of formatting data in response to said formatting type identification data"** means "choosing, from among the two or more file structures stored in the table, the file structure identified by the file structure identifier included in the request."

# ARGUMENT

## I.    LEGAL STANDARDS GOVERNING CLAIM CONSTRUCTION

The scope of a patent is determined by the enumerated claims set forth at the end of the patent. See Laitram Corp. v. NEC Corp., 163 F.3d 1342, 1347 (Fed. Cir. 1998). "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005), cert. denied, 126 S.Ct. 1332 (2006) (citation omitted). A necessary first step in analyzing the infringement and validity of the patents-in-suit is for the Court to determine what the claims mean. Interpreting the claims of a patent is a question of law for the Court. Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).

Claim interpretation begins with the words of the claims. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996). "Quite apart from the written description and the prosecution history, the claims themselves provide substantial guidance as to the meaning of particular claim terms." Phillips, 415 F.3d at 1314. The words of a claim are generally to be accorded their "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of invention." Phillips, 415 F.3d at 1313. See also Innova/Pure Water, Inc. v. Safari Water Filtration Sys., 381 F.3d 1111, 1116 (Fed. Cir. 2004) ("A court construing a patent claim seeks to accord a claim the meaning it would have to a person of ordinary skill in the art at the time of the invention.").

As recognized by the Federal Circuit in Phillips:

> the court looks to 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.' Innova, 381 F.3d at 1116. Those sources include 'the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.' Id.; see also

Gemstar-TV Guide Int'l, Inc. v. ITC, 383 F.3d 1352, 1364 (Fed. Cir.
2004); Vitronics, 90 F.3d at 1582-83; Markman, 52 F.3d at 979-80.

Phillips, 415 F.3d. at 1314.

In Phillips, the Federal Circuit reaffirmed the importance of the specification when

interpreting claims. "[T]he specification 'is always highly relevant to the claim construction

analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'"

Id. at 1315 (citation omitted). The importance of the specification in claim construction derives

from the statutory requirement that the specification describe the claimed invention in "full,

clear, concise, and exact terms." 35 U.S.C. § 112, para 1; Phillips, 415 F.3d at 1316. The

specification is of particular importance because "the person of ordinary skill in the art is deemed

to read the claim term not only in the context of the particular claim in which the disputed term

appears, but in the context of the entire patent, including the specification." Phillips, 415 F.3d at

1313.

In addition to consulting the patent specification, the court should also consider the

patent's prosecution history. The prosecution history "can often inform the meaning of the claim

language by demonstrating how the inventor understood the invention and whether the inventor

limited the invention in the course of prosecution, making the claim scope narrower than it

otherwise would be." Phillips, 415 F.3d. at 1317. See also Medrad, Inc. v. MRI Devices Corp.,

401 F.3d 1313, 1319 (Fed. Cir. 2005) ("We cannot look at the ordinary meaning of the term …

in a vacuum. Rather, we must look at the ordinary meaning in the context of the written

description and the prosecution history."). Often the prosecution history is of critical

significance in determining the meaning of the claims. Vitronics, 90 F.3d at 1582; Markman v.

Westview Instruments, Inc., 52 F.3d 967, 980 (Fed. Cir. 1995). "The prosecution history limits

the interpretation of claim terms so as to exclude any interpretation that was disclaimed during

prosecution." Southwall Techs., v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir.), cert. denied, 516 U.S. 987 (1995). Moreover, as in the specification, a patent application can indicate in the prosecution history that a term should have a special meaning. Vitronics, 90 F.3d at 1582.

Evidence other than the claims, the specification and prosecution history ("extrinsic evidence") may be admissible to explain scientific principles, the meaning of technical terms and terms of art, and demonstrate the state of prior art. See Markman, 52 F.3d at 980; and Phillips, 415 F.3d at 1317; Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1309 (Fed. Cir. 1999). Extrinsic evidence, however, "may not be used to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history." Bell Atl. Network Servs. v. Covad Communs. Group, Inc., 262 F.3d 1258, 1269 (Fed. Cir. 2001).

If the "disputed term has 'no previous meaning to those of ordinary skill in the prior art, its meaning, then, must be found elsewhere in the patent.'" Irdeto Access, Inc. v. Echostar Satellite Corp., 383 F.3d 1295, 1300 (Fed. Cir. 2004) (citation omitted). Absent an accepted meaning in the art, a term is construed only as broadly as provided for by the patent. Id.; see also On Demand Mach. Corp. v. Ingram Indus., 442 F.3d 1331, 1340 (Fed. Cir. 2006), cert. denied, 127 S.Ct. 683 (2006) ("[T]he role of the specification is to describe and enable the invention. In turn, the claims cannot be of broader scope than the invention that is set forth in the specification."); and Cooper Cameron Corp. v. Kvaerner Oilfield Prods., 291 F.3d 1317, 1323 (Fed. Cir. 2002) ("[I]n Gentry, we applied and merely expounded upon the unremarkable proposition that a broad claim is invalid when the entirety of the specification clearly indicates that the invention is of a much narrower scope.").

Claims must be construed the same way for the issues of infringement and validity. Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313, 1330 (Fed. Cir. 2003). In addition,

17

when different claims of patent recite the same terms or phrases, those terms and phrases must be interpreted in the same way in each claim. Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001).

## II.    CONSTRUCTION OF TERMS IN CLAIMS OF THE '737 PATENT

### A.    Claim 1

#### 1.    "Displayed at a browsing device"

The term "displayed at a browsing device" would be understood by the person of ordinary skill in the art at the time of the invention to mean "visually represented on the screen of a browsing device." Support for this interpretation is found in the claim language and in the ordinary meaning of the word "displayed."

"Display" means "a visual representation of data, as on a computer video screen." Webster's New World Dictionary, Third College Edition, 1988. Nothing in the claims, specification or file history indicate that this term has a special meaning in the '737 patent. Rather, all the intrinsic sources to be consulted in construing the meaning of a claim term confirm that the term "displayed at a browsing device" should be given its ordinary and customary meaning.

The context of the claim itself confirms that the Plaintiffs' construction is proper. For example, the preamble of claim 1 of the '737 patent states, "said *viewable data* is displayed at a browsing device." Rosenbloom Decl. Exh. A at Col. 20, lines 2-3. Viewable data is, by its very nature, capable of being visually represented on the screen of the browsing device and seen by the user. The specification further confirms this construction by demonstrating that the "viewable data" is visually represented on the screen of the browsing device: "FIG. 7 illustrates a typical display shown on the visual display unit identified in FIG. 6, in response to instructions

being supplied to the user from a server." Id. at Col. 6, lines 3-5. The specification also states,

"[t]he video signal is supplied to the monitor 602, resulting in the human viewable information

being displayed on the monitor in a form derived from the HTML instructions supplied to the

browser as executed by the browser itself." Id. at Col. 9, lines 54-58. Finally, the file history

does not indicate that the term "displayed at a browsing device" should be construed to mean

anything other than  "visually represented on the screen of a browsing device."

### 2. "Storing executable functions"[9]

The term "storing executable functions" would be understood by the person of ordinary

skill in the art at the time of the invention to mean "storing a universal set of all available

functions, wherein each function has a name and consists of a set of function steps (i.e.,

instructions), each of which, when executed, creates a portion of code (e.g., HTML code)."

Support for this interpretation is found in the specification of the '737 patent and the ordinary

meaning of the term "function."

The '737 patent specification provides that the described system creates web pages "on-

the-fly" by: (1) storing a universal family set of all available functions, and (2) executing a list of

functions (i.e., a "function string") selected from the universal set of functions in response to a

request from a browser.  Specifically, the specification states,

> In accordance with the present system, it is possible for … the HTML
> instructions [i.e., web page] to be generated on-the-fly, as requests are
> made by browsing clients. Thus, the generation of [a web page] …
> becomes an automated technical process performed in response to
> strings of code generated functions stored at the server.
>
> HTML output pages are created by assembling portions of HTML
> instructions …
>
> Each portion of output HTML instructions is created by executing a
> particular function. This function is arranged to … [retrieve] viewable

---

[9] This term also appears in independent claim 4 of the '737 patent.

19

data [from a database]. This viewable data is then processed under the control of the selected function in order to generate a portion of output HTML. A format function of this type may be considered as the smallest unit of instructions for producing a portion of HTML code.

The system as a whole includes a universal family set of all the available functions which may be used in order to generate portions of HTML code. .... For any particularly [sic] application, it is likely that not all of the possible functions will be required, therefore functions may be selected from the universal sets of all available functions. Selected functions are known to both the browser and the server. The browser issues URLs [i.e., requests] to the server that are understood by the server, resulting in the required HTML page being transmitted back to the browser. Rosenbloom Decl. Exh. A at Col. 12, lines 29-60 (emphasis added).
…

Thus, the input URL [i.e., the request transmitted by the web browser] will identify particular types of formatting and particular types of data. The formatting information for the URL will result in particular function strings being read from the string list store 1103. Thereafter, these functions are executed … resulting in text data and graphics data being read from the respective databases 1104 and 1105. As the functions are executed, output HTML is written to the output HTML buffer 1102 and after an identified set of functions have been executed, the HTML stored in output 1102 is [transmitted to the web browser, which displays a web page corresponding to the HTML]. Rosenbloom Decl. Exh. A at Col. 15, line 63-Col. 16, line 7
…

At step 905 the functions required to create the particular string, drawn from the universal set of available functions, are identified and at step 906 the string itself is assembled by listing the functions for sequential processing with data derived from the database or databases. Rosenbloom Decl. Exh. A at Col. 13, lines 41-45.

By stating "the system as a whole includes a universal family set of all the available functions," the specification makes clear that the "universal family set of all available functions" is not an optional feature of the claimed invention, but rather an essential feature.

The specification also makes clear that each function in the universal set consists of one or more function steps (i.e., instructions), which, when executed, create a portion of a web page.

20

See Rosenbloom Decl. Exh. A at Col. 18, lines 46-51 ("At step 1304 a question is asked as to whether a function includes a further functional step and if answered in the affirmative, control is returned to step 1302 for the next function step to be executed. Thus, a functional step may be considered as the smallest portion of a function that results in a write to the HTML buffer."); Col. 12, lines 41-42 ("Each portion of output HTML instructions is created by executing a particular function."); and Col. 13, lines 3-7 ("The formatting functions are arranged to generate small portions of HTML code, such that the universal set of formatting functions is minimised and so that any required output page may be generated by stringing formatting functions together.").

Thus, when viewed in the context of the specification, the phrase "storing executable functions" would be understood by the person of ordinary skill in the art to mean "storing a universal set of all available functions, wherein each function consists of a set of function steps (i.e., instructions), each of which, when executed, creates a portion of code (e.g., HTML code)."

Because a web server may have more than one application and each application may require differently formatted web pages, the specification teaches that it is desirable to derive "function strings" (i.e., lists of functions) from the universal set of functions for each different application.  See Rosenbloom Decl. Exh. A at Col. 13, lines 3-15 ("The formatting functions are arranged to generate small portions of HTML code ... so that any required output page may be generated by stringing formatting functions together. ... Thus, ... the pre-processing step consists of arranging such function strings such that a particular function string, arranged to generate a HTML page, may be quickly sought and executed during on-line operation."); Col. 12, lines 54-57 ("For any particularly [sic] application, it is likely that not all of the possible functions will be required, therefore functions may be selected from the universal sets of all

available functions."); and Col. 12, lines 62-65 ("It is possible that a particular server may be configured to run a plurality of applications and that said applications may require a different sub-set of formatting functions derived from a universal set of available functions.").

The specification further teaches that a computer program (i.e., the "HTTP daemon") creates the function strings. See Rosenbloom Decl. Exh. A at Figure 9 (illustrating the steps performed by the HTTP daemon when creating the function strings). Specifically, the specification teaches that the HTTP daemon creates a function string by identifying the required functions and assembling the function string by "listing the functions for sequential processing." Id. at Col. 13, lines 41-45 ("At step 905 the functions required to create the particular string, drawn from the universal set of available functions, are identified and at step 906 the string itself is assembled by listing the functions for sequential processing ....") (emphasis added).

Because the specification teaches that a function string is assembled by listing the required functions for sequential processing, the specification implies that each particular function within the universal set is associated with a unique identifier (i.e., each function has a name) because a list, by definition, is a series of names.[10] Thus, based on the specification, the person of ordinary skill in the art would understand that each function within the universal set has a name.

This interpretation is consistent with the ordinary meaning of the term "function" in the field of computer programming. In the field of computer programming, the ordinary meaning of the term "function" is "a named group of statements" or "a named module."[11]

---

[10] See Dictionary.com Unabridged (v 1.0.1). Random House, Inc. http://dictionary.reference.com/browse/list (accessed: December 13, 2006); and The American Heritage® Dictionary of the English Language, Houghton Mifflin Company (4th ed. 2004) http://dictionary.reference.com/browse/list (accessed: December 13, 2006).

[11] See The Authoritative Dictionary of IEEE Standards Terms, (7th ed. 2000) (defining function in the software context to mean a module that is, inter alia, named); Computer Dictionary, Microsoft Press (2nd ed. 1994) (defining function to mean "procedure" which is defined as "a named sequence of statements"); IBM Dictionary of Computing, (1994) (noting that within the major programming languages the term function means "a named group

Accordingly, in view of the specification and ordinary meaning of the term "function," the person of ordinary skill in the art at the time of the invention would understand the term "storing executable functions" to mean "storing a universal set of all available functions, wherein each function has a name and consists of a set of function steps (i.e., instructions), each of which, when executed, creates a portion of code (e.g., HTML code)."

### 3. "In response to identifying a request for specified content data and a user identifier; (a) ... (e) ..."[12]

The term "in response to identifying a request for specified content data and a user identifier; (a) ... (e) ..." when read in view of the plain language of the claim, the specification of the '737 patent, the prosecution history of the '737 patent, and the prosecution history of the '530 patent, would be understood by the person of ordinary skill in the art at the time of the invention to mean "performing steps (a) through (e) in response to identifying a request for specified content data and a user identifier, wherein the request was transmitted by a browsing device and includes a format identifier that is separate and distinct from the user identifier."

The term "in response to identifying a request for specified content data and a user identifier; (a) ... (e) ..." is unambiguous. The language of the claim itself provides that steps (a) through (e) are performed in response to identifying a request for specified content data and a user identifier.

### a. The webpage is generated in response to a request from a browsing device.

The claim language, the specification and the prosecution history of the '737 patent teach that the request is received from a browsing device. For example, the preamble to claim 1 recites: "a method of serving pages of viewable data to browsing devices ..." and the first step

---

of statements"); and Webopedia (http://www.webopedia.com/TERM/f/function.html) (defining function to mean "a named section of a program").

[12] This term also appears in independent claim 4 of the '737 patent.

of claim 1 recites, "identifying requests from browsing devices …" Accordingly, the language of claim 1 teaches that "in response to identifying a request" means "in response to identifying a request from a browsing device." As demonstrated below, this interpretation is confirmed by the specification and prosecution history of the '737 patent.

The specification of the '737 patent teaches that a web page is generated in response to a request from a browsing device. For example, the specification states, "HTML output instructions are generated 'on-the-fly' in response to requests made by users." Rosenbloom Decl. Exh. A at Col. 5, lines 22-25 (emphasis added); see also Col. 5, lines 34-37 ("Preferably, viewable data is read from conventional databases in response to a URL being received [from a browsing device], whereafter this data is processed so as to configure it into HTML commands."); and Col. 11, lines 27-31 ("[I]n response to a particular request being made, a string of functions are executed resulting in calls being made to appropriate databases in order to obtain viewable information.").

The prosecution history also states that the web pages are generated in response to a request from a browsing device. In a communication filed by the applicants in response to an office action dated September 17, 2003, the applicants characterized the then-pending claims as follows:

> Applicant has described and claimed an arrangement whereby two different clients [i.e., browsing devices] requesting the same content data form the same server receive differently formatted versions of that same content data depending upon a particular format identifier received from each respective client at the server.

Amendment filed on Dec. 16, 2003 at 13 (Rosenbloom Decl. Exh. M).[13]  Accordingly, the

prosecution history of the '737 patent confirms that the identified request is received from a

browsing device.

**b.  The request from the browsing device must include a format identifier that is separate and distinct from the user identifier.**

The language of claim 1 itself, the specification, the prosecution history of the '737

patent, and the prosecution history of the '530 patent also demonstrate that the request received

from the browsing device must include a format identifier that is separate and distinct from the

user identifier.

The claim.  The plain language of the claim establishes that the "format identifier" is

separate and distinct from the "user identifier" that is also received from the browsing device.

This is evident from the fact that the claim refers to two different items, a "user identifier" and

"format identifiers."  The plain language of those terms confirms that they must be different

things.  The ordinary meaning of "user identifier" is simply data that identifies the user who

made the request for information.  By contrast, the claim makes clear that the "format

identifiers" identify not the user, but "the type of formatting required."

The Specification.  The specification repeatedly emphasizes that web pages are created

on-the-fly in response to receiving from a browsing device a request (e.g., a URL) that includes a

format identifier.  For example, the specification states: "... the incoming URL [that is

transmitted from the browsing device to the web server]... will include ... an element identifying

---

[13] Claim 1 of the '737 patent was added to the application in a subsequent Amendment as claim 30.  The applicant told the Patent Office that claim 30 has the same scope as pending claim 15. See Supplemental Amendment dated Feb. 25, 2005 at 15 (17 of facsimile) (Rosenbloom Decl. Exh. N) ("[T]his Supplemental Amendment is filed so as to add new method claims 22-32 which can be seen to be analogous to apparatus claims 2, 3, 8-13, 15, 16 and 19, respectively.").  Thus, the above quoted remarks apply to claim 1.

the type of formatting required [i.e., a format identifier] ...." Rosenbloom Decl. Exh. A at Col.

13, line 67-Col. 14, line 7 (emphasis added). The specification also states,

> [t]hus, the input URL[, which is received from a browsing device,]
> will identify particular types of formatting and particular types of
> data. The formatting information for the URL will result in particular
> function strings being read from the string list store 1103. Thereafter,
> these functions are executed, with reference to the data identifiers,
> resulting in text data and graphics data being read from the
> respective databases 1104 and 1105.

Id. at Col. 15, line 63-Col. 16, line 2 (emphasis added). Further, the specification states:

> [a]t step 1203 a function string index [i.e., format identifier] is
> identified, from the formatting information present in the URL and
> a step 1204 the indexed function string is read from the string list
> store 1103.

Id. at Col. 18, lines 24-27 (emphasis added); see also Exh. A at Abstract ("Requests from

browsing clients are identified which contain information relating to the data itself and the

display format for the data."); and Id. at Figure 10 (showing that a format identifier is contained

within the incoming URL).

As the '737 patent demonstrates, the patent applicants never contemplated an

embodiment in which web pages are generated on-the-fly in response to a request that does not

include a format identifier. As noted above, the specification states multiple times that the

request received from the browsing device "will include" (not "may include") a format identifier.

Nowhere does the specification ever state that web pages may be generated on-the-fly in

response to a request that does not include a format identifier.

The specification also teaches that the format identifier included in the request is separate

and distinct from the user identifier that is also included in the request. For example, the

specification states,

> The URL [i.e., the request from the browser] will include an element identifying the data required, an element identifying the type of formatting required, information relating to the user and a check sum, so as to reject URL corrupted during transmission. Exh. A at Col. 14, lines 3-7
>
> ...
>
> After the data identifier and the format identifier have been validated at their respective steps, the HTML page or pages are generated at step 1006 with reference to the data identifier and the format identifier. Thereafter, with reference to the user ID, the pages are supplied back to the requesting browser via the network. Id. at Col. 14, lines 41-46.

Accordingly, the specification makes clear that a format identifier is part of the URL (i.e., the request) transmitted to the web server from the browsing device and is separate and distinct from the user identifier (ID) transmitted with the URL. Because it is improper to interpret claims to be broader than the specification implies, the correct interpretation of "identifying a request" is "identifying a request that includes a format identifier that is separate and distinct from the user identifier."

The Prosecution History. This interpretation is confirmed by the prosecution history of the '737 patent and the prosecution history of the '530 patent, which is the parent of the '737 patent.

During prosecution of the '737 patent, the Examiner issued an Office Action on September 17, 2003 rejecting the pending claims (i.e., claims 2-21) as anticipated by U.S. Pat. No. 5,848,413 issued to Wolff. The inventors filed an Amendment in response to the Office Action on December 16, 2003. See Rosenbloom Decl. Exh. M.

In distinguishing claims 2-21 from the Wolff patent, the applicants stated:

> Applicant has described and claimed an arrangement whereby two different clients requesting the same content data from the same server may receive differently formatted version of that same content data depending upon a particular format identifier received from each respective client [i.e., browser] at the server. ... As will be explained in more detail below, it is not believed that the cited Wolff reference in any way teaches serving the same text/graphic

27

content in different viewable page formats – <u>depending upon
received requests incorporating respectively different format
identifiers</u>.

Rosenbloom Decl. Exh. M at 13 (emphasis added).

Not only does this statement from the prosecution history confirm that that claims of the

'737 patent require that the received request contains a "format identifier," but it is also an

explicit disavowal of claim scope. In distinguishing the prior art by noting that the prior art does

not "serv[e] the same text/graphic content in different viewable page formats – depending on

received requests incorporating respectively different format identifiers," the Amendment

provides clear notice to the public that claims 2-21 specifically require that the recited "format

identifiers" are contained within the request (e.g., URL) received from the browsing device.[14]

The prosecution history of the '530 further supports this interpretation.[15]  During

prosecution, the applicants distinguished their "invention" (as opposed to a particular claim)

from a system disclosed in U.S. Pat. No. 5,530,852 issued to Meske by stating,

> [u]nlike the server disclosed in Meske, the <u>present invention</u> receives
> data from a browser which [data] <u>indicates the type of formatting
> required by the browser (i.e., it includes formatting type indication
> data, which is exemplified in the description as a format identifier</u>.)

Amendment filed Apr. 13, 2000 at 6 (emphasis added) (Rosenbloom Decl. Exh. O).

The applicants thus explicitly described "the present invention," as requiring that the

request transmitted by the browser includes a format identifier.  Thus, the prosecution history of

the '530 patent also supports interpreting "identifying a request" to mean "identifying a request

that includes a format identifier that is separate and distinct from the user identifier."

---

[14] Claim 1 of the '737 patent was added to the '737 application as claim 30 subsequent to the filing of the
Amendment.  <u>See</u> Rosenbloom Decl. Exh. N at 15.  The relevant language of claim 1 is substantively identical to the
language of claims 2-21 of the '737 application.
[15] Statements made during prosecution of a parent application may be used to interpret claims in a child application.
<u>See</u> <u>Wang Labs., Inc. v. Am. Online, Inc.</u>, 197 F.3d 1377, 1384 (Fed. Cir. 1999) (applying to a child patent
arguments made in the parent patent).

Accordingly, the term "in response to identifying a request for specified content data and a user identifier; (a) ... (e) ..." when read in view of the plain language of the claim, the specification of the '737 patent, the prosecution history of the '737 patent, and the prosecution history of the '530 patent, would be understood by the person of ordinary skill in the art to mean "performing steps (a) through (e) in response to identifying a request for specified content data and a user identifier, wherein the request was transmitted by a browsing device and includes a format identifier that is separate and distinct from the user identifier."

### 4. "Receiving format identifiers identifying the type of formatting required"[16]

The term "receiving format identifiers identifying the type of formatting required," when read in view of (a) the specification of the '737 patent, (b) the prosecution history of the '737 patent, and (c) the prosecution history of the '530 patent, would be understood by the person of ordinary skill in the art at the time of the invention to mean "receiving two or more format identifiers, wherein the format identifiers are included in said identified request for specified content data and each format identifier is a sequence of one or more characters that uniquely identifies an indexed function string."

### a. "Receiving format identifiers"

The term "receiving format identifiers" would be understood by the person of ordinary skill in the art at the time of the invention to mean "receiving more than one format identifier." Support for this interpretation is found in the claim language itself. The claim language states unambiguously that "format identifiers" are received. Because the term "identifiers" is in the plural, the person of ordinary skill in the art would understand that "identifiers" means "more than one identifier."

---

[16] This term also appears in independent claims 4, 7, 8, 9, 15, 21 and 22 of the '737 patent.

29

Moreover, claim 1 recites "receiving format identifiers" and then "selecting a set of stored functions in dependence upon a received format identifier." As the claim language itself demonstrates, the inventors knew the difference between the singular form of the term identifier and the plural form of the term identifier. Accordingly, there is no reason to believe the inventors intended the term "receiving format identifiers" to mean "receiving a format identifier." See Superior Fireplace Co., v. Majestic Prods. Co., 270 F. 3d 1358, 1375-76 (Fed. Cir. 2001) (noting that the claim term "wall" has a different and broader meaning than the claim term "walls."); see also Papst Licensing GmbH v. Sunonwealth Elec. Mach., 2004 U.S. Dist. Lexis 4402, *24 (N.D. Ill. 2004) ("[T]he claim … refers to plural 'corner areas,' thereby requiring multiple 'corner areas.'"); and Applera Corp. v. Micromass UK Ltd., 186 F. Supp. 2d 487 (D. Del. 2002) ("[T]he only limitation on the number of ions guided through the ion guide is the fact that 'ions' is plural and therefore there must be two or more.").

In fact, the prosecution history of the '737 patent further establishes that the term "format identifiers" should be construed in the plural rather than in the singular. In an Amendment filed on Dec. 16, 2003, the applicants amended claim 15 of the '737 application by changing the term "receive format identifiers" to read "receives format identifiers."[17] Rosenbloom Decl. Exh. M at 9. If the applicants had intended the term "identifiers" to mean "identifier" they would have further amended the claim to read "receives a format identifier."

Lastly, it is well settled that different terms in a claim should be construed to have different meanings, absent evidence to the contrary. See CAE Screenplates, Inc. v. Heinrich Fiedler GmbH & Co. KG, 224 F.3d 1308, 1317 (Fed. Cir. 2000) ("In the absence of any evidence to the contrary, we must presume that the use of these different terms in the claims connotes different meanings."). Accordingly, interpreting "identifiers" to mean the same things

---

[17] Claim 15 of the '737 application is the predecessor to the claim subsequently issued as claim 4 of the '737 patent.

as "identifier" would violate this well established canon of claim construction because there is no evidence to support interpreting "identifiers" to mean "identifier."

For the forgoing reasons, the term "receiving format identifiers" would be understood by the person of ordinary skill in the art to mean "receiving two or more format identifiers."

Furthermore, as discussed above in connection with the interpretation of "identifying a request," the specification and prosecution histories of the '737 and '530 patents demonstrate that each format identifier is received as part of the request transmitted by the browser. Thus, the term "receiving format identifiers" would be understood by the person of ordinary skill in the art to mean "receiving two or more format identifiers, wherein the format identifiers are included in said identified request for specified content data."

### b. "A format identifier identifying the type of formatting required"

The term "a format identifier identifying the type of formatting required" would be understood by the person of ordinary skill in the art at the time of the invention to mean "a sequence of one or more characters that uniquely identifies an indexed set of formatting functions (i.e., function string)."

### i. "format identifier"

When read in the context of the specification of the '737 patent and the context of the ordinary meaning of the term "identifier," the term "format identifier," would be understood by the person of ordinary skill in the art at the time of the invention to mean "a sequence of one or more characters that uniquely identifies the type of formatting required."

The specification teaches that the term "format identifier" simply means "an identifier for the [type of] formatting requested [i.e., required]." Specifically, the only time the specification of the '737 patent uses the term "format identifier" is as follows:

31

> Similarly, <u>an identifier for the formatting requested</u> is validated at step 1005, which may again result in an error message being generated at step 1009.
>
> After the data identifier and <u>the format identifier</u> have been validated at their respective steps, the HTML page or pages are generated at step 1006 with reference to the data identifier and <u>the format identifier</u>. Thereafter, with reference to the user ID, the pages are supplied back to the requesting browser via the network.

Rosenbloom Decl. Exh. A at Col. 14, lines 37-46 (emphasis added).  Because the term "format identifier" is preceded by the word "the," that phase is necessarily referring to the phrase "an identifier for the [type of] formatting requested" as providing what patent lawyers call antecedent basis.  Thus, in view of the language of claim 1 itself and the specification, the person of ordinary skill in the art would understand the term "format identifier" to mean "an identifier for the type of formatting required."

The ordinary meaning of the term "identifier" in the computer field is "a sequence of characters that uniquely identifies a file, variable, account, function, or other entity."[18]

The '737 patent specification is consistent with the ordinary meaning of identifier.  The specification teaches that the format identifier is a sequence of characters that identifies an entity.  More specifically, the specification teaches that the format identifier is an index value (<u>i.e.</u>, a sequence of characters) that identifies a function string (<u>i.e.</u>, an entity) that is executed to create a web page on-the-fly.  For example, the specification states:

> At step 1203 a function string index is identified, from the formatting information [i.e., format identifier] present in the URL

---

[18] <u>See</u> <u>Webopedia</u> (http://www.webopedia.com) (defining identifier to mean "name" and defining "name" to mean "a sequence of characters that uniquely identifies a file, variable, account, function, or other entity."); <u>see</u> also Free On-Line Dictionary of Computing (http://foldoc.org/index.cgi?query=identifier&action=Search) (defining identifier to mean "a formal name used in source code to refer to a variable, function, procedure, package, etc."); <u>IBM Dictionary of Computing</u>, (1994) ("a token that names a data object such as a variable, ..., a subprogram, or a function."); <u>Dictionary of Computing</u>, Oxford University Press (3rd Ed. 1990) ("a string of characters used to identify ... a variable, a data structure, a procedure [i.e., function], a statement ...."); and <u>Computer Dictionary</u>, Microsoft Press (2nd Ed. 1994) ("any text string used as a label, such as the name of a procedure or a variable in a program ....").

> and a [sic] step 1204 the indexed function string is read from the
> string list store 1103.
>
> At step 1205 the function string read from the string list store 1103
> is executed, resulting in HTML code being written to the output
> HTML buffer 1102.

Rosenbloom Decl. Exh. A at Col. 18, lines 24-31; <u>see also</u> Col. 15, lines 64-66 ("The formatting

information for the URL will result in particular function strings being read from the string list

store 1103.").

Accordingly, when read in the context of the specification of the '737 patent and the

context of the ordinary meaning of the term "identifier," the term "format identifier," would be

understood by the person of ordinary skill in the art at the time of the invention to mean "a

sequence of one or more characters that uniquely identifies the type of formatting required."

### ii.  **"Type of formatting required"**

The term "type of formatting" appears only twice in the specification. <u>See</u> Rosenbloom

Decl. Exh. A at Col. 14, lines 3-5 ("The URL will include … an element identifying the type of

formatting required.") and Col. 15, lines 63-64 ("[T]he input URL will identify particular types

of formatting"). As discussed below, the context of the specification and the language of claim 1

itself show that the term "type of formatting required" means "indexed function string."

Specifically, the '737 patent teaches that in response to a request received from a client, a

web page is created on-the-fly by: (1) selecting a function string that is identified in the request

and then (2) executing the functions that comprise the function string. <u>See</u> Id. at Col. 15, line 63-

Col. 16, line 2 ("The formatting information for the URL will result in particular <u>function strings</u>

being read from the string list store 1103. Thereafter, these functions are executed, with

reference to the data identifiers, resulting in text data and graphics data being read from the

respective databases 1104 and 1105.") (emphasis added); Col. 18, lines 24-31 ("At step 1203 a

function string index is identified, from the formatting information present in the URL and a [sic]
step 1204 the indexed function string is read from the string list store 1103. At step 1205 the
function string read from the string list store 1103 is executed, resulting in HTML code being
written to the output HTML buffer 1102.") (emphasis added); Col. 11, lines 27-31 ("[I]n
response to a particular request being made, a string of functions are executed resulting in calls
being made to appropriate databases in order to obtain viewable information.") (emphasis
added); and Col. 20, lines 21-26 ("(d) selecting a set of stored functions in dependence upon a
received format identifier and said read user information; and (e) executing said set of functions
to generate [a web page on-the fly]....").

Accordingly, when the specification states, "[t]hus, the input URL will identify particular
types of formatting ....," it is clear that the term "types of formatting" is used synonymously with
the term "function string" because the specification clearly teaches that the input URL identifies
a function string.

Additionally, the specification also teaches that the function string must be indexed. See
Rosenbloom Decl. Exh. A at Col. 13, lines 18-23 ("[I]t is necessary to generate of [sic] a
plurality of function strings .... [t]hese function strings are arranged in a string list, with an
indexing pointer being provided so as to enable a particular function string to be quickly
identified ... and thereafter executed in order to generate [web pages].")(emphasis added); Col.
13, lines 48-56 ("At step 907 the function string generated at step 906 is appended to the string
list created for that particular application and at step 908 an indexing reference is identified
within the list of strings .... [t]hus, when a particular call is made for formatting signals, in the
form of an executable string of functions, the particular call identifies the index reference within
the list of strings, resulting in the selected index being selected from the list ...."); Col.13, lines

58-62 ("Eventually, all of the function strings will have been created, appended to the string list and appropriately <u>indexed</u> ...."); Col. 15, lines 19-31 ("Each of the databases and the string list store is relational, in that an index, known to the processor 301 relates to a particular database entry. Thus, in response to the processor 301 pointing to an index, the related data is returned back to the processor 301. Thus, the string list store 1103 includes a string index portion 1106 and the actual string list portion 1107. Function strings are added to the string list portion 1107 at step 907 of FIG. 9 with their related index reference being added to portion 1106 at step 908. The processor 301 makes a request in terms of identifying a particular index reference, stored in portion 1106. This index is related to a particular string held in portion 1107."); and Col. 18, lines 24-28 ("At step 1203 a function string index is identified, from the formatting information present in the URL and a step 1204 the indexed function string is read from the string list store 1103.").

The specification also teaches that an advantage of the "indexing" feature is that it enables the system to personalize the web pages that are generated on-the-fly. Id. at Col. 16, lines 8-14 ("In addition to use the user database to confirm user validity and to record actions ... the on-line processor 301 may also make use of [preference] information read from the user database in order to adjust the relationship between indexes ... and their associated function strings and data ...."); Col. 15, lines 31-34 ("[I]t is possible to adjust the relationship between indexes and [executable function] strings, thereby adjusting the way in which the data is actually formatted in response to a particular request."); and Col. 18, lines 5-8 ("[T]he system may identify the particular user concerned and, in response to this information, select an index which differs from the normal index selected.").

Moreover, the specification teaches that "indexing" the function strings is a key feature of the patents. After the inventors described several different web-page personalization capabilities of their invention, the applicants stated:

> [i]t can be appreciated that the possibilities are endless .... [t]his is all provided by the fact that the actual HTML pages supplied back to the users are generated "on-the-fly" <u>by indexing</u> locations within databases.

Id. at Col. 17, line 66-Col. 18, line 2 (emphasis added). Thus, according to the specification, indexing is a critical element of the system.

Because the specification failed to contemplate an embodiment having function strings in which the function strings are not indexed, and because the specification teaches that the "indexing" feature is a critical feature, the term "type of formatting required," would have been understood by the person of ordinary skill in the art to mean "an indexed function string."

### 5. "Selecting a set of stored functions in dependence upon a received format identifier and said read user information"[19]

The term "selecting a set of stored functions in dependence upon a received format identifier and said read user information" would be understood by the person of ordinary skill in the art at the time of the invention to mean "choosing a particular stored and indexed function string from a set of stored and indexed function strings, wherein the selection is dependent on both a received format identifier <u>and</u> said read user information, which are separate and distinct, and the format identifier is included in said identified request for specified content data." Support for this interpretation is found in the specification of the '737 patent.

### a. "Selecting a set of stored functions."

The term "selecting a set of stored functions" would be understood by the person of ordinary skill in the art at the time of the invention to mean "choosing a particular stored and

---

[19] This term also appears in independent claims 4, 8, and 21 of the '737 patent.

indexed function string from a set of stored and indexed function strings." Support for this interpretation is found in the specification of the '737 patent and the ordinary meaning of "selecting."

### i.  "A set of stored functions"

As discussed above, the specification repeatedly emphasizes that web pages are created on-the-fly by selecting a function string from a "string list store," which stores a plurality of function strings, and executing the function string. As also discussed above, the specification repeatedly emphasizes that a function string is indexed and includes a list of formatting functions, wherein each of the formatting functions included in the list is included in the universal family set of formatting functions. As one example, the specification states:

> The formatting functions are arranged to generate small portions of HTML code ... <u>so that any required output page may be generated by stringing formatting functions together. The pre-processing initialisation procedures consist of identifying strings of formatting functions required to generate particular lines of HTML code. Thus, a particular line of HTML code is produced by sequentially executing a string of formatting functions and the pre-processing step consists of arranging such function strings such that a particular function string, arranged to generate a HTML page, may be quickly sought and executed during on-line operation.</u>

> One function string will generate a particular line of code HTML code. In most applications, not all lines will take up the same format, therefore it is necessary to generate of [sic] a plurality of function strings. These function strings are arranged in a string list, with an <u>indexing pointer</u> being provided so as to enable a particular function string to be quickly identified ... and thereafter executed in order to generate the output HTML instructions [i.e., the web page].").  (emphasis added)

Id. at Col. 12, line 62-Col. 13, line 23 (emphasis added).

In view of the specification, the person of ordinary skill in the art would interpret the claim language "selecting a set of stored functions ... and executing said set of functions to

generate [a web page]" to mean selecting an indexed function string and executing the function string.

Moreover, the specification uses the term "a set of functions" only once. The specification states:

> Thus, the input URL will identify particular types of formatting and particular types of data. The formatting information for the URL will result in <u>particular function strings being read from the string list store</u> 1103. Thereafter, these functions are executed, with reference to the data identifiers, resulting in text data and graphics data being read from the respective databases 1104 and 1105. As the functions are executed, output HTML is written to the output HTML buffer 1102 and after an <u>identified set of functions</u> have been executed, the HTML stored in output 1102 is read, so as to supply the output HTML signals to the HTTP daemon 403.

Id. at Col. 15, line 63-Col. 16, line 7 (emphasis added).

Thus, when the specification refers to the "set of functions," the specification is referring to a function string.

### ii. "Selecting"

Selecting means "to take as a choice from among several."[20]  Accordingly, "selecting a set of stored functions" means "choosing a particular indexed function string from a set of indexed function strings." This is consistent with the specification. As discussed above, the specification repeatedly emphasizes that web pages are created on-the-fly by selecting a function string from a "string list store," which stores a plurality of function strings.

### b. "In dependence upon a received format identifier and said read user information"

Because the plain language of claim 1 requires that the selection be dependent upon "a format identifier" <u>and</u> "read user information," claim 1 should be construed so that the selection is not dependent solely upon "a format identifier" or solely upon the "read user information."

---

[20] *The American Heritage® Dictionary of the English Language, Fourth Edition.* Houghton Mifflin Company, 2004.

Rather, the selection must be made based on <u>both</u> the format identifier and the user information. Furthermore, these items -- the format identifier and the user information -- must be separate and distinct. Not only does the claim refer to them as two separate items, but it specifies that the format identifier is "received" and the user information is "read" from the user database. This interpretation follows from not only the plain language of the claim -- which says "and" -- but also from an admission by Ablaise concerning the differences between the claims of the '737 patent and the prior art Fishwrap electronic newspaper.

An entity accused of infringing the '737 patent presented Ablaise with documents describing the prior art Fishwrap electronic newspaper and asked Ablaise to explain why the '737 patent is not invalid in view of the Fishwrap system.[21]

Ablaise distinguished claim 1 of the '737 patent from the Fishwrap system by, *inter alia*, noting that the Fishwrap system does not lay out the content data of a web page based on a format identifier, but rather arranges the content data on the web page solely in dependence upon the user's preference information. <u>See</u> Letter from Matthew G. McAndrews dated October 12, 2006 (Rosenbloom Decl. Exh. P). Specifically, Ablaise argued that:

> Instead of formatting a page based on format identifiers, the Fishwrap system reorders news stories appearing in the bulleted list based on a user's "hit" count for a given topic [i.e., user preference information]. .... <u>Thus, rather than using format identifiers to explicitly change the formatting of a page (as claimed in the '737 patent), the Fishwrap system merely maintains a "hit count" in relation to specific topics or stories [i.e., the user preference information] and then outputs such topics or stories as a sorted list [which is sorted in dependence only upon the user preference information].</u>

---

[21] As discussed above in the Introduction section, the Fishwrap electronic newspaper includes a web site that generates personalized newspapers on-the-fly. More specifically, in response to a request from the user, the website: (1) retrieves the user's preference information, which information includes information identifying the content the user would like to read and information identifying the user's preferred ordering of the content, and (2) creates the page in dependence upon the retrieved preference information. Thus, if a user would like his/her newspaper to have only articles concerning computer technology and articles concerning adventure travel and the user's preference information indicates that user the likes to read the travel articles first, then the website will generate a web page for the user that has the travel articles at the top of the page.

Rosenbloom Decl. Exh. P at 2 (emphasis added).  Accordingly, Ablaise has admitted that a system that personalizes a page based solely on user preference information does not infringe the '737 patent.[22]

### c.  "A received format identifier"

As discussed above in connection with the interpretation of "identifying a request," the specification and prosecution histories of the '737 and '530 patents show that each received format identifier is received as part of the identified request, which was transmitted by the browsing device.  Thus, the term "a received format identifier" would be understood by the person of ordinary skill in the art to mean "a format identifier included in said identified request for specified content data."

### 6.  "Executing said set of functions to generate viewable data comprising said selected content data and formatting data"[23]

The term "executing said set of functions to generate viewable data comprising said selected content data and formatting data" would be understood by the person of ordinary skill in the art at the time of the invention to mean "executing the selected set of functions, wherein the execution of the selected function set causes formatting data to be combined with the selected content data, thereby generating viewable data, which formatting data specifies the location of the content data within a page."  Support for this interpretation is found in the specification, the prosecution history of the '737 patent, and the language of claim 1 itself.

The specification teaches that the execution of the selected set of functions causes formatting data to be combined with the selected content data.  See Rosenbloom Decl. Exh. A at

---

[22] Given Ablaise's contention that no claim of the '737 patent reads on the Fishwrap system, Dow Jones is at a loss to understand how Ablaise can, consistent with Rule 11, contend that either the "My On-line Journal" feature of the Wall Street Journal website or the "My Portfolio" feature of the Marketwatch website infringes when these websites, like the Fishwrap system, personalize the web pages based solely upon stored user preference information.

[23] This term also appears in independent claims 4, 7, 8, 9, 15, 21 and 22 of the '737 patent.

Abstract ("Requests from browsing clients are identified which contain information relating to the [content] data itself and the display format for the [content] data. <u>The [content] data is read and processed so as to combine a representation of the viewable data with executable instructions.</u>") (emphasis added); Col. 8, lines 37-44 ("When requested, the on-line processing will receive human viewable data from a database 406 in combination with file structures from a file structure source 407. Thereafter, in response to instructions from the on-line processing system 405, the processing environment 402 will process human viewable data <u>in combination with</u> file structure data to produce HTML output files ....") (emphasis added); Col. 11, lines 31-33 ("[The] viewable information is then processed so as to <u>combine it</u> with HTML tags, to produce output signals for transmission to browsing clients.") (emphasis added).

The language of claim 1 teaches that the term "formatting data" should be construed to mean "data which specifies the location of the content data within a page." The preamble to claim 1 states that a page served by the method of claim 1 includes "formatting data which specifies locations of said [content data] within [the] page."

This is confirmed by the prosecution history of the '737 patent. In an amendment filed on December 16, 2003, the applicants amended the preamble of claim 15 by adding the language "which specifies locations of said [content data] within [the] page" after the term "formatting data." Rosenbllom Decl. Exh. M at 8. In the same amendment, the applicants stated,

> The applicant's invention relates to a serving device that serves pages of viewable data comprising content data and formatting data. The content data, itself, comprises text and/or graphics and these are located within the page as specified by the formatting data. Independent claims 2, 14, 15, and 20 have been amended to make this even more clear.

<u>Id</u>. at 14. This statement confirms that the term "formatting data" should be construed to mean "data which specifies the location of the content data within a page."

## III.    CONSTRUCTION OF TERMS IN CLAIMS OF THE '530 PATENT

### A.    Claim 1

#### 1.    "Identifying requests from browsing devices that define a request for specified viewable data, said request including formatting type identification data"[24]

The term "identifying requests from browsing devices that define a request for specified viewable data, said request including formatting type identification data" would be understood by the person of ordinary skill in the art at the time of the invention to mean "identifying a request from a browsing device, wherein the request includes an identifier identifying certain viewable data and an identifier identifying a certain file structure." Support for this interpretation is found in the specification and prosecution history of the '530 patent.

Neither the term "formatting type identification data" nor the term "formatting type data" is found in the specification of the '530 patent. Nevertheless, viewed in the context of the specification and the claim language itself, the person of ordinary skill in the art would understand "formatting type identification data" to mean "an identifier identifying a certain file structure."

The specification states,

> it is possible for the [web server] to respond to requests where the output HTML file will be produced "on the fly" in response to instructions identified as "on-line processing". When requested, the on-line processing will receive human viewable data from a database 406 in combination with <u>file structures</u> from a file structure source 407. Thereafter, ... the processing environment 402 will process human viewable data in combination with <u>file structure data</u> to produce HTML output files for the I/O device 304.

Rosenbloom Decl. Exh. B at Col. 8, lines 26-36 (emphasis added).

Claim 1 of the '530 patent refers to "combin[ing] said selected part of said content data with said specific one of said types of formatting data." <u>Id</u>. at Col. 20, lines 7-9. Accordingly, because the specification teaches that the invention relates to combining viewable data (<u>i.e.</u>,

---

[24] This term also appears in independent claims 2, 3 and 12 of the '530 patent.

content data) with "file structures from a file structure source" and the language of claim 1 recites combining viewable data with "said types of formatting data," the person of ordinary skill would conclude that "types of formatting data" means "file structure data." Thus, it would be clear to the person of ordinary skill that "formatting type identification data" means "an identifier identifying a certain file structure."

The specification also teaches that the request includes an identifier identifying certain viewable data <u>and</u> a separate identifier identifying a certain file structure. <u>See</u> Id. at Col. 13, lines 60-64 ("The URL [<u>i.e.</u>, the request from the browser] <u>will</u> include an element identifying the data required [and] an element identifying the type of formatting required ....") (emphasis added); Col. 18, lines 15-18 ("At step 1203 a function string index is identified, from the formatting information present in the URL ...."). The specification states:

> Thus, the input URL <u>will</u> identify particular types of formatting <u>and</u> particular types of data. The formatting information for the URL will result in particular function strings being read from the string list store 1103. Thereafter, these functions are executed, with reference to the data identifiers, resulting in text data and graphics data being read from the respective databases 1104 and 1105.

<u>Id.</u> at Col. 15, lines 53-59 (emphasis added). These statements from the specification indicate that the request from the browser includes data at least two elements: an element identifying viewable data and an index identifying types of formatting (<u>i.e.</u>, file structure data).

This is confirmed by the prosecution history. <u>See</u> Response filed Feb. 3 1998 at 9 ("In addition to specifying viewable data, a request also includes formatting type data ...."). (Rosenbloom Decl. Exh. Q); and Rosenbloom Decl. Exh. O at 8 (distinguishing the invention from the prior art by noting that in the prior art "[n]o data specific to formatting is included in the request."). These statements were made by the applicant in distinguishing the claimed subject

matter from prior art and, like the statement in the specification, indicate that the request includes data that is unique to formatting in addition to data that specifies certain viewable data.

Thus, the term "identifying requests from browsing devices that define a request for specified viewable data, said request including formatting type identification data" would be understood by the person of ordinary skill in the art to mean "identifying a request from a browsing device, wherein the request includes an identifier identifying certain viewable data and an identifier identifying a certain file structure."

### 2. "Maintaining a plurality of formatting types of data defining respectively corresponding predetermined formats for portions of said viewable data"[25]

The term "maintaining a plurality of formatting types of data defining respectively corresponding predetermined formats for portions of said viewable data" would be understood by the person of ordinary skill in the art at the time of the invention to mean "storing, in a table, two or more file structures, each file structure defining a format for portions of the viewable data." Support for this interpretation is found in the specification and prosecution history of the '530 patent.

As discussed above, the term "formatting type data" should be construed to mean "file structure data." Further, the specification and prosecution history make clear that the formatting data is stored in a table. First, the only specific structure identified in the specification for maintaining formatting type data is the "string list store 1103," which is a table within a relational database. See Rosenbloom Decl. Exh. B at Col. 15, lines 9-12 ("Each of the databases and the string list store is relational, in that an index, known to the processor 301 relates to a particular database entry."). Second, during prosecution, the applicant distinguished claims 1 and 13 (renumbered in the '530 patent as claims 3 and 1, respectively) from the prior art by noting,

---

[25] This term also appears in independent claims 2, 3 and 12 of the '530 patent.

> Claims 1 and 3 … specify a new advantage achieved by the invention,
> namely that [content] … need not be especially formatted for
> server/browser communications …. Moreover, the formatting of the
> text/graphics data is not restricted to a single type … but is
> independently selected (from table 1103) during processing at the server.

Amendment filed Aug. 20, 1999 at 5 (emphasis added) (Rosenbloom Decl. Exh. R).

Accordingly, viewed in the context of the specification and prosecution history, the term "maintaining a plurality of formatting types of data defining respectively corresponding predetermined formats for portions of said viewable data" would be understood by the person of ordinary skill in the art to mean "storing, in a table, two or more file structures, each file structure defining a format for portions of the viewable data."

### 3.   "Selecting a specific one of said types of formatting data in response to said formatting type identification data"[26]

As noted above, the specification and prosecution history show that the formatting data (i.e., file structure data) is identified by an identifier included in the request and selected from a table. As also noted above, the term "selecting" means "to take as a choice from among several." Thus, the term "selecting a specific one of said types of formatting data in response to said formatting type identification data" would be understood by the person of ordinary skill in the art to mean "choosing, from among the two or more file structures stored in the table, the file structure identified by the file structure identifier included in the request."

Respectfully submitted,

ROTHWELL, FIGG, ERNST & MANBECK

By:    /s/ Steven Lieberman
       Steven Lieberman (439783)
       Joseph A. Hynds  (440464)
       Brian Rosenbloom (461413)

---

[26] This term also appears in independent claims 2, 3 and 12 of the '530 patent.

1425 K Street N.W., 8th Floor
Washington, DC  20005
(202) 783-6040
*Attorneys for Plaintiff Dow Jones & Company, Inc.*


DORSEY & WHITNEY, L.L.P.

Creighton R. Magid (476961)
1001 Pennsylvania Avenue, NW
Suite 400
Washington, DC 20004-2505
Tel: (202) 442-3555
*Attorneys for Plaintiff*
*Dow Jones Reuters Business Interactive, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **OPENING BRIEF OF PLAINTIFF DOW JONES & COMPANY, INC, AND DOWN JONES REUTERS BUSINESS INTERACTIVE, LLC CONCERNING CLAIM CONSTRUCTION** was served this 5th day of January, 2007 via electronic means and first class, postage prepaid U.S. Mail, to the following:

**Amy S. Owen**
COCHRAN & OWEN, LLC
8000 Towers Crescent Drive
Suite 160
Vienna, VA 22182
703-847-4480

**Thomas G. Scavone**
NIRO SCAVONE HALLER & NIRO
181 W. Madison St.
Suite 4600
Chicago, IL 60602
313-236-0733

**Creighton R. Magid**
DORSEY & WHITNEY, L.L.P.
1001 Pennsylvania Avenue, NW
Suite 400
Washington, D.C. 20004-2505
202-442-3555

___/s/_____
Brian S. Rosenbloom