**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| DOW JONES & COMPANY, INC. | ) | |
| 200 Liberty St. | ) | |
| New York, New York 10281 | ) | |
| | ) | **Civil Action No. 1:06CV01014** |
| Plaintiff, | ) | |
| v. | ) | **Judge James Robertson** |
| | ) | |
| ABLAISE LTD ("Ablaise") | ) | |
| 40 Queen Anne Street | ) | |
| London W1G 9EL, | ) | |
| United Kingdom | ) | |
| and | ) | |
| GENERAL INVENTIONS | ) | |
| INSTITUTE A, INC., ("GIIA") | ) | |
| Craigmuir Chambers, P.O. Box 71 | ) | |
| Town Road | ) | |
| Tortola, British Virgin Islands | ) | |
| | ) | |
| Defendants. | ) | |

| | | |
|---|---|---|
| DOW JONES REUTERS | ) | |
| BUSINESS INTERACTIVE, LLC. | ) | |
| 200 Liberty St. | ) | |
| New York, New York 10281 | ) | |
| | ) | **Civil Action No. 1:06CV01015** |
| Plaintiff, | ) | |
| v. | ) | **Judge James Robertson** |
| | ) | |
| ABLAISE and GIIA | ) | |
| Defendants. | ) | |

**DOW JONES'S REPLY MEMORANDUM CONCERNING CLAIM CONSTRUCTION**

ROTHWELL, FIGG, ERNST & MANBECK

Steven Lieberman (439783)
Joseph A. Hynds (440464)
Brian Rosenbloom (461413)
1425 K Street, NW; Suite 800
Washington, DC 20005
Tel: (202) 783-6040
*Attorneys for Plaintiff*
*Dow Jones & Company, Inc.*

May 9, 2007

# TABLE OF CONTENTS

INTRODUCTION .......................................................................................................... 1

    A.  Ablaise's efforts to narrow certain aspects of the claims .............................. 1

    B.  Ablaise's efforts to broaden impermissibly other aspects of the claims ...................... 2

ARGUMENT ............................................................................................................... 3

I.     CONSTRUCTION OF TERMS IN CLAIMS OF THE '737 PATENT ........................... 3

    A.  "Displayed at a browsing device" ............................................................... 3

    B.  "Storing executable functions" .................................................................. 3

    C.  "Function" .............................................................................................. 4

    D.  "In response to identifying a request for specified content data and a user
        identifier; (a) … (e) …" ........................................................................... 5

         1.  A request for specified content data ................................................... 5

             (a) The request must include a format identifier ........................................... 6

             (b) The phrase *request for specified content data* should be construed
                 such that it does not read on a request to retrieve and execute a
                 specified file ................................................................................ 13

    E.  "Receiving format identifiers identifying the type of formatting required" ............... 14

         1.  "Receiving" ................................................................................ 14

         2.  "Format *Identifiers*" ..................................................................... 15

         3.  "Format Identifier" ....................................................................... 15

         4.  "Identifying" ............................................................................... 18

         5.  "Type of formatting required" ........................................................... 19

    F.  "Selecting a set of stored functions in dependence upon a received format
        identifier and said read user information" .................................................... 19

1. "A set of stored functions"................................................................... 19

2. "Selecting a set of stored functions *in dependence upon a received format identifier and said read user information*" .................................................. 21

G. "Formatting Data"...............................................................................22

III.   CONSTRUCTION OF TERMS IN CLAIMS OF THE '530 PATENT ......................... 22

A. "Requests from browsing devices that define a request for specified viewable data"................................................................................... 22

B. "Formatting type identification data" ....................................................... 22

C. "Formatting types of data" ....................................................................24

D. "*Maintaining* a plurality of formatting types of data" ................................24

E. "Selecting a specific one of said types of formatting data in response to said formatting type identification data"........................................................25

CONCLUSION...........................................................................................25

# TABLE OF AUTHORITIES

## Cases

Andersen Corp. v. Fiber Composites, LLC,
    474 F.3d 1361 (Fed. Cir. 2007)..................................................................... 10, 12, 25

Biogen, Inc. v. Berlex Laboratories, Inc.,
    318 F.3d 1132 (Fed. Cir. 2003)......................................................................... 18, 23

Desper Products, Inc. v. Qsound Labs, Inc.,
    157 F.3d 1325 (Fed. Cir. 1998) ............................................................................... 9

Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.,
    222 F.3d 951 (Fed. Cir. 2000)................................................................................. 10

Honeywell Intern., Inc. v. ITT Industries, Inc.,
    452 F.3d 1312 (Fed. Cir. 2006)......................................................................... 14, 18

Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,
    381 F.3d 1111 (Fed. Cir. 2004)......................................................................... 14, 16

Microsoft Corp. v. Multi-Tech Systems,
    357 F.3d 1340 (Fed. Cir. 2004)......................................................................... 11, 24

Multiform Desiccants, Inc. v. Medzam Ltd.,
    133 F.3d 1473 (Fed. Cir. 1998)............................................................................... 12

Norian Corp. v. Stryker Corp.,
    432 F.3d 1356 (Fed. Cir. 2005)............................................................................... 10

Rhodia Chimie v. PPG Indus.,
    402 F.3d 1371 (Fed. Cir. 2005)............................................................................... 18

Seachange Intern., Inc. v. C-Cor, Inc.,
    413 F.3d 1361 (Fed. Cir. 2005)............................................................................... 10

Springs Window Fashions v. Novo Indus.,
    323 F.3d 989 (Fed. Cir. 2003).................................................................... 10, 11, 25

**Other Authorities**

The American Heritage® Dictionary of the English Language, Fourth Edition. Houghton Mifflin Company, 2004 ................................................................................................................ 19

Webster's Third New International Dictionary, *Unabridged*. Merriam-Webster, 2002 ............... 19

## INTRODUCTION

Ablaise's approach to claim construction consists of interpreting the claims in light of what Ablaise wishes the specification had disclosed, rather than in light of what the specification actually discloses.  Specifically, Ablaise throughout its papers repeatedly mischaracterizes  -- or more frequently, ignores -- the specification.  Like a congressional district map of North Carolina from the 1960's that has been gerrymandered to produce the electoral results desired by its partisan architects, Ablaise's proposed claim constructions are sometimes broader and sometimes narrower than what the specification and prosecution history require.  Specifically, Ablaise proposes a narrow construction for some terms for the purpose of avoiding prior art (e.g., prior art that discloses the "on-the-fly" generation of web pages based on stored user preferences -- see, e.g., Rosenbloom Decl. Ex. L).  At the same time, it proposes inappropriately broad constructions for other terms, so that Ablaise can allege the patents cover virtually all personalized websites in which a user can specify a page layout.  For the reasons set forth in Dow Jones's opening papers and further discussed below, Ablaise's result-oriented approach to claim construction should be rejected.

### A.  **Ablaise's efforts to narrow certain aspects of the claims**

Much of Ablaise's proposed construction contortions result from the fact that it has a prior art problem.  When the applicants filed their U.S. patent application in 1996, they represented to the Patent Office that, prior to their "invention," all web pages had to be created "manually" (i.e., all web pages had to be "pre-created," as opposed to being created "on-the-fly").  See '737 patent[1] at col. 4, ll. 2-8; col. 4, ll. 51-68; and col. 10, ll. 56-58.  In short, the applicants had claimed to the Patent Office that they invented generating web pages "on-the-fly."

---

[1] U.S. Patent No. 6,961,737 (the '737 patent), Rosenbloom Decl. Ex. A.  The specification in an issued patent is identical to the specification in the patent application filed with the patent office.

Id. at col. 8, ll. 34-36.  Now, before this Court, Ablaise admits the prior art taught the "on-the-fly" generation of web pages with the result that a website "could deliver different content in the same format."  Ablaise Br. at 6.

Ablaise recognizes that the claims of the patents must be narrowly interpreted in certain respects in order to avoid invalidity based on that prior art.  This is why Ablaise contends that the claims of the '530 and '737 patents do not cover the dynamic generation of web pages where a website delivers different content in the same format, but is limited to the dynamic generation where the website delivers the same content in a different format.  See Ablaise Br. at 6; and id. at n.1.  More specifically, Ablaise contends that the claims of both patents require a user to specify or choose a page layout even though the claim language does not expressly or implicitly require such a feature.  See id. at 29-31 and 38.  As discussed in Section I.E.3.(a) below, such a proposed narrowing construction is inconsistent with both the claim language and the specification.

**B.  Ablaise's efforts to broaden impermissibly other aspects of the claims**

Ablaise also proposes impermissibly broad constructions for at least the following terms and phrases: function, request, identifying, type, formatting type identification data.  For example, with respect to the term "formatting type identification data," Ablaise proposes a construction that would encompass a "user identifier," and with respect to the term "identifying," Ablaise proposes a construction that equates the term with "corresponding to."  None of Ablaise's proposed constructions are supported by either the intrinsic or extrinsic evidence.  Nevertheless, Ablaise proposes these broad constructions in an attempt to cover most, if not all, websites that provide web page personalization options.

**ARGUMENT**

**I.    CONSTRUCTION OF TERMS IN CLAIMS OF THE '737 PATENT**

    **A.  "Displayed at a browsing device"**

This element should be construed according to its plain and ordinary meaning.  See Dow

Jones Br. at 18-19.[2]

    **B.  "Storing executable functions"**

The correct construction of "storing executable functions" is "storing a universal family

set of all available functions which may be used in order to generate portions of HTML code."

Ablaise contends that this construction is not supported by the intrinsic evidence because,

*inter alia*, the intrinsic evidence does not indicate that storing a "universal family set of all

available functions ..." is an "essential feature" of the claimed embodiment.  Although Ablaise

states that the "universal family set of functions" is not essential (Ablaise Br. at 18), Ablaise

provides no reference to the specification in support of this assertion.

The patent discloses two different embodiments for achieving the applicants' goal of

generating web pages "on-the-fly."  '737 patent at col. 11, l. 16-33.  The first embodiment relies

on "templates" with "gaps therein for the actual viewable data, such that, in response to a request

being made the viewable data could be identified and interlaced with the formatting HTML

instruction."  Id.  The second embodiment, which is described as the "preferred embodiment,"

relies on function strings "such that, in response to a particular request being made, a string of

functions are executed."  Id. at col. 11, ll. 27-31.

It is undisputed that all of the <u>claims</u> of the '737 patent are directed to the preferred

embodiment (hereafter the "function string" embodiment).  We know this because all of the

---

[2] For the convenience of the Court, we attach as Exhibit A a spreadsheet that collects in one place both parties' proposed claims constructions along with citations to the relevant portions of the briefs and the patent specification.

claims require executing functions in response to a particular request and none of the claims require a template.

An essential feature of the "function string" embodiment is the universal family set of functions.  See Chesnais Decl. ¶ 19.  With respect to the function string embodiment, the specification states:  "the system as a whole includes a universal family set of all the available functions."  '737 patent at col. 12, ll. 49-50 (emphasis added).  This is an unequivocal statement that the universal family set is not an optional feature of the embodiment, but rather a required feature.  Additionally, the specification teaches that the strings of formatting functions that are executed in response to a particular request, which formatting functions are key to the claimed embodiment, are derived or drawn from the universal set of functions.  Id. at col. 13, ll. 41-45.  Thus, without the universal set, the system would not have the ability to create the critical strings of formatting functions.  See Chesnais Decl. ¶ 19.  Accordingly, the specification teaches one of ordinary skill that the universal set is not merely an optional component, but an essential component of the claimed invention.  Hence, the correct interpretation of "storing executable functions" is storing "a universal family set of all the available functions ...."  See Dow Jones Br. at 19-22.

## C.  "Function"

With respect to the meaning of the term "function" within the phrase "storing executable functions," Ablaise asserts that the plain and ordinary meaning is "an identifiable unit of computer instructions."  But Ablaise cites no authority for this proposition and, as best we can tell, no such authority exists.  See Chesnais Decl. ¶ 21.

Ablaise attempts to support its definition of "function" by citing a single sentence in the specification.  See Ablaise Br. at 17.  That sentence states, "[a] format function of this type may

be considered as the smallest unit of instructions for producing a portion of HTML code."

Ablaise argues that, because the specification discloses that a function "may be considered as [a]

unit of instructions," it is appropriate to define the term "function" to mean "an identifiable unit

of computer instructions." However, it is a logical fallacy to assert that every identifiable unit of

computer instructions is a function merely because every function "may be considered [a] unit of

instructions" (i.e., just because a cat can be considered an animal does not mean that all animals

are cats). Moreover, the very sentence relied upon by Ablaise rebuts Ablaise's proposed

construction because it makes clear that a function must include specific instructions for

producing a portion of HTML code. Accordingly, this Court should adopt Dow Jones's

interpretation, which is: "a named set of function steps, at least one of which, when executed,

creates a portion of code." [3]  See Dow Jones Br. at 22.

### D. "In response to identifying a request for specified content data and a user identifier; (a) … (e) …"

Ablaise and Dow Jones agree that "user identifier" means "an identifier that identifies a

user" and agree that "in response to identifying ... performing steps (a) – (e)" means what it says.

Ablaise improperly argues, however, that the Court should not construe the phrase "a request for

specified content data." For the reasons set forth below, Ablaise is incorrect.

#### 1. A request for specified content data

Ablaise argues that Dow Jones "makes no attempt to tie its proposed construction to any

claim term." Ablaise Br. at 21. But this argument ignores the fact that Dow Jones is construing

the phrase "request for specified content data." See Dow Jones Br. at 25. With respect to this

phrase, Ablaise concedes that the request is transmitted from a browsing device (Ablaise Br. at

21), but disagrees that the request must include a format identifier. As is demonstrated below,

---

[3] Dow Jones has inserted "at least one of which" to replace "each of which" based on a further review of the specification.

based on the intrinsic evidence, this Court should define "request for specified content data":  (a) to require that the request include a format identifier, and (b) such that the request is not a request to retrieve and execute a specified file.

### (a) The request must include a format identifier

The intrinsic evidence demonstrates that the request must include a format identifier.  Neither the language of claim 1 nor the doctrine of claim differentiation compel another conclusion.

### i. The Intrinsic Evidence

The Specification.  The specification repeatedly emphasizes that web pages are created on-the-fly in response to receiving a request (e.g., a URL) that includes a format identifier.  For example, the specification states:

> the incoming URL [i.e., request]… will include … an element identifying the type of formatting required [i.e., a format identifier]
> …
>
> [t]hus, the input URL will identify particular types of formatting and particular types of data. The formatting information for the URL will result in particular function strings being read from the string list store 1103.
> …
>
> [a]t step 1203 a function string index [i.e., format identifier] is identified, from the formatting information present in the URL and a step 1204 the indexed function string is read from the string list store 1103.

'737 patent at col. 13, l. 67- col. 14, 1. 5; col. 15 1. 63-66; col. 18, l. 24-27 (emphasis added).

The specification repeatedly provides that the request received from the browsing device "will include" (not "may include") a format identifier.  Moreover, nowhere does the specification ever state that web pages may be generated on-the-fly in response to a request that does not include a format identifier.

Apparently recognizing this problem for its proposed construction, Ablaise argues that "[t]he specification discloses another embodiment in which the format identifier is received from

a storage location <u>and not from the browser</u>" (citing to col. 15, line 6 – col. 16, line 4 of the '737

patent). Ablaise Br. at 24. However, the cited portion of the patent teaches the exact opposite of

what Ablaise asserts. Rather than teach that the request sent to the server does not include a

format identifier, the cited portion of the patent states: "the input URL [<u>i.e.</u>, the request] <u>will</u>

identify particular types of formatting and particular types of data." <u>Id.</u> at col. 15, ll. 63-64

(emphasis added).

   In further support of its assertion that a format identifier is read from a database as

opposed to being included in the request, Ablaise focuses on the following passage from the

specification:

> In addition to use the user database to confirm user validity and to record actions
> made by the user (possibly for billing purposes) the on-line processor 301 may
> also make use of information read from the user database in order to adjust the
> relationship between indexes (1106, 1109, 1110) and their associated function
> strings and data (1107, 1108, 1111). Ablaise Br. at 25.

   However, the terms "identifier," "format identifier" or "user format preference," are

nowhere used in the above passage. Thus, the passage upon which Ablaise relies provides no

support for its contention that a "format identifier" is obtained from the user database, rather than

from the user's browser.

   Ablaise bases its assertions that the "format identifier" is obtained from a database rather

than included in the request transmitted from the user's browser on the mere fact that the

information read from the user database may be used to "adjust the relationship between an

index and a function string." Ablaise's reasoning is wrong for two reasons.

   <u>First</u>, the fact that the relationship between an index and a function string is adjusted

based on the information from the user database implies that an index and function string were

identified separately from the information read from the user database. This is so, because a

relationship between an index and a function string cannot be adjusted without identifying the index and function string whose relationship is to be adjusted. Chesnais Decl. ¶ 23. Accordingly, this implies that the server must have received an index identifier (i.e., format identifier) separate from the information read from the user database. Id. Not surprisingly, this is exactly what the specification teaches.

The specification teaches that "the input URL will identify particular types of formatting," which formatting identifier identifies an index to a "particular function string" and the relationship between the index and the function string may be adjusted based on "information read from the user database." '737 patent at col. 15, l. 63 – col. 16, l. 13. The specification further teaches that "the system may identify the particular user concerned and, in response to this information, select an index which differs from the normal index selected." The specification teaches that the "normal index selected" is the index that is identified by the format identifier included in the request sent to the server. See, e.g., id. at col. 18, ll. 24-27 ("a function string index is identified, from the formatting information present in the URL"); and id. at col. 15, ll. 63-66 ("the input URL will identify particular types of formatting … [which] will result in particular function strings being read from the string list store.").

Second, the fact that a relationship between an index and a function string is adjusted based on information read from the user database does not lead to the conclusion that the information read from the user database includes a "format identifier [i.e., an identifier corresponding to a page layout specified by a user]," as Ablaise contends. For example, it is possible to adjust the relationship based on "a user content preference," as opposed to "a user page layout preference." In fact, this is explicitly what the '737 patent discloses. See id. at col. 16, ll. 43-46 ("one user may only use the on-line shopping facility when shopping for gardening

supplies.  The user may relay this information to the system, such that the system will

concentrate on gardening supplies"); col. 16, ll. 57-59 ("the user may only be interested in ...

sports equipment, such that a first screen would display the sports icon followed by particular

types of sports"); and col. 17, ll. 24-26 ("on detecting [that the user is interested only in

clothing], it will be possible for the system to present the clothing page as the first page ....").

　　　　Nowhere does the specification inherently or explicitly disclose storing a user's page layout

preference, let alone adjusting a relationship between an index and a function based on a user's

page layout preference.  This is why Ablaise does not and cannot cite a single passage in the

specification to support its contention that "information read from the user database may include a

user format preference which corresponds to certain HTML tags being written."  Ablaise Br. at 26.

　　　　Accordingly, the above passage from the specification relied on by Ablaise does not

support either of Ablaise's conclusions.  Rather, it supports Dow Jones's interpretation.

　　　　<u>The Prosecution History</u>.  The "prosecution history is an important source of intrinsic

evidence in interpreting claims ...."  <u>Desper Prods., Inc. v. QSound Labs, Inc.</u>, 157 F.3d 1325,

1336-37 (Fed. Cir. 1998).  The prosecution history of the '737 patent and the prosecution history

of the '530 patent[4] confirm that the correct interpretation of "a request for specified content data"

is "a request that includes a format identifier."

　　　　During prosecution of the '737 patent, the applicants distinguished a prior art reference

on the grounds that "it is not believed that the cited Wolff reference in any way teaches serving

the same text/graphic content in different viewable page formats – <u>depending upon received</u>

<u>requests incorporating respectively different format identifiers</u>."  Rosenbloom Decl. Ex. M at 13

(emphasis added).

---

[4] U.S. Patent No. 6,295,530 (the '530 patent), Rosenbloom Decl. Ex. B.

9

This is a disclaimer of claim scope. <u>Andersen Corp. v. Fiber Composites, LLC</u>, 474 F.3d 1361, 1374 (Fed. Cir. 2007). The statement provides notice to the public that claims 2-21 specifically require that the request incorporates a "format identifier." Yet Ablaise urges this Court to ignore the above language because, according to Ablaise, it was not necessary to distinguish over the prior art. Ablaise Br. at 28-29. But, "there is no principle of patent law that the scope of a surrender of subject matter during prosecution is limited to what is absolutely necessary to avoid a prior art reference ...." <u>Norian Corp. v. Stryker Corp.</u>, 432 F.3d 1356, 1361 (Fed. Cir. 2005); <u>see also</u> <u>Andersen</u>, 474 F.3d at 1374 ("as we have made clear, an applicant's argument that a prior art reference is distinguishable on a particular ground can serve as a disclaimer of claim scope even if the applicant distinguishes the reference on other grounds as well.").

Ablaise also argues that this Court should disregard the statement because the applicants now claim that they did not intend to limit the claims in this manner. <u>See</u> Ablaise Br. at 27 ("The inventors were 'trying' to make [a] distinction about 'format'"); and <u>id.</u> at 28 ("It could not have been the inventor's intention [to limit the claims as Dow Jones suggests]"). But "[c]ourts must view the prosecution history not for applicant's subjective intent [i.e., what the applicant was 'trying' to say], but as an official record that is created in the knowledge that its audience is not only the patent examining officials and the applicant, but the interested public." <u>Seachange Intern., Inc. v. C-Cor, Inc.</u>, 413 F.3d 1361, 1375 (Fed. Cir. 2005); <u>see also</u> <u>Springs Window Fashions v. Novo Indus.</u>, 323 F.3d 989, 995 (Fed. Cir. 2003); <u>Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.</u>, 222 F.3d 951, 957 (Fed. Cir. 2000).

In this case, based on applicants' remark that the "Wolff reference [does not teach] ... <u>requests incorporating respectively different format identifiers</u>," a member of the public would

10

conclude that the claimed invention covers only those systems/methods in which the claimed "request for specified content data" incorporates a format identifier, and the public is entitled to rely on the inventors' disclaimer. See Springs Window Fashions, 413 F.3d at 995. Ablaise therefore must be held to the restrictive claim construction that was argued during prosecution to distinguish the claimed invention from the prior art. Id.

With respect to the prosecution history of the '530 patent, Ablaise contends that statements made during prosecution of the '530 patent are irrelevant. However, those statements are relevant. During prosecution of the '530 patent, the applicants stated, "the present invention receives data from a browser which [data] indicates the type of formatting required by the browser." Rosenbloom Decl. Ex. O at 6. Because the statement was in the context of "the present invention," the statement was not limited to the invention claimed in the '530 patent, but was a reflection of the applicants' own understanding of the invention disclosed in the '530 and '737 patents. See Microsoft Corp. v. Multi-Tech Systems, 357 F.3d 1340, 1349-50 (Fed. Cir. 2004) (construing the claims of one patent in light of a statement made during prosecution of a related patent because the statement was related to the scope of the invention disclosed in the specification). Thus, the statement is relevant to the construction of the claims of the '737 patent and reinforces the conclusion that the applicants considered the invention to require incorporating format identifiers in the requests transmitted to the web server. Id. at 1350 ("Any statement of the patentee in the prosecution of a related application as to the scope of the invention would be relevant to claim construction ....").

### ii. The language of claim 1

Based on the language of claim 1, Ablaise argues that it is inconsistent to require that the format identifiers be included "in" the request because claim 1 requires receiving the format identifier "in response to" the request. Ablaise Br. at 23. However, there is no inconsistency.

Not only is it possible to identify a request containing a format identifier and then, in response to identifying the request, receive said format identifier, but that is exactly what the specification discloses.  More specifically, the specifications disclose that a computer program known as the "HTTP daemon" receives and identifies requests (i.e., URLs from web browsers).  '737 patent at col. 8, ll. 18-62.  The specification also teaches that, after the HTTP daemon detects the URL (i.e., request), the on-line processor 301 receives the URL from the HTTP daemon.  See id. at Fig. 11 (showing the HTTP daemon 403 transmitting URLs to the processor 301 through the input URL buffer 1101).  Thus, no inconsistency is created by construing claim 1 to require (1) that the request includes a format identifier and (2) receiving the format identifier in response to identifying the request.

### iii. Claim Differentiation

Ablaise argues that because claim 2 requires that the "format identifier is received with said request," under the doctrine of claim differentiation, it would be erroneous for this Court to adopt Dow Jones's construction.  Ablaise's claim differentiation argument fails for two reasons.  First, the doctrine of claim differentiation is relevant only when a claim construction would render another claim superfluous.  Andersen Corp.,  474 F.3d at 1369 ("To the extent that the absence of such difference in meaning and scope would make a claim superfluous, the doctrine of claim differentiation states the presumption that the difference between claims is significant.") (citation and internal quotations omitted).  In this case, claim 2 would not be rendered superfluous because claim 2 requires that "viewable data is served to a browser ..." in addition to requiring that the "format identifier is received with said request."  Second, "claim differentiation can not be used to broaden claims beyond their correct scope, determined in light of the specification and the prosecution history. . . ." Multiform Desiccants, Inc. v. Medzam Ltd.,

133 F.3d 1473, 1480 (Fed. Cir. 1998).  In this case, Ablaise is attempting to broaden claim 1 beyond its correct scope.

> **(b) The phrase *request for specified content data* should be construed such that it does not read on a request to retrieve and execute a specified file**

Ablaise, by asking this Court not to construe this claim element, implicitly seeks a construction broad enough to read on a request for a predetermined file as well as a request to retrieve and execute a specified file (e.g., CGI programs such as scripts and other programs).  But, Ablaise admitted in the specification that (a) serving a predetermined file in response to identifying a request and (b) retrieving and executing a specified file in response to identifying a request, were both well known features that were found in the prior art.  See '737 patent at col. 8, ll. 19-44.  Furthermore, the applicants explicitly distinguished their system, which they termed an "on-line processing system," from this prior art.  Id.

> In response to detected requests, the processing environment **402** is arranged to supply predetermined HTML files **403** to the I/O device **304**. In addition, it is also possible for the HTTP daemon **401** to identify common gateway interface binary programs (CGI.BIN programs) which are executable instructions within the processing environment **402** .... Facilities of this type are available within existing HTTP servers. However, in addition, it is possible for the daemon to respond to requests where the output HTML file will be produced "on-the-fly" in response to instructions identified as "on-line processing".

Id.  With reference to figures 4 and 5 of the specification, the specification distinguishes among (1) a request for "on-line processing," (2) a request to retrieve and execute a specified file (e.g., a CGI.BIN program), and (3) a request for a specified predetermined HTML file.  That is, the specification makes clear what the invention is (i.e., generating HTML pages "on-the-fly" using an "on-line processing" system) and what it is not (e.g., retrieving and executing a file in response to a request that identifies the file).

The applicants, by distinguishing and criticizing these prior art technologies as not enabling the creation of web pages on-the-fly, have disavowed them from the scope of the patent's claims.  "Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question."  <u>Honeywell Intern., Inc. v. ITT Industries, Inc.</u>, 452 F.3d 1312, 1318-19 (Fed. Cir. 2006) (construing "electrically conductive fibers" to exclude carbon fibers because the written description "demeaned the properties of carbon fibers.").  Accordingly, when the claim recites, "in response to identifying a request ....,  performing steps (a) ... (e)," one of ordinary skill in the art at the time of the invention would have understood the term "request" to mean something other than (1) a request for a predetermined file or (2) a request to retrieve and execute a file identified in the request.  Chesnais Decl. ¶ 25.

### E.  "Receiving format identifiers identifying the type of formatting required"

#### 1.  "Receiving"

Ablaise asks this Court to interpret "receiving" to encompass "look[ing] up" (<u>i.e.</u>, reading[5]).  Ablaise Br. at 23 (arguing that Dow Jones's construction of "receiving format identifiers" means that format identifiers "cannot be looked up in [<u>i.e.</u>, read from] ... a database").  However, there is no basis for such a broad construction of the term receiving.  Claim 1 requires "*reading* user preference information from [a] database"[6] and "*receiving* format identifiers."  There is a presumption that different words in a claim have different meanings.  <u>Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.</u>, 381 F.3d 1111, 1119

---

[5] Ablaise uses "looking up" synonymously with reading.  <u>See</u> Chesnais Decl. ¶ 26.
[6] '737 patent at col. 20, lines 14-15.

(Fed. Cir. 2004). Thus, there is a presumption that "receiving" does not mean "reading" or "looking up." Indeed, the specification uses the verb "to read" to mean retrieving data, as from a database, and uses the verb "to receive" to mean to acquire something transmitted. See, e.g., '737 patent at col. 5, ll. 34-35 ("Preferably, viewable data is read from conventional databases in response to a URL being received") (emphasis added).

Furthermore, if this Court were to accept Ablaise's proposed construction of "receiving" and its proposed construction for "format identifier," then the element "receiving format identifiers" would cover "reading a format specified by a user (i.e., user preference information) from a database." However, as mentioned above, claim 1 of the '737 patent requires "reading user preference information from said user database" in addition to "receiving format identifiers." Thus, accepting Ablaise's proposed construction of "receiving format identifiers" would make redundant "reading user preference information from said user database."

Accordingly, Dow Jones asks this Court to construe receiving as "acquiring something transmitted."

### 2. "Format *Identifiers*"

Ablaise did not contest Dow Jones interpretation of "format identifiers," and, therefore admits that "format identifiers" means "more than one format identifier."

### 3. "Format Identifier"

As explained in Dow Jones's opening brief, when read in the context of the specification of the '737 patent, the phrase "format identifier" would be understood by the person of ordinary skill in the art to mean "an identifier[7] that was included in the request for specified content data and that identifies the type of formatting required."

---

[7] Dow Jones does not contest Ablaise's proposed construction of the term identifier to mean "name, token, string of characters, or sequence of bits."

In response, Ablaise argues that the "format identifiers" need not have been included in the "request for specified content data."  As discussed above, Ablaise supports this argument by contending that the specification discloses an embodiment in which a user's formatting preferences (i.e., format identifiers) are obtained from the user database, rather than from the request.  For reasons set forth in Section I.D.1.(a), supra,  this argument is without merit. Furthermore, even if we assume arguendo that the specification discloses obtaining a user's formatting preferences from the user database, Ablaise's argument that, *ipso facto*, the phrase "receiving format identifiers" should be construed broadly to encompass reading a user's formatting preference from the user database is without merit because the claim explicitly recites "reading user preference information from said user database."  '737 patent at col. 20, ll. 14-15. Because the claim recites "reading user preference information from said user database," there is a presumption that the phrase "receiving format identifiers" means something other than "receiving user preference information from the user database."  Innova/Pure Water, 381 F.3d at 1119.  Ablaise has put forth no evidence to overcome this presumption.  Rather, Ablaise has admitted that the user preference information read from the user database "is distinct from 'format identifiers' ...."  Ablaise Br. at 34 n.8.

### a.  Neither the claim language nor the specification support interpreting "format identifier" to mean an identifier corresponding to a user specified page layout

Ablaise proposes construing the phrase "format identifier" to mean an identifier corresponding to a user's specified formatting (i.e., page layout) preference.[8]  More specifically, Ablaise proposes constructing the phrase "format identifier" to mean "an identifier corresponding to a type of [page layout] specified by a user from at least two types of [page layouts] available to the user for specified content data."  Ablaise Br. at 22 (emphasis added).

---

[8] Ablaise asserts that "formatting" means "page layout."  Ablaise Br. at 31.

Ablaise's proposed construction is based on a mischaracterization of both the claim and the specification.

(1) <u>The claim language supports Dow Jones's construction.</u>  The claim explicitly requires "reading user preference information from said user database in response to a received <u>user identifier</u>."  '737 patent at col. 20, ll. 14-15 (emphasis added).  Thus, it is the claimed "user identifier," not the claimed "format identifier," that corresponds to user preference information.

Notwithstanding the plain language of the claim, Ablaise contends that, because the step of "receiving format identifiers identifying the type of formatting required" is performed "in response to identifying ... a user identifier," the format identifiers, *ipso facto*, correspond to a page layout "<u>specified</u> by the user" (<u>i.e.</u>, user preference information). Ablaise Br. at 30.  But, even if we were to assume that the format identifier corresponds to user preference information (which it does not), it does not follow that the format identifier corresponds to a preference <u>specified</u> by a user.   In fact, the specification discloses a system that <u>infers</u> a user's preferences based on the user's browsing history.  '737 patent at col. 17, ll. 14-46.  Thus, even if we were to assume arguendo that a format identifier corresponds to user preference information, the specification teaches that the received format identifier could correspond to a preference specified by a computer program based on the user's browsing history.

(2) <u>The specification does not teach that a user can select a page layout.</u>  Ablaise argues that "a key purpose for the invention claimed in the '737 patent is to allow a user to choose between at least two available types of formatting  [<u>i.e.</u>, types of <u>page layout</u>, according to Ablaise's definition of formatting]."  Ablaise Br. at 30.  But once again Ablaise provides no citation to any portion of the specification for this proposition.  Why?  Because there is no such disclosure anywhere in the '737 patent.

Ablaise then argues that, "the specification describes that users indicate preferences <u>such as which type of formatting [i.e., page layout] they prefer</u>." <u>Id.</u> (emphasis added).  In support of this argument, Ablaise cites to a portion of the specification that states, "[a user may] specify preferences such that the system becomes more tailor-made and specific to that particular user." <u>Citing</u> '737 Patent at col. 16, 11. 39-41, 63.  But the sentences immediately following the language Ablaise makes absolutely clear that these user specified preferences are <u>content</u> preferences, not <u>page layout</u> preferences.  <u>See,</u> '737 patent at col. 16, ll. 42-43 ("in a home shopping environment, it is possible for a user to specify the particular goods of interest."); <u>id.</u> at col. 16, ll. 56-58 ("the user may only be interested in sports equipment"); <u>id.</u> at col. 16, ll. 64-66 ("Such an approach may be used in news publication.  For example, some users may be interested predominantly in financial news, while other may be interested in sports news.").  Nowhere does the specification teach a user selecting a page layout preference.

 (3) <u>The prosecution history does not support Ablaise's interpretation</u>.  The specification does not disclose a system in which a user specifies a page layout preference.  Ablaise therefore relies on a self-serving statement from the prosecution history in an attempt to broaden the content of the specification.  But a patent applicant is not allowed to expand the scope of the claims through statements made during prosecution.  <u>See</u> <u>Biogen, Inc. v. Berlex Laboratories, Inc.</u>, 318 F.3d 1132, 1140 (Fed. Cir. 2003); <u>Rhodia Chimie v. PPG Indus.</u>, 402 F.3d 1371, 1379 (Fed. Cir. 2005); <u>Honeywell v. ITT Indus., Inc.</u>, 452 F.3d. 1312, 1319 (Fed. Cir. 2006).

### 4.  "Identifying"

Ablaise proposes interpreting "identifying" to mean "corresponding to."  However, it provides no discussion as to why this Court should make this construction.  Because there is

nothing in the specification that requires otherwise, this Court should give the term its plain and ordinary meaning.  The ordinary meaning of "identifying" is "establishing the identity of."[9]

### 5.  "Type of formatting required"

Dow Jones disputes Ablaise's contention that "formatting in the '737 patent means <u>page layout</u> ... [or] how a user wants the page to <u>look</u>."  Ablaise Br. at 31 (emphasis added).  As discussed above, neither the specification nor claims teach a user choosing a page layout or "look."  Specifically, the specification does not use the term "look" even once and it uses the term "page layout" only once when discussing the "Background of the Invention."  <u>See</u> '737 patent at col. 3, ll. 7-11 (discussing conventional HTML technology and noting that it is "possible to generate a wide range of page layouts from a modest set of HTML tags.").  Accordingly, when Ablaise states, "the specification ... demonstrate[s] that a user chooses a type of formatting [<u>i.e.</u>, page layout or look] ....," Ablaise Br. at 31, Ablaise is simply making stuff up.  Thus, this Court should adopt Dow Jones's proffered construction (discussed in Dow Jones's opening brief at 33) because it is supported by specification. [10]

### F.  "Selecting a set of stored functions in dependence upon a received format identifier and said read user information"

#### 1.  "A set of stored functions"

Viewed in light of the claim and the specification, the phrase "a set of stored functions" would be understood by the person of ordinary skill in the art at the time of the alleged invention to mean "a particular stored and indexed function string."  Chesnais Decl. ¶ 31.  In response, Ablaise argues that "there is no basis for Dow's attempt to limit a 'set of functions' to only one

---

[9] <u>The American Heritage® Dictionary of the English Language, Fourth Edition</u>. Houghton Mifflin Company, 2004.
[10] Furthermore, Ablaise's proposed construction of the phrase "type of formatting required" completely ignores the word "type."  Thus, if this Court were to agree with Ablaise that "formatting in the '737 patent means page layout," Ablaise Br. at 31, then this Court should construe the phrase "type of formatting required" to mean "type of page layout required," and, furthermore, should give the word "type" its plain and ordinary meaning, which is "kind" or "sort."  <u>Webster's Third New International Dictionary</u>, <u>Unabridged</u>. Merriam-Webster, 2002.

such form discussed in the preferred embodiment." Ablaise Br. at 36. Ablaise is wrong for the following reasons.

First, as discussed above, all of the claims of the '737 patent are specifically directed to the preferred embodiment. See section I.B, supra.

Second, the specification repeatedly emphasizes that, in the preferred embodiment, web pages are created on-the-fly by selecting an indexed function string and executing the selected function string. '737 patent at col. 11, ll. 26-28("in response to a particular request being made, a string of functions are executed"); col. 15, ll. 64-67 ("[t]he formatting information for the URL will result in particular function strings being read from the [database] .... [t]hereafter, these functions are executed"); col. 13, ll. 5-7 ("any required output page may be generated by stringing formatting functions together"); col. 5, ll. 13-15 ("a particular function string, arranged to generate a HTML page, may be quickly sought and executed during on-line operation"); and col. 18, ll. 24-27 ("[a]t step 1203 a function string index is identified ... and a step 1204 the indexed function string is read from the string list store 1103").

Third, as explained in Dow Jones's opening brief, the specification uses the term "a set of functions" only once and uses it synonymously with "function string." See Dow Jones Br. at 38.

Fourth, an essential feature of the preferred embodiment is that the system stores a plurality of indexed function strings and selects at least one such indexed function string in response to receiving a request from the web browser. Specifically, after the '737 patent describes several different web page personalization capabilities of the disclosed web server, it states:

> [i]t can be appreciated that the possibilities are endless …. [t]his is all provided by the fact that the actual HTML pages supplied back to the users are generated "on-the-fly" by indexing locations within databases.

'737 patent at col. 17, l. 66-col. 18, l. 2 (emphasis added).  Thus, the specification teaches that indexing is a critical feature of the invention.

Accordingly, when one of ordinary skill in the art reads the element "selecting a set of stored functions .... in response to a request ...." in light of the specification, the person would understand "selecting a set of stored functions" to mean "selecting an indexed function string." Chesnais Decl. ¶ 31.

### 2.    "Selecting a set of stored functions *in dependence upon a received format identifier and said read user information*"

Ablaise contends that this element covers systems in which at least one function is selected in dependence upon only the read user information and another function is selected in dependence upon only the format identifier.  This proposed construction is wrong.  The plain language of the claim states that the set is selected based on the read user information <u>and</u> the format identifier; it does not state that a portion of the set may be selected based on only the format identifier or only the user information.[11]

In addition, the specification never discloses an embodiment where, in response to a request, the server selects at least two functions, where one function is selected in dependence upon only the user information and the other function is selected in dependence upon only the format identifier.  Rather, the specification discloses selecting a function string in response to detecting a request, where the selection is dependent upon both the format identifier received in the request and user information read from the database.  <u>See id.</u> col. 15, l. 63 to col. 16, l. 14 (describing a request that includes a format identifier, which identifies a particular indexed function string, and describing that user information can be used to adjust the relationship between the index and its associated function string).

---

[11] The term "format identifier" in this element of the claim should be construed the same as proposed above in section I.E.3

Accordingly, this Court should adopt Dow Jones's proposed construction.  See Dow Jones Br. at 38-39.

### G.  "Formatting Data"

Ablaise and Dow Jones agree (Ablaise Br. at 37) that the phrase "formatting data" should be limited to data which specifies location.  Ablaise further proposes to limit the phrase "formatting data" to "markup language, such as HTML tags" because Ablaise contends that that is the "plain and ordinary meaning."  Ablaise Br. at 36.  However, Ablaise argues elsewhere in the brief that "the specification is clear that formatting data means HTML tags."  Ablaise Br. at 40-41 (emphasis added).[12]  Ablaise needs to make up its mind.

## III.    CONSTRUCTION OF TERMS IN CLAIMS OF THE '530 PATENT

### A.  "Requests from browsing devices that define a request for specified viewable data"

Ablaise did not contest Dow Jones's proposed construction of this element of the claim, but only argued that the term does not need construction.  Accordingly, this Court should adopt Dow Jones's proposed construction.[13]  See Dow Jones Br. at 42-44.

### B.  "Formatting type identification data"

Ablaise asks this Court to define "formatting type identification data" to mean "data corresponding to a specified page format chosen from at least two page formats available to the requesting browsing device for specified viewable data."  Dow Jones asks this Court to define the phrase to mean "data identifying a type of formatting."  Dow Jones's construction follows logically from the plain language of the words "formatting type identification data." Ablaise's

---

[12] This statement by Ablaise was made in reference to the term "formatting data" found in claim 1 of the '530 patent.  However, as noted previously, the written description of the '530 patent is identical to the written description of the '737 patent.

[13] In addition, for the reasons given above with respect to the '737 patent, this Court should hold that term "a request from a browsing device" does not read on a request to retrieve and execute a file identified in the request.

construction does not.  Ablaise's construction might have been persuasive had the claim recited –

which it does not -- "page format identification data," rather than "formatting type identification

data."

Other portions of the claim also support Dow Jones's construction.  For example, the

claim states, "selecting ... one of said types of formatting data in response to said formatting type

identification data."  '530 patent at col. 20, ll. 4-5.  The claim does not state "selecting a page

format in response to said formatting type identification data."  Accordingly, the term does not

mean "data corresponding to a specified page format."[14]

Ablaise also asks this Court to construe the term "formatting type identification data" to

read on a "user identifier if the user identifier is used to select between two or more page

formats."  In support of this broad reading of the claim, Ablaise cites to a statement made during

prosecution.  See Ablaise Br. at 39.  However, as discussed above, "[r]epresentations during

prosecution cannot enlarge the content of the specification."  Biogen, 318 F.3d at 1140.  In this

case, rather than teach that a user identifier could be formatting type identification data, the

specification explicitly teaches that a user identifier is separate and distinct from data identifying

the type of formatting required.  See, e.g., '530 patent at col. 13, ll. 60-64 ("The URL will

include ... an element identifying the type of formatting required [and] information relating to the

user ....").

In further support of its interpretation, Ablaise asserts that "there is no claimed 'user

identifier' in the '530 patent."  Ablaise Br. at 38.  This is assertion is false.  Claims 8 and 11 of

---

[14] Moreover, by asking this Court to construe "... *identification data*" to mean "*data corresponding* to ...," Ablaise once again asks this Court to equate the term "identifying" with the term "corresponding" without providing any rational for such a broad construction.  As discussed above, this Court should give the term "identifying" its ordinary meaning. See section I.E.4 supra.

the '530 patent require the request to include "data relating to a user identity." '530 patent at col. 21, ll. 46-67.

### C.  "Formatting types of data"

Ablaise proposes construing the phrase "formatting types of data" to mean "mark-up tags, such as HTML tags" because Ablaise contends that that is the "plain and ordinary meaning" of "formatting data."  Ablaise Br. at 36, 40.  However, there is no evidence "mark-up tags" is the plain and ordinary meaning of "formatting data."  Ablaise also argues that "the specification is clear that <u>formatting data means HTML tags</u>."  Ablaise Br. at 41 (emphasis added).  Dow Jones disagrees and requests this Court to adopt Dow Jones's proposed construction.  <u>See</u> Dow Jones Br. at 42-43.  However, if this Court were to agree with Ablaise that "the specification is clear that formatting data means HTML tags," then the Court should construe the phrase "formatting types of data" to mean "HTML tags," rather than construe it to mean "mark-up tags," which is how Ablaise proposes construing it.

### D.  "*Maintaining* a plurality of formatting types of data"

The correct construction of "*maintaining* a plurality of formatting types of data" is "*storing, in a table,* a plurality of formatting types of data."  Ablaise objects to this construction because, Ablaise Argues, it seeks to impose a structural limitation into claim 1 and claim 1 is a method claim, not an apparatus claim.  However, it is entirely appropriate to limit a method claim to require a specific structure when the intrinsic evidence mandates such a construction. <u>See, e.g.,</u> <u>Microsoft Corp. v. Multi-Tech Systems</u>, 357 F.3d 1340, 1347-49 (Fed. Cir. 2004) (construing the term "transmitting" in a method claim to mean "transmitting over a telephone line" because the specification "repeatedly and consistently describes ... communicating directly over a telephone line").

24

Ablaise also contends that the specification discloses storing formatting functions as opposed to formatting types of data in "table 1103." This argument is incorrect. The applicants admitted during prosecution that the "formatting types of data" may be stored in "table 1103." <u>See</u> Rosenbloom Decl. Ex. R at 5. Ablaise wants this Court to ignore this admission, which it characterizes as "irrelevant." Ablaise Br. at 43. However, a statement made during prosecution to distinguish a prior art reference is not irrelevant, regardless of whether the statement was necessary to overcome a rejection. <u>See</u> <u>Andersen Corp.</u>, 474 F.3d at 1374. In this case, the applicants distinguished their alleged invention from a patent to Meske by noting, "data is not restricted to single type (as taught by Meske) but is ... selected (<u>from table 1103</u>) during processing ...." Rosenbloom Decl. Ex. R at 5 (emphasis added). Moreover, as discussed above, the prosecution history is a public record, and the public should be able to rely on statements made by the applicants. <u>See</u> <u>Springs Window Fashions</u>, 323 F.3d at 995 ("The public notice function of a patent and its prosecution history requires that a patentee be held to what he declares during the prosecution of his patent.").

    **E. "Selecting a specific one of said types of formatting data in response to said formatting type identification data**

Ablaise contends this element need not be construed. Dow Jones disagrees and requests this Court to construe the element as proposed in Dow Jones's opening brief. <u>See</u> Dow Jones Br. at 45.

**CONCLUSION**

For the reasons set forth above and in Dow Jones's opening papers, the claims of the '737 and '530 patents should be construed as proposed by Dow Jones.

Respectfully submitted,

ROTHWELL, FIGG, ERNST & MANBECK

By:    /s/ Steven Lieberman
        Steven Lieberman (439783)
        Joseph A. Hynds  (440464)
        Brian Rosenbloom (461413)
        1425 K Street N.W., 8th Floor
        Washington, DC  20005
        (202) 783-6040
        *Attorneys for Plaintiff Dow Jones & Company, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **DOW JONES'S REPLY MEMORANDUM CONCERNING CLAIM CONSTRUCTION** was served this 9th day of May, 2007 via electronic means and first class, postage prepaid U.S. Mail, to the following:

**Amy S. Owen**
COCHRAN & OWEN, LLC
8000 Towers Crescent Drive, Suite 160
Vienna, VA 22182
703-847-4480

**Thomas G. Scavone**
NIRO SCAVONE HALLER & NIRO
181 W. Madison St. , Suite 4600
Chicago, IL 60602
313-236-0733

**Creighton R. Magid**
DORSEY & WHITNEY, L.L.P.
1001 Pennsylvania Ave., Suite 400
Washington, D. C. 20004
202-442-3555

**Jeffrey John Downey**
ROBINS, KAPLAN MILLER & CIRESI, LLP
1875 Eye Street, NW; Suite 300
Washington, DC 20006
(202) 736-2782

**Cyrus A. Morton**
ROBINS, KAPLAN, MILLER & CIRESI LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
(612) 349-8500

__/s/_____
Brian S. Rosenbloom