# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DOW JONES & COMPANY, INC.,　)

　　　　　　　Plaintiff,　　)　　　Civil Action No. 1:06-CV-01014

　)

　　　v.　　　　　　　　　　)　　　Judge James Robertson

　)

ABLAISE LTD. and GENERAL　　)　　**Filed under Seal**
INVENTIONS INTITUTE A, INC.　)

　)

　　　　　Defendants.　　　　)

　)

DOW JONES REUTERS BUSINESS　)
INTERACTIVE, LLC d/b/a FACTIVA,　)　　Civil Action No. 1:06-CV-01015

　)

　　　　　　　Plaintiff,　　)　　　Judge James Robertson

　)

　　　v.　　　　　　　　　　)　　　**Filed under Seal**

　)

ABLAISE LTD. and GENERAL　　)
INVENTIONS INTITUTE A, INC.　)

　)

　　　　　Defendants.　　　　)

　)

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY

Steven Lieberman (439783)
Sharon Davis (439223)
Brian Rosenbloom (461413)
Oliver Edwards (975833)
ROTHWELL, FIGG, ERNST & MANBECK
1425 K Street, N.W., Suite 800
Washington, DC 20005
Tel: (202) 783-6040
Fax: (202) 783-6031

*Attorneys for Plaintiffs, Dow Jones & Company, Inc. and Dow Jones Reuters Business Interactive, LLC d/b/a Factiva*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ............................................................................................................... 1

    A.    Anticipation .......................................................................................... 3

    B.    Obviousness .......................................................................................... 4

STATEMENT OF FACTS .................................................................................................. 7

    A.    Personalization of Computer Display Formats before May 15, 1995 ................... 7

    B.    Development of the World Wide Web before May 15, 1995 ................................ 9

    C.    The Motiviation to Bring Personalized Formatting to the Web ........................... 12

    D.    Technology Combining Personalization and the Web before May 15, 1995 ........ 14

        1.    Fishwrap ..................................................................................... 14
        2.    The Bobo Patent ......................................................................... 15
        3.    The Sun Microsystems Patent ...................................................... 16
        4.    Thunderstone .............................................................................. 16
        5.    HTGrep ...................................................................................... 17

    E.    The '737 and '530 Patents .................................................................... 18

ARGUMENT ..................................................................................................................... 20

I.    Legal Standards Governing Dow Jones' Motion .............................................. 20

II.    Claims 1, 3, 4 And 6 Of The '737 Patent Are Invalid In Light Of  Fishwrap ............ 23

    A.    Fishwrap was Publicly Used in the United States before May 15, 1995 .............. 23

    B.    Fishwrap Anticipates Claims 1, 3, 4 and 6 of the '737 Patent ........................... 24

        1.    Fishwrap Uses Format Identifiers to Select the
            Functions to Generate the Web Page ............................................ 27
        2.    A "Format Identifier" Does Not Require Explicit
            User Selection of Format ............................................................. 29

    C.    Fishwrap Renders Claims 1, 3, 4 and 6 of the '737 Patent Obvious .................... 31

**TABLE OF CONTENTS (cont'd.)**

Page

1.   The Invention of the '737 Patent would have been
     Obvious to the Person of Ordinary Skill in the Art ................................31

2.   Ablaise has not Established any Secondary Indicia
     of Non-Obviousness that Support a Finding on Non-
     Obviousness ................................................................................34

III.   Claims 1, 3, 4 And 6 Of The '737 Patent Are Invalid In Light Of The Bobo Patent ........37

       A.   The Bobo Patent Anticipates Claims 1, 3, 4 and 6 of the '737 Patent....................37

       B.   The Bobo Patent Renders Claims 1, 3, 4 and 6 of the
            '737 Patent Obvious................................................................................39

IV.    Claims 1, 3, 4 And 6 Of The '737 Patent Are An Obvious Combination Of
       Personalized Computer Display (i.e., The Reuters Patent) And Web Technology
       For Generating HTML Pages On The Fly (i.e., The Sun Microsystems Patent)..............40

V.     The HTGrep Program Invalidates Claims 1-3 Of The '530 Patent .....................................42

       A.   The HTGrep Program was Disclosed in a Printed Publication
            and Used in the United States before May 15, 1995...............................................42

       B.   The HTGrep Program Anticipates Claims 1-3 of the '530 Patent.........................44

       C.   The HTGrep Program Renders Claims 1-3 of the '530 Patent Obvious ..............45

VI.    The Thunderstone Bridge Program Invalidates Claims 1-3 Of The '530 Patent..............46

       A.   The Thunderstone Bridge Program was Sold and Used in the
            United States before May 15, 1995............................................................46

       B.   The Thunderstone Bridge Program Anticipates Claims 1-3
            of the '530 Patent................................................................................47

       C.   The Thunderstone Bridge Program Renders Claims 1-3
            of the '530 Patent Obvious .........................................................................48

CONCLUSION................................................................................48

## TABLE OF AUTHORITIES

**Cases**                                                                                   **Page**

Adenta GMBH v. Orthoarm, Inc., 501 F.3d 1364 (Fed. Cir. 2007) ...............................21

Bruckelmyer v. Ground Heaters, Inc., 445 F.3d 1374 (Fed. Cir. 2006) ........................21

Commonwealth Scientific and Industrial Research Org. v. Buffalo Technology, Inc.,
    2008 U.S. App. LEXIS 20061 (Fed. Cir. Sept. 19, 2008) ..........................22, 32

Elan Pharms. Inc. v. Mayo Found., 304 F.3d 1221 (Fed. Cir. 2002)............................20

Elmer v. ICC Fabricating, 67 F.3d 1571 (Fed. Cir.1995)..............................................20

In re Klopfenstein, 380 F.3d 1345 (Fed. Cir. 2004) ......................................................21

Iron Grip Barbell Co. v. USA Sports, Inc., 392 F.3d 1317, 1324 (Fed. Cir. 2004).......................36

KSR Int'l Co. v. Teleflex Inc., 127 S. Ct. 1727 (2007) ........................................ *passim*

Leggett & Platt, Inc. v. VUTEK, Inc., 537 F.3d 1349 (Fed. Cir. 2008) ........................21

Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318 (Fed. Cir. 2008)..................22, 30

Ruiz v. A.B. Chance Co., 234 F.3d 654 (Fed. Cir. 2000)..............................................34

Tivo, Inc. v. Echnostar Comm'ns Corp., 516 F.3d 1290 (Fed. Cir. 2008) ...................30

## INTRODUCTION

Plaintiffs, Dow Jones & Company, Inc. and Dow Jones Reuters Business Interactive, LLC d/b/a Factiva ("Dow Jones"), respectfully submit this memorandum in support of their motion for summary judgment of invalidity of Claims 1, 3, 4 and 6 of U.S. Patent No. 6,961,737 ("the '737 patent") and Claims 1-3 of U.S. Patent No. 6,295,530 ("the '530 patent"). These are the only claims that Ablaise has asserted are infringed by Dow Jones, and thus a finding of invalidity as to these claims will dispose of this action.[1]

The claims of both the '737 and '530 patents relate to using a computer server to send users personalized content and format over the World Wide Web in the form of HTML pages generated dynamically or "on the fly." Both patents claim a priority date of May 15, 1995. See Declaration of Sharon L. Davis, Esq. ("Davis Decl."), Exs. 1 and 2. Both the '737 patent and the '530 patent are based on the same specification and claim priority from the same U.K. patent application. The difference between the two patents' claims involve the mechanism by which personalized formatting is implemented. The claims of the '737 patent specify that the user's preferences be stored in a database. See Davis Decl., Ex. 1 at Claims 1, 3, 4 and 6. The claims of the '530 patent do not require use of a user database, but instead require that formatting data be included in the request that is sent from the user's computer to the server. See Davis Decl., Ex. 2 at Claims 1, 2 and 3.

Ablaise's own technical expert admits that the technology for providing personalized content to users on HTML pages generated "on the fly" was known before May 15, 1995. See Davis Decl., Ex. 3 at 24-25. It is also undisputed that the web programming technology as of

---

[1] As this Court is aware, on July 2, 2008, Ablaise withdrew its infringement allegations with respect to the claims of the '530 patent. Ablaise has alleged infringement of the '530 patent in its expert report. Ablaise moved to dismiss Dow Jones' declaratory judgment claims for invalidity of the '530 patent. On September 11, 2008, the Court denied Ablaise's motion to dismiss the invalidity claims on the '530 patent without prejudice.

May 15, 1995 made it possible for a person of ordinary skill in the art to generate HTML pages

on the fly that provided users with personalized format.  See Davis Decl., Ex. 3 at 28-29.  Indeed,

according to Ablaise's own expert, the inventions of the '737 and '530 patent could have been

implemented by a person of ordinary skill in the art using the existing known web programming

technology as long as that person had "the idea and need" to do so.  Id. at 33-34.

      In its recent ruling on the law of obviousness, the United States Supreme Court observed

that:

> "Granting patent protection to advances that would occur in the
> ordinary course without real innovation retards progress and may,
> in the case of patents combining previously known elements,
> deprive prior inventions of their value or utility."

KSR Int'l Co. v. Teleflex Inc., 127 S. Ct. 1727, 1741 (2007).

      As demonstrated in detail below, the Ablaise patents display no originality at all because

all of the elements of each claim of the two patents are fully disclosed in a single reference (two

references that anticipate the claims of the '737 patent and two references that anticipate the

claims of the '530 patent).  And even if Ablaise were able to argue successfully that an element

of a claim is not disclosed in one of these prior art references, the modicum of originality is so

low that these patents should be found to be obvious.  The policy reasons for such a finding are

particularly clear here where Ablaise has described its patents as covering "around 70% of the

world's leading commercial websites" and based on that reading of its patents has built what it

calls a "coercive licensing business" to generate licensing revenue.  Davis Decl., Ex. 4.

      The '737 and '530 patent claims are invalid under both 35 U.S.C. § 102 (anticipation)

and § 103 (obviousness).

**A.**     **Anticipation.**

The Ablaise inventors were not the first to develop systems providing HTML web pages in which the format as well as the content is personalized based on users' preferences. Dow Jones has identified multiple pieces of prior art that, prior to May 15, 1995, delivered HTML pages with both personalized content and format based on users' preferences, using the same technology disclosed in the '737 and '530 patents. At least two of these references anticipate the claims of the '737 patent, and at least two anticipate the claims of the '530 patent.

The first reference that anticipates Claim 1 of the '737 patent is Fishwrap, a personalized electronic newspaper developed at MIT. Fishwrap created HTML pages of content selected by the user, and formatted that content in an order determined by stored user preferences. See Davis Decl., Ex. 3 at 94, 100, 101-02. Fishwrap determined the order (and thus the layout) in which to deliver the content of the electronic newspaper by measuring the newspaper reader's behavior in viewing the electronic newspaper and using an algorithm to reformat the newspaper on future views to put the sections in which the user was most interested toward the top of the page. See id. at 101-02.

The second anticipatory reference, U.S. Patent No. 5,675,507 ("the Bobo patent"), describes a system that allows users to access faxes by receiving HTML pages through the Web displaying the faxes in the user's choice of five different formats. See Davis Decl., Ex. 5 at Col. 8, line 53 – Col. 9, line 37. For example, the user could choose to view the first page of a facsimile in either a full size image or a thumbnail image. Id. Based on the format chosen by the user, different web pages would be generated "on the fly" in HTML. Id. at Col. 10, lines 38-45.

In both Fishwrap and the Bobo patent, the content is delivered to users as HTML pages in different formats for different users, based on preferences of that user stored in a database.

Because, as set forth in more detail below, there can be no genuine dispute of fact that both of these references practiced each and every element of Claims 1, 3, 4 and 6 of the '737 patent, Dow Jones should be granted summary judgment that those claims are invalid as anticipated.

With respect to Claims 1-3 of the '530 patent, Dow Jones has identified two prior art references that anticipate those claims by offering users a personalized format based on user preferences, wherein the formatting data is sent in the request from the browser to the server. The first, the HTGrep program, delivered HTML pages of search results to users, and provided users with a form that let them choose whether those results would be formatted as a plain text list, a numbered list, a bulleted list or a definition list. See Davis Decl., Ex. 3 at 167-68. Based on the user's selection of the desired format, the request sent from the browser to the server included the formatting information corresponding to that selection, and the content was formatted by HTML generated based on that selection. See id. at 166-70. The second anticipatory reference, the Thunderstone program, provided users with formatting choices and sent requests to the server for HTML to format the content consistent with those choices. See id. at 163-64; Ex. 7 at ¶¶ 130-31. Because there is no genuine dispute of fact that HTGrep and Thunderstone practiced each and every element of Claims 1, 2 and 3 of the '530 patent before May 15, 1995, Dow Jones should be granted summary judgment that those claims are invalid as anticipated.

**B.**    **Obviousness.**

For two independently sufficient reasons, the '737 and '530 patent claims are also invalid under 35 U.S.C. § 103 because the inventions as a whole would have been obvious to the person of ordinary skill in the art as of May 15, 1995. First, in the event that the Court does not hold that the two patents are anticipated, the claimed inventions are obvious in light of the

anticipatory references discussed above. The purported differences between these references and the inventions of the '737 and '530 patents that Ablaise has relied upon in its expert report (and its expert's testimony) are extremely narrow and are merely implementation details well known to the person of ordinary skill in the art.

Second, the '737 and '530 patents are obvious in light of the prior art teaching of both personalization of computer display format and the standard web technology used in the industry before May 15, 1995. For example, U.S. Patent No. 5,339,392 (the "Reuters patent"), filed in 1990 and assigned to Reuters in 1994, describes the customization of electronically displayed content in great detail. The Reuters patent describes "a software program providing a facility for a user to compose a custom active document using tools provided by the program." In this system "the user can select which real time data is to be displayed, where it is to be displayed and in what format and style it is to be displayed." Davis Decl., Ex. 6 at Abstract (emphasis added). The Reuters patent focuses specifically on the feature of allowing the user to "layout each sheet of the active document." Id. In Figure 1, for example, the Reuters patent shows a customized display for a trader that includes current stock prices for a list of specified stocks at the top of the page, trades for a specified set of issues that exceed a minimum volume in the middle of the page and a Telerate page on foreign exchange data at the bottom of the page. See id. at Figure 1.

The web programming technology that was known in the field before May 15, 1995, is described in numerous prior art references. For example, the Sun Microsystems patent describes the use of all of the same programming technology described in the Ablaise patents – using CGI programs to generate HTML pages "on the fly," and delivering those pages to browsers based on stored user preferences. See Davis Decl., Ex. 7 at ¶ 102.

The alleged invention of the '737 and '530 patents is merely a common sense combination of the known use of personalized formatting for displays of content on computers (such as that taught by the Reuters patent) and the use of known Web programming technologies for their usual functions (such as those taught in the Sun Microsystems patent).

There is no dispute that personalized formatting of computer displays was known before the alleged invention. <u>See</u> Davis Decl., Ex. 3 at 84, 91-92, 194-95. There is also no dispute that the programming required to implement the personalized formatting described in the '737 and '530 patents was within the ability of the person of ordinary skill in the art using known technology for its known uses. <u>See</u> <u>id</u>. at 33-34. The person of ordinary skill in the art would have been motivated to bring the function of personalized formatting to the Web because, <u>inter</u> <u>alia</u>, at the time of the alleged invention the entire industry was focused on putting additional functions on the Web. <u>See</u> <u>id</u>. at 189-90. Therefore, it would have been obvious to the person of ordinary skill in the art to use known Web programming technology to implement the invention of the '737 and '530 patents. Because the inventions of the '737 and '530 patents as a whole would have been obvious to a person of ordinary skill in the art in May 1995, summary judgment of invalidity based on obviousness is warranted.

In order to provide the Court with context for addressing the invalidity issues presented by this motion, Dow Jones first sets forth the technological background against which the alleged inventions of the '737 and '530 patents were made. Next, Dow Jones provides an overview of the legal standards applicable to the issues before the Court in resolving Dow Jones' motion. Based on that factual and legal framework, Dow Jones sets forth the undisputed facts that, under the governing legal standards, establish that summary judgment of invalidity is warranted here.

Indeed, as reflected herein, most of the facts upon which Dow Jones relies were agreed to by Ablaise's sole technical expert witness, Geoff Mulligan.

## STATEMENT OF FACTS

**A.      Personalization of Computer Display Formats before May 15, 1995.**

Before the use of the Internet became widespread, and well before the invention date of the Ablaise patents, the personalization of computer displays for individual users was well known and had been implemented in a variety of computer systems.

Before May 15, 1995, many database systems offered users the ability to personalize the formats for the display of data, both as described in patents[2] and used in commercial products such as SQL and Microsoft Access. See Davis Decl., Ex. 7 at ¶¶ 13-17. As the 1994 Microsoft Access User Guide explains:

> "with Microsoft Access, you can design reports that present information the way you want. You can use many different design elements, such as text, data, pictures, lines, boxes and graphs, to create just the report you need. Which elements you use and how you arrange them are up to you."

Davis Decl., Ex. 9 at 486 (emphasis added). These reports could be saved by the user in the database to be reused at a later time with different data. See id. at 502-503. Thus, users were able to "completely customize" the format in which they wanted database content returned to their computer and to save that customized format in database management systems before May 15, 1995. See Davis Decl., Ex. 3 at 84.

Personalization of both content and layout was also well-described in the art before May 15, 1995 in the context of delivering real-time news and information to individual users through

---

[2]  For example, U.S. Patent No. 5,615,367, filed May 25, 1993, describes a database system which "allows the user to customize how the user's data are presented." Davis Decl., Ex. 8 at Col. 13, lines 35-36. As the specification explains, "a user can create design documents that display one record at a time, display multiple records at a time, display only certain fields of a table, display design features . . . and the like." Id. at lines 39-44.

networked computer systems.  For example, as set forth above, the Reuters patent, filed in 1990, described in great detail the personalization of content and format in user's computer displays. The program in the Reuters patent works over a network so that "[r]eal time data is then passed to the program from whatever network communication process is being used and is immediately displayed in <u>the format style and location previously specified by the user</u>."  Davis Decl., Ex. 6 at Col. 8, lines 63-68 (emphasis added).  <u>See also id</u>. at Col. 2, lines 44-49; Col. 5, lines 24-29. Thus, the Reuters patent describes a system in which the user's preference for the location of content received over a network is saved by the system and applied in subsequent uses of the system.  Ablaise does not dispute that the Reuters patent allows users to specify the location of various items on their computer displays and allowed users to save those preferences for future use of the system.  <u>See</u> Davis Decl., Ex. 3 at 194-95.

The personalization of formatting was also adapted to client-server systems prior to May 15, 1995.[3]  In such systems using software called the "X system," an individual user could set preferences for how various windows are laid out on the display terminal, including specifying the size and placement of windows.  <u>See</u> Davis Decl., Ex. 7 at ¶¶ 25-26; Ex. 3 at 91-92.  By using display preference files, the user could specify the layout of the windows on the page and store that information on the system for the next time the user logged in.  <u>See</u> Davis Decl., Ex. 7 at ¶ 26; Ex. 3 at 92-93.

As demonstrated by these references and others identified in the Bestavros Report, the personalization of formatting for computer displays was widespread before May 15, 1995. Ablaise's expert, Mr. Mulligan, does not dispute that in these non-Web systems users had the

---

[3]  A client-server system is a system allowing a user to access a large computer (the "server") through a terminal or PC (the "client").  The Web is an example of a client-server system.

ability to personalize the format of their computer display, and save those preferences on the system, before May 15, 1995.  See Davis Decl., Ex. 3 at 84, 92-93, 194-95.

**B.      Development of the World Wide Web before May 15, 1995.**

The maturation of the Internet and the abundance of increasingly powerful PCs set the stage for the birth of the World Wide Web in the early 1990s.  What we now refer to as the Web is a combination of two basic technologies – HTTP and HTML. See Davis Decl., Ex. 7 at ¶ 31; Ex. 3 at 16-17.

HTTP is an Internet protocol, which enables clients and servers to use a common vocabulary to request and serve specific content (including HTML-formatted content).  See Davis Decl., Ex. 7 at ¶ 33.  The HTTP protocol came into widespread use in approximately 1990 and was "widely used and widely deployed" before May 15, 1995.  See Davis Decl., Ex. 3 at 17. The availability of more powerful PCs by the early 1990s enabled the development of "browser" software applications (such as Mosaic, and later Netscape and Internet Explorer), which could use HTTP protocol to communicate with servers.  By 1995, multiple browsers had been developed and browsers were widely known and used in the industry.  See Davis Decl., Ex. 3 at 18.  Although HTTP itself is "stateless" (i.e., it does not know when the same user has returned to a particular website) by May 15, 1995, the use of databases to track individuals was known, and web programmers knew how to keep track of user information with known technologies. See Davis Decl., Ex. 3 at 31-32.

The other necessary component in the birth of the Web was HTML.  HTML is a rendering language that allows a server to specify to a client both what content is to be displayed on a page, and how such content is to be laid out or displayed.  See Davis Decl., Ex. 7 at ¶ 32. HTML uses particular instructions, called "tags," to indicate how to display the content on a web

page and is designed so that all browsers can understand the tags.  A tag is an instruction placed inside the symbols < >.  Thus, for example, the tag <b> placed before text will tell the browser to bold the text following the tag.  Id.  By May 15, 1995, HTML, including the functions of the tags used therein, was well known to persons of skill in the art.  See Davis Decl., Ex. 3 at 17, 32; Ex. 10 at ¶ 15.  Indeed,   HTML was well enough known by 1995 that a book was published for laypersons for explaining how to create HTML pages using HTML tags.  See Davis Decl., Ex. 11 at xix-xx (identifying who should read this book).

The HTML tags known to persons of ordinary skill in the art by May 15, 1995 included multiple tags that constitute "formatting data" as that claim term has been construed by this Court (July 11, 2007 Memorandum Order at 10-12), because they specify the location of text on the page.  For example, as shown in Figure 8 of the '737 patent itself, the Image tag (<IMG>) includes attributes that indicate whether the image in question is to be aligned at the top, middle or bottom of the accompanying text.  See Davis Decl., Ex. 1 at Fig. 8 ("<img scr = "/im/sport.gif if" align = middle hspace – 5>") (emphasis added).  In the Teach Yourself HTML book, the author explains that using the align attribute of the image tag "allows you to control how the text and image are aligned."  See Davis Decl., Ex. 11 at 165.  For example, below is a figure showing the effect of the image tag changing the alignment attribute:



**Figure 7.7.** *Images and text alignment.*

Mr. Mulligan agreed that the Image tag used in Figure 8 of the '737 patent was "formatting data" that specified the location of text on the page. <u>See</u> Davis Decl., Ex. 3 at 80.  Likewise, the Paragraph tag (<P>), which is used to move text onto the next line to form a new paragraph, is formatting data within the meaning of the Ablaise patents because it specifies the location of text on the page.  <u>See</u> <u>id</u>. at 80-81.

A final component of Web technology that is used in the alleged inventions of the '737 and '530 patent is the use of programs called CGI programs to generate the HTML pages dynamically or "on the fly."  The use of CGI programs to create web pages "on the fly" was well

known by May 15, 1995.  See Davis Decl., Ex. 3 at 24.  Ablaise does not dispute that by May 15,

1995 the prior art included web sites that generated personalized content using CGI programs.

See id. at 199 (conceding that Bobo patent describes generating personalized content using CGI);

Ex. 12 at ¶ 19 (Ablaise expert agreeing that in 1995 web sites used CGI to change content

dynamically).  As Mr. Mulligan concedes, any web page developer "worth his salt" would have

known about CGI programs by May 15, 1995.  See Davis Decl., Ex. 3 at 21-22.  Inventor Ritchie

agreed that CGI was "well known by people that were . . . interested in that technology."  Davis

Decl., Ex. 13 at 45.  The existence of CGI programs as of May 15, 1995, made it possible for a

programmer to generate different formats for different users on a  web page generated "on the

fly" without developing any new web technology.  See Davis Decl., Ex. 3 at 29, 33-34.

### C.      The Motivation to Bring Personalized Formatting to the Web.

The period between the initial development of the Web at the beginning of the 1990s and

May 15, 1995 was characterized by a flurry of development activity for web pages and the

delivery of web pages.  As Ablaise itself admits, "in the mid-1990's companies were rushing to

establish an online presence and developers were working fast and furiously to get clients up on

the Web."  Davis Decl., Ex. 10 at ¶ 65.  During that time frame "people were constantly adding

to and modifying their web pages."  Davis Decl., Ex. 3 at 189-90.  This clear market pressure to

develop web pages for commercial use provided the person of ordinary skill in the art with ample

reason to use the available web technology to improve the web pages provided to users by giving

the users features they would like to have.

An obvious source to determine what features users would like to have on web pages

would be the features that had previously been implemented for users of non-Web systems for

electronic delivery of information.  Since, as discussed above, allowing users to control the

formatting of the content on their screen was well-known in multiple non-Web applications, the person of ordinary skill in the art would have had every reason in the world to implement that feature on web pages as well.

The academic literature reflected this recognition in the art that the Web technology available could be used to move the functionalities that had been used on other systems to the Web.  For example, in 1994, authors Gee and Boulter wrote about the use of the Web to replace an X-windows application (one of the major pre-Web systems allowing customized formatting) and allow for web-based interface with databases.  These authors recognized that the development and wide acceptance of Web technologies, and in particular HTML and CGI, provided the opportunity to use the Web to generate web pages dynamically.  See Davis Decl., Ex. 14 at DJ0003704.  Likewise, in another 1994 paper, the authors described using CGI programming to move from X windows to a web-based system.  According to the authors, "the learning curve for developing dynamic HTML pages was short" and a fully functional interface had been developed within a week.  See Davis Decl., Ex. 15 at DJ0000026.  In another paper presented in 1994 at the First International WWW Conference Proceedings in Geneva Switzerland, the author specifically addressed the intent to develop a system that "keeps track [of] a user's identity throughout each session and maintains a set of personalized preferences for each user."  See Davis Decl., Ex. 16 at DJ0001286.

These articles, in addition to the market and industry forces pushing toward increasing personalization of web pages, would have provided more than sufficient motivation for a web programmer to use the already available and known web technology to create personalized formatting of web pages.  See, e.g., KSR, 127 S. Ct. at 1742 ("any need or problem known in the

field of endeavor at the time of invention and addressed by the patent can provide a reason for combining elements in the manner claimed").

**D.      Technology Combining Personalization and the Web before May 15, 1995.**

The record is clear – and Ablaise does not dispute – that web programmers had created websites that dynamically generated HTML pages containing personalized content for individual users before the alleged invention date. See Davis Decl., Ex. 3 at 199 (agreeing that "it was known in the art before May 15, 1995 to provide personalized content to users on web pages generated on the fly"); Ex. 13 at 63.

**1.      Fishwrap.**

Before May 15, 1995, MIT computer science students had developed a personalized electronic newspaper, called Fishwrap, that was delivered via the World Wide Web.[4] Users of Fishwrap could choose the sections and topics they wished to have included in their electronic newspaper and thereby customize the content of the web page returned to their browser. See Declaration of Pascal Chesnais ("Chesnais Decl.") at ¶ 4  and Ex. 32 at 280; Davis Decl., Ex. 3 at 93-95. Fishwrap used CGI programs to generate web pages "on the fly" and used HTML tags to format the web page returned to the browser. See Chesnais Decl. at ¶ 4 and Ex. 32 at 277, 280. The order in which the user's selected sections are laid out on the web page was personalized based on the user's individual preferences as reflected in their usage patterns. Chesnais Decl., Ex. 32 at 280; Davis Decl., Ex. 3 at 102-04. Fishwrap kept track of the content selected by a user and recorded that information in a user database. Chesnais Decl., Ex. 32 at 280 (system "observes and records" user behavior). Based on that information, for example, a user who looks mostly at sports stories would be provided a newspaper page with sports section

displayed at the top of the page and other sections less frequently viewed by the user displayed further down the page. Because of this technology, Fishwrap provided different users with the same content arranged in a different order on the dynamically-generated web page, based on that individual user's identity and preferences.

<p style="text-align:center">2.    <u><b>The Bobo Patent</b></u>.</p>

The Bobo patent, filed April 28, 1995, describes a system for allowing users to view faxes remotely by sending HTML web pages to users containing the faxes. <u>See</u> Davis Decl., Ex. 5. In that system, the user is offered a choice of five different formats in which he can receive the content. As the Summary of Invention sets forth:

> "A listing of the facsimile messages may be sent to the user <u>in one of several formats</u>. These <u>formats</u> include a textual only listing or a listing along with a full or reduced size image of the first page of each message. A full or reduced size image of each page of a message in the listing may alternatively be presented to the user."

<u>Id.</u> at Col. 5, lines 19-23 (emphasis added). The five display formats are described in detail at Col. 8, line 53 –Col. 9, line 37. The Bobo patent describes storing the display format selected by the user in a database. <u>See id.</u> at Col. 16, lines 57-62 (memory "would contain the data indicating the preferences for each user"). When the user requests his webpage, the system retrieves the stored display preference and, based on that preference, generates HTML to create the page in the requested format. <u>See id.</u> (the server "would ascertain from the data in memory 33 the preferred option of displaying the facsimile message and would generate the appropriate HTML files"). Indeed, the Bobo patent has a specific figure showing the selection of functions based on the display option selected by the user. <u>See id.</u> at Fig. 4.

---

[4] The initial launch of Fishwrap was in 1993. <u>See</u> Chesnais Decl. at ¶ 4. The function for reordering content based on user preferences was in use at least by July 1994 and the version of Fishwrap put into use in March 1995 made full use of the reordering functions. <u>Id.</u>

<p style="text-align:center">15</p>

### 3.     The Sun Microsystems Patent.

In the Sun Microsystems patent, U.S. Patent No. 5,761,662, originally filed in 1994, the inventor describes another form of personalized newspaper for viewing over the World Wide Web.  See Davis Decl., Ex. 17.  The Sun Microsystems patent is entitled "Personalized Information Retrieval Using User-Defined Profile."  This system uses a "user-defined profile" to create a newspaper with content from various sources.  See id. at Col. 3, lines 20-24.  A personalized newspaper is then generated based on the user's preferences and, through the use of CGI script (to generate the page on the fly) and HTML (to format the page), is displayed to the user as a web page.  See id. at Figure 4; Col. 5, lines 54-64.  The formatting of the web page returned to the browser from the server in the system described in the Sun Microsystems patent is done using HTML tags.  See id. at Col. 7, lines 11-21.

### 4.     Thunderstone.

Thunderstone, a database company operating in Ohio, sold a commercial system in 1994 that allowed a user to access a database from a web browser and retrieve data from that database in the form of reports.  See Davis Decl., Ex. 7 at ¶ 127.  The Thunderstone system not only generated web pages "on the fly" with content specified by the user, but also allowed the user to control the format of the report on the web page that was generated.  See, e.g., Davis Decl., Ex. 18 at 327-328; Ex. 3 at 160-61.  For example, a user of the Thunderstone system could choose whether to display search results on the web page in (1) a paragraph or non-paragraph format and (2) a horizontal or vertical format.  See Davis Decl., Ex. 19 at 40-41; Ex. 3 at 161, 165-66.  The information about the user's format preference was contained in requests sent from the user to the Thunderstone web server.  See Davis Decl., Ex. 18 at 342-343.

5.    **HTGrep.**

A professor in Switzerland, Oscar Nierstrasz, applied these same principles of personalized formats to another database searching program, resulting in the launch of the HTGrep program in May 1994.  See Davis Decl., Ex. 20 at 33-34.  Using the HTGrep program, a user could use his web browser to search a remote file and return results as a web page.  The HTGrep program allowed users to specify the format for the search results web page, by, for example, letting the user select whether to receive search results in HTML paragraph form, a numbered list or a bullet point list.  See Davis Decl., Ex. 21 at DJ0003668; Ex. 3 at 166-68.  The user's choice of output format was input through a form that provided a choice of, inter alia, a numbered list or plain HTML paragraphs:

---

**HTGREP Form**

Here is a sample form for specifying the arguments to htgrep.

| W3catalog/cat.html | **File to search** (relative to WWW home) |
| | **Header file** |
| | **Alternative header** (when query is supplied) |
| | **Search string** (perl regexp) |

Submit    Reset

HTML paragraph
Numbered list
Bullet list
Description list
Plain ascii text      **Output style**  No / Yes    **Make URLs live** (in plain text)

N/A
Plain
Abstract      **Bibliography format** (search refer files)        file / dir    **FTP style**
                **Max records to return**

250

---

The request sent to the server in the HTGrep program contained information indicating which format the user wanted applied to his search results.  See Davis Decl., Ex. 21 at DJ0003666

("The tag style = *style* must be included in the call to htgrep where *style* is one of pre, dl, ol, or ul."). Based on that formatting information in the request, the HTGrep system would apply the HTML necessary to generate the page in the requested format. Id.

In each of these examples, web programmers before May 15, 1995, had moved beyond offering users personalized content and had begun changing the format of the web pages being generated based on user's preferences.

### E.      The '737 and '530 Patents.

The '737 and '530 patents claim priority to the same U.K. patent application, which was filed on May 15, 1995. There is no dispute that the '737 and '530 patent priority date is May 15, 1995.

In this action, Ablaise has asserted two independent claims (Claims 1 and 4) and two dependent (Claims 3 and 6) that depend from Claims 1 and 4 respectively.

Claim 1 of the '737 patent provides:

> 1.      A method for serving pages of viewable data to browsing devices connected to a network, wherein a page of said viewable data comprises content data defining text and/or graphics and formatting data which specifies locations of said text and/or graphics within a page, and said viewable data is displayed at a browsing device such that locations of said text and/or graphics depend on said formatting data, said method comprising:
>> identifying requests from browsing devices that define a request for specified content data;
>> storing content data;
>> storing executable functions;
>> maintaining a user database comprising information relating to user preferences; and
>> in response to identifying a request for specified content data and a user identifier;
>>> (a)      reading user preference information from said user database in response to a received user identifier;
>>> (b)      selecting stored content data in dependence upon the content data specified in a received request;
>>> (c)      receiving format identifiers identifying the type of

> formatting required;
>
> (d)  selecting a set of stored functions in dependence upon a received format identifier and said read user information; and
>
> (e)  executing said set of functions to generate viewable data comprising said selected content data and formatting data.

Claim 4 of the '737 patent is directed to a "serving device" that performs the same steps as the method described in Claim 1. See Davis Decl., Ex. 1 at Claim 4. Claims 3 and 6 add to Claims 1 and 4 respectively only the limitation that the viewable data is "HTML (hypertext markup language) data and said formatting data comprise HTML tags." See id. at Claims 3 and 6.

The claims of the '530 patent originally asserted by Ablaise were Claims 1-3. Claim 1 of the '530 patent provides:

> 1.   A method of serving output signals from a serving device to a plurality of browsing devices connected to a network, wherein said output signals represent commands executable by a browsing device so as to display viewable data in accordance with a specified page format said method comprising steps of:
>
>   identifying requests from browsing devices that define a request for specified viewable data, said request including formatting type identification data;
>
>   maintaining a plurality of formatting types of data defining respectively corresponding predetermined formats for portions of said viewable data;
>
>   storing content data representing said viewable data;
>
>   selecting a specific part of said content data representing specific viewable data;
>
>   selecting a specific one of said types of formatting data in response to said formatting type identification data;
>
>   processing said content data and said formatting types of data so as to combine said selected part of said content data with said specific one of said types of formatting data, and for outputting processed viewable data with executable instructions; and
>
>   supplying output signals to the requesting browser device derived from said output processed data,
>
>   in which said output signals represent commands executable by a browsing device so as to display said specific viewable data in

19

accordance with a first specified page format when a first type
of formatting data is selected and in a second specified page
format when a second type of formatting data is selected.

Claim 2 of the '530 patent differs from Claim 1 only in that it requires that the content

data include graphics data.  Claim 3 of the '530 patent claims a "serving device" that performs

the same steps as the method described in Claim 1.

Ablaise has admitted that the inventors originally sought to obtain claims that covered the

generation of web pages on the fly with personalized content.  See Ablaise Ltd. and General

Inventions Institute A, Inc.'s Markman Sur-Reply Brief in Support of It's Proposed Claim

Construction at 2.  When, during prosecution of the patents it became apparent that such

personalized content was unequivocally described in the prior art before the PTO, the inventors

limited their claims to the combination of personalized content and format.  See id.

The '530 patent issued on September 25, 2001 and the '737 patent issued on November

1, 2005.  None of the prior art references that form the basis for Dow Jones' anticipation analysis

were before the Patent Examiner during the prosecution of the '530 and '737 patents.

## ARGUMENT

### I.    Legal Standards Governing Dow Jones' Motion.

A finding of anticipation under 35 U.S.C. § 102 "requires that all of the elements and

limitations of the claimed subject matter must be expressly or inherently described in a single

prior art reference."  Elan Pharms. Inc. v. Mayo Found., 304 F.3d 1221, 1227 (Fed. Cir. 2002).

In analyzing validity, "the first step involves the proper interpretation of the claims.  The second

step involves determining whether the limitations of the claims as properly interpreted are met by

the prior art."  Elmer v. ICC Fabricating, 67 F.3d 1571, 1574 (Fed. Cir.1995).  The party seeking

to invalidate the claim has the burden of proving it with facts supported by clear and convincing

evidence. See Adenta GMBH v. Orthoarm, Inc., 501 F.3d 1364, 1367-68 (Fed. Cir. 2007).

"While anticipation is a question of fact, it may be decided on summary judgment if the record

reveals no genuine dispute of material fact." Leggett & Platt, Inc. v. VUTEK, Inc., 537 F.3d

1349, 1352 (Fed. Cir. 2008).

To sustain an invalidity determination under 102(b) based upon a public use or sale, "the

record must show that an embodiment of the patented invention was in public use as defined by

the statute before the critical date." Adenta 501 F.3d at 1371. A public use includes "any use of

the [claimed invention] by a person other than the inventor who is under no limitation, restriction

or obligation of secrecy to the inventor." Id. at 1371.

The "printed publication" provision of § 102(b) was designed to prevent an inventor from

withdrawing what was already in the possession of the public. Bruckelmyer v. Ground Heaters,

Inc., 445 F.3d 1374, 1378 (Fed. Cir. 2006). Because references may be disseminated to the

interested public in many ways, public accessibility is the "touchstone" for determining if a

reference is a § 102(b) publication. Id. To determine public accessibility, the Court undertakes a

case-by-case analysis, considering factors such as distribution, indexing, intended audience, and

availability for copying. See In re Klopfenstein, 380 F.3d 1345, 1350-52 (Fed. Cir. 2004)

(posters displayed at conference were printed publications although not distributed or indexed).

Section 103 (obviousness) forbids issuance of a patent when "the differences between the

subject matter sought to be patented and the prior art are such that the subject matter as a whole

would have been obvious at the time the invention was made to a person having ordinary skill in

the art to which said subject matter pertains." In KSR, the Supreme Court explained the process

and inquiry that the Court should undertake when evaluating the obviousness of a patent claim.

The Court explained that the obviousness inquiry must take an "expansive and flexible

approach" and expressed "the need for caution in granting a patent based on the combination of elements found in the prior art." KSR, 127 S. Ct. at 1731.[5] For that reason, "the combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results." Id. at 1731.

To determine whether a claimed invention is obvious, "a court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions." KSR, 127 S. Ct. at 1731. In doing so, the Court's analysis is not restricted to specific and explicit statements suggesting the combination at issue. Instead, the Court may rely on the influence of "design incentives and other market forces," the use of technique to improve other similar devices, and "the background knowledge possessed by a person having ordinary skill in the art" to determine whether the claimed invention as a whole would have been obvious to a person of ordinary skill in the art. Id. The Court further recognized that "[i]n many fields it may be that there is little discussion of obvious techniques or combinations, and it may often be the case that market demand, rather than scientific literature, will drive design trends." KSR, 127 S. Ct. at 1732.

In its obviousness cases issued after KSR, the Federal Circuit has further illuminated how the obviousness standard should be applied. For example, in Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1326-27 (Fed. Cir. 2008), the Federal Circuit held, based on KSR, that the patent in suit was obvious, based on its conclusion that "adapting existing electronic processes to incorporate modern internet and web browser technology" was commonplace by the time of the invention. Likewise, in Commonwealth Scientific and Industrial Research Org. v. Buffalo Technology, Inc., 2008 U.S. App. LEXIS 20061 (Fed. Cir. Sept. 19, 2008), the Federal Circuit recognized that where the invention consists of a combination of elements, all of which are

---

[5]  Both the '737 and '530 patents were issued by the Patent Office before the Supreme Court decided KSR.

known in the prior art, such "a combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."

## II.   Claims 1, 3, 4 And 6 Of The '737 Patent Are Invalid In Light Of Fishwrap.

### A.   Fishwrap was Publicly Used in the United States before May 15, 1995.

There is no genuine dispute of fact that Fishwrap was publicly used in the United States prior to May 15, 1995.  Mr. Pascal Chesnais has submitted a Declaration setting forth his testimony on this point.  Mr. Chesnais was a graduate student at MIT during the development of Fishwrap.  See Chesnais Decl. at ¶ 8.[6]  As set forth in his Declaration, Mr. Chesnais was personally involved in the development of Fishwrap and has confirmed that  Fishwrap, including the feature of reordering the sections of the electronic newspapers based on user preferences, was in use at MIT before May 15, 1995.  See Chesnais Decl. at ¶¶ 4, 8.  He describes in detail in his Declaration the process by which Fishwrap was developed and the timeframe during which those features were put into public use in the Fishwrap system.  As Mr. Chesnais explains, before May 15, 1995, Fishwrap offered all the functions that form the basis for Dr. Bestavros' invalidity analysis, including particularly the reordering of content in different order for different users, based on its analysis of that user's preferences.  See Chesnais Decl. at ¶ 4.  By March 1995, Fishwrap was fully accessible through the Web.  See Chesnais Decl. at ¶¶ 39-40.

Mr. Chesnais' testimony as to the prior use of Fishwrap is corroborated by multiple contemporaneous documents.  Fishwrap was described on in multiple media sources prior to May 15, 1995.  See Chesnais Decl. at ¶¶ 5, 41, Exs. 18-26.  In particular, the ability of Fishwrap to reorder sections based on user preferences is specifically described in an article published on

---

[6] Mr. Chesnais  is now employed as a Director of Research at France Telecom and has no personal interest in the outcome of this matter.  Id. at ¶ 10.  Mr. Chesnais was identified in Dow Jones' Rule 26 Disclosures served on October 10, 2007, but Ablaise declined to depose him during discovery in this case.  In the event that this case were to proceed to trial, Mr. Chesnais has indicated that he will voluntarily travel to Washington, D.C. to testify.

July 3, 1994. See, e.g., Chesnais Decl., Ex. 23 (Fishwrap "learns from experience, changing the order of things depending on how frequently you've read them in the past."). A student thesis that was submitted to the Department of Electrical Engineering and Computer Sciences in May, 1994 describes the operation and use of Fishwrap, including the personalization of formatting using the reordering algorithm. See Chesnais Decl., Ex. 15. Mr. Chesnais confirms that the Koen thesis accurately describes the reordering features of Fishwrap used before May 15, 1995. See Chesnais Decl. at ¶ 49.

Multiple contemporaneous documents from Mr. Chesnais' own files further establish that the reordering function of Fishwrap was in public use before May 15, 1995. See e.g., Chesnais Decl. at ¶¶ 5, 43-49. For example, Mr. Chesnais sent an email submitting his research paper describing the use of the reordering feature of Fishwrap on March 21, 1995. See Chesnais Decl., Ex. 33. Mr. Chesnais also sent an email on March 17, 1995 indicating that the new version of Fishwrap then available online was "100% self-organizing in the news section." See Chesnais Decl., Ex. 35 at DJ0165030; see also Ex. 36 (this release of Fishwrap "will always reorganize the presentation of your table of contents to the way you read your news. Items you read first will make their way to the top.").

Ablaise has identified no evidence calling into question the above evidence demonstrating that Fishwrap, including the function to reorder the content based on user preferences, was in public use prior to May 15, 1995. Therefore, there is no dispute of genuine fact on this issue.

**B.    Fishwrap Anticipates Claims 1, 3, 4 and 6 of the '737 Patent.**

Fishwrap, prior to the date of the alleged invention, allowed users to receive HTML pages which personalized both the content (i.e., the particular sections and topics included in the

24

newspaper) and the format (<u>i.e.</u>, the order in which the sections and topics are displayed).  <u>See</u>

Davis Decl., Ex. 7 at ¶¶ 83-84; Ex. 3 at 96, 98-99, 107.  When a user logged on to the Fishwrap

system for the first time, the user would provide certain information about himself (such as

"where are you from?" and "what is your major?") and was given an individual access password.

<u>See</u> Chesnais Decl., Ex. 32 at 275.  Based on this information, a personalized set of topics,

grouped into sections, is provided to the user.  The HTML page provided to a user of Fishwrap

looked similar to this:



**Figure 3.4:** The Table of Contents Page of a Fishwrap SelfOrganizing Paper

Fishwrap went beyond offering users personalized content by also "adapting future presentations to [users'] reading habits." See id. at 276.  To accomplish this personalization of the presentation for individual users, the Fishwrap system recorded how individuals navigated on the website and recorded that data.  See Davis Decl., Ex. 7 at ¶ 48; Ex. 3 at 98-99.  That data was then used in a reordering algorithm to reorder the sections and topics to reflect the user's preferences.  See Davis Decl., Ex. 7 at ¶ 84; Ex. 3 at 103-04.   As Mr. Chesnais explains in his paper "on subsequent generations, those section and topic filters that the users paid the most attention to in the past will appear closer to the top of their paper." See Chesnais Decl., Ex. 32 at 280.

As set forth in detail in the claim charts in the Bestavros Report, Fishwrap disclosed each and every element of the asserted claims of the '737 patent.  See Ex. Davis Decl., Ex. 3 at ¶ 84.  Indeed, Ablaise's expert, Mr. Mulligan, concedes that except for the use of a "format identifier" and the subsequent elements that require use of a format identifier all of the elements of Claim 1 of the '737 patent are taught by Fishwrap.  See Davis Decl., Ex. 3 at 200-03.[7]   Therefore, Dow Jones focuses its anticipation analysis on only those elements of Claim 1 of the '737 patent that Ablaise has asserted are not disclosed by Fishwrap.

Fishwrap forces Ablaise to abandon the claim that its invention is the first to allow generation of HTML pages containing the same content in different formats for different users. See id. at 101-02.  The reordering algorithm of Fishwrap, as Mr. Mulligan understands it, "could possibly reorder the content, put it in different order for different users."  Id. at 102; see also

---

[7]  Claim 4 of the '737 patent claims a server performing the same steps as the method described in Claim 1.  Davis Decl., Ex. 7 at ¶ 88.  There is no dispute that the Fishwrap system uses a server.  See Chesnais Decl., Ex. 32 at 280.  Claims 3 and 6 add only the limitation that the "viewable data" be HTML.  See Davis Decl., Ex. 7 at ¶¶ 86, 90.  There is no dispute that Fishwrap discloses the use of HTML.  See Chesnais Decl., Ex. 32 at 277.  Therefore, if Fishwrap anticipates Claim 1 of the '737 patent it also anticipates Claims 3, 4 and 6.

Davis Decl., Ex. 10 at ¶ 20 (Fishwrap "reorders the articles within the 'newspaper' based on a record of the articles that a user has previously searched on."). Ablaise has taken the position that changing the order of content on the webpage, as Fishwrap does, is changing the format of the webpage within the meaning of the '737 patent. See Davis Decl., Ex. 3 at 111-12. The sole basis for Ablaise's unwillingness to concede that its '737 patent claims are anticipated by the Fishwrap system is the assertion that: (1) the Fishwrap system does not use "format identifiers" to create those different formats for different users; and (2) that it does not let users explicitly choose the order of articles. Neither of these grounds is a valid basis for Ablaise to avoid summary judgment of anticipation by Fishwrap.

       1.     **Fishwrap Uses Format Identifiers to Select the Functions to Generate the Web Page.**

      In the <u>Markman</u> opinion in this case, the Court explained that "[t]he format identifier has two purposes in the claim: it is used for 'identifying the type of formatting required' and for 'selecting a set of stored functions.'" <u>Markman</u> Op. at 9. Ablaise's technical expert, Mr. Mulligan, applied this same analysis of the function of the format identifier in his infringement analysis, determining that, as to a particular ordered list of content, "it's a format identifier because it's used to identify the formatting required." Davis Decl., Ex. 3 at 66-67. See also id. at 69 ("item blob" constitutes "format identifier" "because it does indicate the formatting required"). As Mr. Hicks, the expert that Ablaise used in connection with the <u>Markman</u> motion but who has not submitted an expert report, stated in his Affidavit submitted to the Court in connection with the <u>Markman</u> motion, the defining characteristic of the format identifier is that "it identifies something." Davis Decl., Ex. 12 at ¶ 24.

      The stored observations made by Fishwrap unquestionably perform these two functions that comprise the role of the "format identifier" in Claim 1 of the '737 patent. The Fishwrap

system in use at MIT prior to May 15, 1995, stored information about an individual user's

viewing habits on Fishwrap, which it then used to identify the order (layout) in which that user's

articles will appear. See Davis Decl., Ex. 7 at ¶ 84; Ex. 10 at ¶ 20. Ablaise has conceded that

Fishwrap stored user information in a database. See Davis Decl., Ex. 3 at 103-104. Ablaise has

also conceded that based on retrieving that stored user preference information Fishwrap

provided content to users that was in different order. See id. at 107 (Fishwrap "added a feature

to try to automatically reorder articles based on usage."); Davis Decl., Ex. 10 at ¶ 20 (newspaper

is reordered based on articles user has previously clicked on). Moreover, Ablaise has also

conceded that, by changing the order of the content, the stored information dictates the layout or

presentation of the articles on the web page generated by Fishwrap. See Davis Decl., Ex. 3 at

103-04 (based on description of Fishwrap, it would "retrieve usage information" from the

database "that would be factored into determining" the order of the articles being displayed.); see

also id. at 107-08 (the order of the articles is determined by the user information in the algorithm,

along with other inputs, and that order is used to generate HTML). Thus, there can be no dispute

that the stored data about the user's history identifies the order in which the articles should be

displayed for the user (i.e., the type of formatting required).

Fishwrap relies on the stored user preferences to reorder the list of the newspaper sections

for that particular user. Thus, Fishwrap then selects and executes the code based on that selected

format to generate the HTML for the user's personalized page. See Davis Decl., Ex. 7 at ¶ 84.

As Mr. Mulligan concedes, "the algorithm is run for a particular user and calculates the order for

that particular user." See Davis Decl., Ex. 3 at 115-16. The order that is determined by the

algorithm determines the order (format) in which the content will be displayed on the HTML

pages for that user. See id. at 115-16. See also id. at 121 ("the paper goes through a structuring

algorithm where both the section and subtopics are reordered based on the status of the

database."). The HTML for the web pages is generated by functions based on the layout

identified by the user's history. See Davis Decl., Ex. 7 at ¶ 84.

     Although there is no dispute that Fishwrap's user information performed the functions of

a "format identifier," Ablaise seems to take the position that the "format identifier" must take

some particular form, beyond serving the functions defined by the Court. Ablaise has not

identified anything in the claim construction opinion that would support such a limitation.

Ablaise's expert during claim construction briefing – from whom it chose not to submit an expert

report on invalidity – indicates that "identifiers" could include "strings of characters, bits, names,

tokens and elements." Davis Decl., Ex. 12 at ¶ 24. Moreover, in his infringement analysis, Mr.

Mulligan relies on several different types of "format identifiers" including ordered lists and  item

blobs." See Davis Decl., Ex. 3. at 46, 68-69. Thus, there is no basis for grafting some additional

narrowing construction onto the "format identifier" for the purpose of avoiding anticipation by

Fishwrap.

     Because the user data as used in Fishwrap to identify the ordering of sections and topics

for an individual user and to select and execute functions based thereon constitutes a "format

identifier" as that claim term has been construed by the Court, Ablaise cannot avoid anticipation

by Fishwrap of Claims 1, 3, 4 and 6 of the '737 patent.

         **2.**     **A "Format Identifier" Does Not Require Explicit**
                 **User Selection of Format.**

     Ablaise further contends that Fishwrap does not anticipate the asserted claims of

the '737 patent because the user preferences are not explicitly made by the user, but are based on

the user's implicit preferences as measured by the user's activities on the Fishwrap site. This

contention fails because the Court has already held that the user explicitly choosing the format is

not an element of the claims of the '737 patent. During the extensive Markman briefing in this

case, Ablaise made this very argument. See, e.g., Ablaise Ltd. and General Inventions Institute

A, Inc.'s Responsive Markman Brief in Support of its Proposed Claim Construction at 30-31

("Ablaise's definition indicates that a format identifier corresponds to a type of formatting

specified by a user"); Ablaise Ltd. and GIIA's Markman Sur-reply Brief in Support of its

Proposed Claim Construction at 17-18 (proposing construction of "format identifier" as "an

identifier corresponding to a type of formatting specified by a user from at least two types of

formatting available to the user for specified content data"). The Court rejected Ablaise's

construction and did not include the limiting language proposed by Ablaise in its claim

construction. When presenting testimony on invalidity, "an expert must compare the construed

claims to the prior art." Muniauction, Inc. v. Thomson Corp., 532 F.3d at 1325 (Fed. Cir. 2008),

citing Tivo, Inc. v. Echnostar Comm'ns Corp., 516 F.3d 1290, 1311 (Fed. Cir. 2008). Because

Mr. Mulligan's opinion does not take into account the Court's construction of the claims, it must

be disregarded on this point.

There is no reason for the Court to revisit this claim construction issue. As was

addressed extensively in the Markman briefing, see, e.g., Dow Jones' Reply Memorandum

Concerning Claim Construction at 16-18, Ablaise's renewed attempt to read this limitation into

the claims is without basis in either the claim language or the patent specification. The claims of

the '737 patent refer to "user preferences" and "user preference information" from a user

database. Inventor Ritchie testified that the term "user preferences' includes both observed and

stated preferences. See Davis Decl., Ex. 13 at 273. They say nothing about limiting preferences

to those that are expressly disclosed as a user. In fact, the '737 patent specification specifically

describes the use of implicit user preferences. See Davis Decl., Ex. 1 at Col. 17, lines 14-16

(describing mode of operation of the invention in which "it is not necessary for a user to identify their own preferences" but instead relies on the system recording a history of usage); see also Davis Decl., Ex. 3 at 128-29 (admitting that the patent specification talks about implicit user preferences).  In the absence of any language in the claim requiring that the user explicitly choose the format, and in light of the unequivocal inclusion of implicit user preferences in the specification as an embodiment of the invention, there is no basis for reading Ablaise's proposed limitation into the claims.  Just as a child may express his preference for chocolate cake either by: (a) eating chocolate cake (rather than brussel sprouts); or (b) saying "I like chocolate cake", so too may a computer user reflect his preferences both by activity (which types of articles he reads) or by explicitly stating them ("I want sports articles to be presented first").

Because when the claims are properly construed (which this Court has already done with respect to this element), there is no limitation requiring that the user explicitly select the format, the absence of that limitation in Fishwrap cannot provide a basis for avoiding summary judgment of anticipation.

### C.   Fishwrap Renders Claims 1, 3, 4 and 6 of the '737 Patent Obvious.

#### 1.   The Invention of the '737 Patent would have been Obvious to the Person of Ordinary Skill in the Art.

The differences between the alleged invention and Fishwrap, even as described by Ablaise's expert are extremely narrow.  Ablaise's expert concedes that all but the "format identifier" aspects of Claim 1 of the '737 patent are disclosed by Fishwrap.  See Davis Decl., Ex. 10 at ¶¶ 24-26; Ex. 3 at 199-203.

A central principle in an obviousness inquiry is that "a Court must ask whether the improvement is more than the predictable use of prior art elements according to their established functions."  KSR, 127 S. Ct. at 1740.  Where, as here, the invention consists of a combination of

elements, all of which are found in prior art, a "combination of familiar elements according to known methods is likely to be obvious when it does not more than yield predictable results." Commonwealth Scientific and Indus. Research Org. v. Buffalo Tech. Inc., 2008 U.S. App. LEXIS 20061 at * 21 (Fed. Cir. Sept. 19, 2008), quoting KSR.

Ablaise admits that Fishwrap delivered HTML pages with the same content to different users in different order. See Davis Decl., Ex. 3 at 97-99. Ablaise's expert concedes that the reordering of content for different users is a change to the layout or presentation of the content on the web page. See id. at 56. Thus, the question before the Court is whether, given the disclosure of Fishwrap of storing user preference information in a database, and using an algorithm to layout an electronic newspaper based on those preferences, it would have been obvious to a person or ordinary skill in the art, to reach the same result using a "format identifier."

The "format identifier" used in the alleged invention of the '737 patent, under Ablaise's interpretation, can take many different forms, any one of which would have been well known to persons of skill in the art. A format identifier could be, for example, a simple list of the contents in order. See Davis Decl., Ex. 22 at 14-15, 44 (identifying list of contents as format identifier); Ex. 3 at 46 (a format identifier "can be made up of an ordered list of items to be displayed"). A format identifier can also be a simple assignment of place numbers for different locations on the page (i.e., 1 for top right, 2 for top left, 3 for middle right, etc.). See Davis Decl., Ex. 3 at 62-63. If a system lets users store information about their preferences on the system so that the system can apply those preferences in future uses, there has to be some way of identifying the user and which preferences go with that user. Id. at 95. Likewise, if a system is going to generate an

HTML page for a particular user in a particular format, it logically has to have some mechanism to identify which format to use for that particular user.

The use of an "identifier" to specify the format chosen by a user was well known in the art. Both the HTGrep and Thunderstone references (both in 1994), for example, contain such identifiers where the user chooses the format for the output. See Davis Decl., Ex. 7 at ¶¶ 130, 147. Likewise, the Bobo patent uses the user's choice of display preferences to identify the format to send to that user. See e.g., Davis Decl., Ex. 5 at Figure 4A and B. As explained in the Bestavros Report at ¶ 94, providing a mechanism such as a simple fill-in form that enables a user to explicitly choose the order of the sections in Fishwrap would have been easier for the person of ordinary skill in the art to implement than the algorithm used in Fishwrap. See Davis Decl., Ex. 7 at ¶ 94. As Dr. Bestavros explains, "the use of the Fishwrap system with the user directly choosing the order of content would have been unlikely to merit treatment in a thesis by an MIT computer science student (and would certainly not have been an "A" thesis).)" Id. at ¶ 94, fn. 10. There is no dispute that such HTML forms were known to the person of ordinary skill in the art. See Davis Decl., Ex. 3 at 133. Because the person of ordinary skill in the art would have been motivated to use the simpler approach to implement the Fishwrap functionality of providing users with sections of a newspaper in different orders, he would have been motivated to combine Fishwrap and the use of identifiers.

Because the use of a "format identifier" in combination with the Fishwrap system would be a combination of known elements and there are no unpredictable results of doing so, that combination would have been obvious to the person of ordinary skill in the art.

33

### 2.   Ablaise has not Established any Secondary Indicia of Non-Obviousness that Support a Finding of Non-Obviousness.

Ablaise has not identified any secondary indicia that could overcome the conclusion of obviousness.  Mr. Ritchie, Ablaise's designated Rule 30(b)(6) witness on secondary indicia of non-obviousness conceded that Ablaise did not have any evidence of copying of its patent, (see Davis Decl., Ex. 13 at 333); was not aware of skepticism of others or failure of others, (id. at 334); was not aware of any recognition of the invention by others, (id. at 332-33); and was not aware of any long felt but unresolved need met by the invention, (id. at 335).

Ablaise's expert, Mr. Mulligan, has identified only three secondary indicia that he contends would support a conclusion of non-obviousness.  See Davis Decl., Ex. 10 at ¶¶ 68-75.  As the Federal Circuit has explained, "a nexus between the merits of the claimed invention and evidence of secondary considerations is required in order for the evidence to be given substantial weight in an obviousness decision."  Ruiz v. A.B. Chance Co., 234 F.3d 654, 668 (Fed. Cir. 2000).  None of the secondary indicia asserted by Ablaise is entitled to any weight and none can overcome the showing of obviousness.

First, Ablaise's expert Mr. Mulligan indicates that the secondary indicia of long-felt but unmet need or prior failure of others would support a conclusion of non-obviousness.  Inventor Ritchie testified that as far as he's aware there was no long standing need to find a new way to generate HTML pages in 1995.  See Davis Decl., Ex. 13 at 335.  The only  evidence on which Mr. Mulligan relies to make this argument are two quotations from articles describing the Fishwrap system.  Mr. Mulligan points to a statement in a paper by Mr. Chesnais that "students were a bit concerned at the lack of a mechanism for changing the order of the news presentation."  Davis Decl., Ex. 10 at ¶ 71.  Tellingly, Mr. Mulligan omitted the sentence

immediately following the quoted sentence: "However, the self-organization facility seemed to make up for the lack of such a tool." <u>See</u> Chesnais Decl., Ex. 32 at 281.  Mr. Mulligan also points to the following statement in the Koen thesis:

> Another user suggested that the problem of paper structuring could be satisfactorily solved by providing the user with a mechanism for moving the topics and sections around manually, and in this way he would be able to select the paper structure that appealed to him. While this solution might be equitable for technically inclined users, the object of this research is to increase automation and responsiveness to the reader's wishes without the need for explicit intervention on his part.

<u>See</u> Davis Decl., Ex. 10 at ¶ 71.

Neither of these statements supports the conclusion of either a long-felt need or failure of others.  Indeed to the contrary, the fact that students using Fishwrap <u>recognized</u> that one could reformat the personalized newspaper by simply allowing users to move the topics to the position they wished reflects the obviousness of doing so.  The Fishwrap developers did not suggest that this would have been difficult or could not be done, nor did they express any skepticism about the feasibility of doing so.  Instead, the Fishwrap developers explained why they had chosen not to implement a system using express user preferences -- because they wanted to develop a system that would reorder the paper without the user's direct involvement.  <u>See</u> Chesnais Decl., Ex. 15 at 26.  As Dr. Bestavros has explained, a Fishwrap system with the user directly choosing the order of content would have been deemed too elementary even to qualify as thesis-worthy work.  Davis Decl., Ex. 7 at ¶ 94, fn. 10.

<u>Second</u>, Ablaise's expert cites to an article describing the Krakatoa Chronicle electronic newspaper that he contends indicates a skepticism of the invention of the '737 patent.  <u>See</u> Davis Decl., Ex. 10 at ¶ 73.  This position is based on a complete misreading of the article in question.  In fact, the article recognizes the existence of Fishwrap and the fact that Fishwrap had provided a

personalized newspapers to readers. See Davis Decl., Ex. 23 at 1. The point being made by the authors of the Krakatoa Chronicle article is that they could achieve more advanced formatting using Java than using HTML due to the limitations in HTML's formatting capabilities. See id. at 1 (noting that prior online newspaper personalization, such as Fishwrap "have been subject to the limitations of HTML."). Thus, there was no skepticism expressed that one could use HTML to create customized formatting (indeed, the authors recognized that Fishwrap was already doing so). See id. at 1 (citing Fishwrap as an example of online newspapers providing personalization).

Third, Ablaise's expert indicates that Ablaise will contend that it has established the secondary indicia of commercial success and licensing of the patents.[8]  In order to establish commercial success, the patent holder must establish that the commercial success has a causal nexus with the patented invention. See Iron Grip Barbell Co. v. USA Sports, Inc., 392 F.3d 1317, 1324 (Fed. Cir. 2004). Here, Ablaise has not and cannot establish such a nexus. There is no evidence that personalization of format (as opposed to personalization of content) has generated commercial success of the websites to which Ablaise is referring. Indeed, Ablaise's damages expert conceded that he was unable to separate out the effect of content personalization from layout personalization in evaluating Dow Jones' sales. Davis Decl., Ex. 24 at ¶ 229. Because Ablaise cannot meet its burden of establishing a nexus between the invention and the commercial success of the accused websites, it cannot rely on commercial success as a secondary indicia of non-obviousness. In addition, Ablaise's licensing of its patents for amounts below the cost of defending a patent litigation speak not at all to the validity of the patent. See id. at ¶ 90 (admitting that license agreements "had little to do with the actual value of the patented invention" because they "were the simply the result of a licensing strategy aimed at avoiding

---

[8]  Mr. Mulligan does not himself offer opinions on commercial success on licensing but indicates that he will rely on the testimony of Ablaise's damages expert Mr. Wagner. See Davis Decl., Ex. 10 at ¶¶ 74-75; Ex. 3 at 192-193.

litigation"). Under those circumstances, there is no basis for according any weight to the licenses as indicia of non-obviousness.

**III.   Claims 1, 3, 4 And 6 Of The '737 Patent Are Invalid
         In Light Of The Bobo Patent.**

The Bobo patent issued on October 7, 1997, based on an application filed on April 28, 1995. There is no dispute that the Bobo patent is prior art pursuant to § 102(a).

**A.     The Bobo Patent Anticipates Claims 1, 3, 4 and 6 of the '737 Patent.**

The system described in the Bobo patent gives a user a choice of display preferences to indicate how he would like his web page to display the fax messages he has received. See Davis Decl., Ex. 5 at Col. 5, lines 19-25; Ex. 3 at 141. For example, a user of the Bobo system could choose to receive an image of his fax in a full-sized view or a thumbnail-sized view. See Davis Decl., Ex. 5 at Col. 5, lines 23-25. It accomplishes this offering of formats by generating HTML pages on the fly in the format necessary to give the user their display preference. See Davis Decl., Ex. 3 at 140.

The disclosure of each and every element of Claim 1 of the '737 patent in the Bobo patent is detailed in the claim chart in Dr. Bestavros's expert report. See Davis Decl., Ex. 7 at ¶ 116. Ablaise does not dispute that the Bobo patent discloses each of the elements of Claim 1 of the '737 patent relating to the storage and retrieval of content data according to user preferences. See Davis Decl., Ex. 3 at 204-05. Ablaise does not dispute that the Bobo patent discloses a database that stored the user's "display preferences." See id. at 145-46; Ex. 5 at Col. 16, lines 56-57 ("the memory . . . would contain the data indicating the preferences of each user."). Ablaise does not dispute that those display preferences were used to select the functions that were executed to generate the HTML to be delivered to the user's browser. See Davis Decl., Ex. 3 at 156-57. Indeed, Figures 4 (A and B) "are flowcharts of operations for generating HTML

files according to user preferences." Davis Decl., Ex. 5 at Col. 5, lines 53-54; see also Ex. 13 at

108 (Bobo discloses generating HTML according to user preferences).

Despite the Bobo patent's teaching that it offers users "one of several formats" –

language used in the Bobo patent itself – Ablaise contends that the Bobo patent's "display

preferences" are content identifiers not "format identifiers." See Davis Decl., Ex. 10 at ¶ 44.

Mr. Mulligan contends that because the images contained in some of the display options are

saved in different image files on the server, they are different "content" not different "format."

See Davis Decl., Ex. 3 at 152. Ablaise's argument flies in the face of the actual disclosures of

the Bobo patent, which repeatedly describes the ability of users to express their preferences as to

how they wish to have the content formatted or displayed. See, e.g., Davis Decl., Ex. 5 at Col. 5,

lines 19-25 (Summary of Invention describing sending listings "in one of several format"); Col

10, lines 38-42 (describing operation "when the user requests a page of information in a display

format other than the user's preferred option of displaying the message"); Col. 5, lines 59-60

(Figure 7 is display "according to a fourth display option"); Col. 7, lines 43-47 (request will

include "display preferences"); Col. 8, line 5 (referring to "display options"); Col. 9, lines 38-46

(describing how HTML is generated "based upon the option selected for displaying the facsimile

message"); Col. 12, lines 26-35 (tables show HTM for display shown in Figure 7); Col. 14, lines

62-65 (owner can change "the manner in which facsimile messages are displayed on the

computer"). There is no dispute that the display preferences the display preference controls what

functions are selected to generate HTML. See Davis Decl., Ex. 3 at 156-157. As such, the

display preferences are "format identifiers" within the meaning of the '737 patent.

Ablaise's position requires it to contort the definitions of "content" and "format" beyond

recognition. To say that receiving the same page of a facsimile in a full-size image versus a

thumbnail image is receiving different content rather than the same content in a different format defies common sense.  Moreover, there is nothing in the specification of the '737 patent suggesting that Ablaise meant to adopt such a strained view of the distinction between content and format.  Ablaise cannot overcome the plain disclosure of format choices in the Bobo patent by simply declaring them different "content."

Because there is no genuine dispute of fact that the display preferences disclosed in the Bobo patent are "format identifiers" as that claim term has been construed by this Court, and there is no dispute that the Bobo patent discloses all the other elements of the claims, summary judgment of anticipation is warranted on this independent ground as well.[9]

**B.        The Bobo Patent Renders Claims 1, 3, 4 and 6 of the '737 Patent Obvious.**

The difference that Mr. Mulligan asserts exists between the alleged invention and the disclosure of the Bobo patent is slender indeed.  There can be no dispute that the Bobo patent teaches providing users with specific choices about how to display their fax messages.  See Davis Decl., Ex. 3 at 144-45.  Ablaise does not dispute that the person of ordinary skill could program the system to accomplish personalized formats based on known Web technologies as long as he had the "idea and need" to do so.  See id. at 33-34.  Indeed, Ablaise admits that one way to provide users with different sized images just as described in the Bobo patent would have been to use settings in the HTML image tag itself that could change the size of the image when displayed in HTML.  See id. at 152-53.  The idea of letting users pick the format for their web page is plainly taught by the Bobo patent's disclosure of five different display options.  See e.g.,

---

[9]  The Bobo patent also discloses sending the display preferences in the request.  See Davis Decl., Ex. 5 at Col. 18, lines 16-32; Ex. 7 at ¶ 160.  Therefore, it also anticipates Claims 1, 2 and 3 of the '530 patent.  See Davis Decl., Ex. 7 at ¶¶ 159-163.

Davis Decl., Ex. 5 at Col. 5, lines 19-25.  Even if this Court were to adopt Ablaise's argument

that fax pages displayed in full-size image versus a thumbnail images are not in different

formats, then it would have been obvious for the person of ordinary skill in the art to use

standard web programming of HTML tags to accomplish that end.[10]

**IV.    Claims 1, 3, 4, And 6 Of The '737 Patent Are An Obvious Combination Of Personalized Computer Display (i.e., The Reuters Patent) And Web Technology For Generating HTML Pages On The Fly (i.e., The Sun Microsystems Patent).**

The customization of the format of computer displays for individual users, and the ability

to store the user's preferences, was a feature of numerous computer systems long before the

development of the World Wide Web.  As Mr. Mulligan himself recognizes, the person of

ordinary skill in the art knew how to do the programming of a system according to the invention

of the '737 patent if he had the "idea and need."  See Davis Decl., Ex. 3 at 33-34.

By the time the World Wide Web was developed in the early 1990s, customization of the

format of computer displays and the computer users' desire for such customization was well

understood by persons of ordinary skill in the art.[11]  As detailed above, users were able to

customize the location of content on their computer displays in database systems (like Microsoft

Access), news and information systems (as described in the Reuters patent), and (Xwindows).

An example of this customization of format displays is described in detail in Reuters patent, filed

in 1990.  See Davis Decl., Ex. 6.  It is undisputed that the Reuters patent disclosed personalized

format displays for users' screens that allowed users to specify the location of items on their

---

[10] For the same reasons set forth above, Ablaise has not established any secondary indicia of non-obviousness that could possibly outweigh the undisputed evidence demonstrating the obviousness of the invention in light of the Bobo patent or any of the other obviousness arguments set forth herein.

[11] The parties do not agree as to the appropriate levels of skill for the persons of ordinary skill in the art.  Ablaise takes the position that the person of ordinary skill in the art would require as little as one year of experience in web page development. See Davis Decl., Ex. 10 at ¶ 9. Dow Jones believes that the applicable skill level for the person of ordinary skill in the art is more experienced than proposed by Ablaise's expert. See Davis Decl., Ex. 7 at ¶ 80. The Court need not resolve that issue in conjunction with this motion because even under Ablaise's definition, the invention would be obvious.

computer display. Davis Decl., Ex. 3 at 195. It is also undisputed that the Reuters patent described allowing users to save those formatting display preferences. Id.

The development of the Web and the technology used to implement it, which was all well known before May 15, 1995, gave programmers a mechanism for implementing customized web pages for individual users. The usefulness of the Web for implementing these customization technologies was discussed in multiple articles in the industry published prior to May 15, 1995. For example, as discussed above, multiple articles in 1994 described the desirability of moving from the pre-web systems that had provided personalization to web pages using dynamically generated HTML. Moreover, as Ablaise's own expert concedes, "by the mid-1990s, companies were rushing to establish an online presence and developers were working fast and furiously to get clients up on the Web." Davis Decl., Ex. 10 at ¶ 66. The combination of the articles and the market interest in moving onto the Web that Ablaise's expert concedes, demonstrates "the effects of demands known to the design community or present in the marketplace" that suggest the obviousness of the combination. See Muniauction, 532 F.2d at 1326 (Fed. Cir. 2008), quoting KSR.

There was no need for the development of any technological solutions beyond the Web technology that was already known to the person of ordinary skill in the art in order to bring personalized formatting to the Web. See Davis Decl., Ex. 3 at 33-34. Indeed, in his report Mr. Mulligan attempts to identify various "issues" that he contends would have limited the ability to bring the customization of non-web computer displays to the customized format of web pages. Davis Decl., Ex. 10 at ¶ 15. These supposed "issues" were stateless connections, band width limitation, lack of display control elements and limitations of HTML. See id. However, as Mr. Mulligan was forced to concede, the inventors of the Ablaise patents did not invent anything that

addressed any of these issues.  See Davis Decl., Ex. 3 at 87-91.  Where, as here, the alleged

invention is simply incorporating web browser functionality into existing electronic prior art

systems, the combination is obvious.  See Muniauction, 532 F.3d at 1326-1327 (Fed. Cir. 2008)

(holding that "adapting existing electronic processes to incorporate modern internet and web

browser technology" was obvious).  Moreover, as discussed in detail above, Ablaise cannot

establish even one secondary indicia of non-obviousness that would support a conclusion that the

invention was non-obvious.

Given the prior use and prevalence of customized formatting, the development of Web

technologies that permitted that customized formatting to include HTML generated on a server,

and the motivation throughout the industry to move technology onto the Web platform, it would

have been obvious to the person of ordinary skill in the art to make the invention claimed in the

'737 patent.

## V.     The HTGrep Program Invalidates Claims 1-3 Of The '530 Patent.

### A.     The HTGrep Program was Disclosed in a Printed Publication and Used in the United States before May 15, 1995.

The undisputed testimony of Oscar Nierstrasz, the developer of the HTGrep program, and

contemporaneous documents establish that the HTGrep program is both a prior public use and a

prior printed publication.

Mr. Nierstrasz testified[12] that he posted the HTGrep program on his publicly-accessible

website in May, 1994.  He announced its availability in a posting to a public user group on May

17, 1994.  See Davis Decl., Ex. 20 at 33-34, 49-50; Ex. 25.  The announcement of HTGrep

included a link that directed the user to the website containing HTGrep.  See Davis Decl., Ex. 20

---

[12]  Although Dow Jones provided a declaration from Mr. Nierstrasz pursuant to F.R.E. 902(12), Ablaise refused to agree to the admissibility of the documents, thus forcing Dow Jones to travel to Europe to take Mr. Nierstrasz's deposition.

at 33-35.  Not only was the existence and availability of HTGrep posted on user groups, HTGrep

included a link to the server on each page generated.  <u>See</u> Davis Decl., Ex. 20 at 114-115; Davis

Decl., Ex. 26 at DJ0983468.  A history of his work on the Web that Mr. Nierstrasz wrote back in

1996, confirms that HTGrep was "born" on May 12, 1994.  <u>See</u> Davis Decl., Ex. 27 at 2.

 After Mr. Nierstrasz posted HTGrep on the World Wide Web in May 1994, it was

downloaded by, used by, and commented upon by numerous users around the world, including in

the United States, in 1994-95.  <u>See</u> Davis Decl., Ex. 20 at 46-47 (describing contact with

HTGrep users in 1994).  Archived user group postings before May 15, 1995 describe his website

and the programs available thereon, including specifically HTGrep.  <u>See, e.g.</u>, Davis Decl., Ex.

28 (indicating in posting dated August 29, 1994, that poster "is using something called 'htgrep'

from Oscar Nierstrasz" and posting a link to Nierstrasz's website); Ex. 29 (January 12, 1995

posting stating "there is a tool, called HTGREP by Oscar Nierstrasz" and providing links to

website); Ex. 30 (January 3, 1995 posting referring to review of HTGrep source code).  An

archived email concerning the HP-UX archive in March 1995 identified Htgrep-1.0 as one of the

programs it had archived.  <u>See</u> Davis Decl., Ex. 31.  The log of the University of Pennsylvania

web server for the period July 1, 1994 through March 22, 1995 indicates that HTGrep had been

installed on the University's server and accessed 38 times during that period.  <u>See</u> Davis Decl.,

Ex. 32.  These documents and Mr. Nierstrasz's testimony, and the absence of contrary evidence,

remove any genuine dispute of fact that HTGrep was published on the Web, and was also in

public use in the United States, before May 15, 1995.

 There is no genuine dispute of fact that the HTGrep program as available in 1994

included the use of different formatting options.  <u>See</u> Davis Decl., Ex. 25 (May 17, 1994 posting

describing HTGrep as one that "supports various formatting options" and identifying the URL

for the website where HTGrep is available); Ex. 20 at 47 (all of the HTGrep programs on his

website included the function of setting the format).

**B.      The HTGrep Program Anticipates Claims 1-3 of the '530 Patent.**

There is no dispute that the HTGrep program creates web pages on the fly in response to

a request and those web pages contain different HTML tags depending on a style identifier

included in the request. See Davis Decl., Ex. 3 at 170. Ablaise does not dispute that HTGrep

allowed users to select different display options for the output. See id. at 166-67. In particular,

the user could choose between HTML paragraphs, a numbered list, a bullet list, or a definition

list. See id. at 167-68. Each of those types of lists had a particular meaning in HTML and

would, for example, indent the text to form a list. See id. at 168-69 (conceding that using a list

would put the text in a different location "just like if I just typed in a 1 or put in extra words it

would move over").

Ablaise's expert asserts that the formatting choices offered to users of HTGrep – the

choice of display as a numbered list, bulleted list or plain text – are not "formatting types of

data" because they do not "define the location of text and/or graphics on a web page." See Davis

Decl., Ex. 10 at ¶ 55; Ex. 3 at 180-81. The HTML tags offered by the HTGrep program

unquestionably change the location of the text on the page by, for example, indenting the text.

See Davis Decl., Ex. 3 at 169.

The absurdity of Ablaise's position is demonstrated by its expert's attempt to make a

distinction between HTML tags that are not expressly disclosed in HTGrep and the HTML tags

that are. For example, Mr. Mulligan has admitted that the <center> tag, which, as the name

suggests, centers the text it surrounds, is a tag that specifies the location of the text and/or

graphics. See Davis Decl., Ex. 10 at ¶ 51; Ex. 3 at 179. When pressed to explain why the

<center> tag specifies the location of text and/or graphics but the <paragraph> tag does not,

Ablaise's expert was unable to explain precisely what it is about the format of two web pages

must change in order to constitute "formatting data." See Davis Decl., Ex. 3 at 180-21; 187-88.

HTGrep unquestionably provides users with different formats, using HTML tags that

specify the location of the text on the page. Because HTGrep teaches use of formatting data and

different page formats, it anticipates Claims 1, 2 and 3 of the '530 patent.

C.      The HTGrep Program Renders Claims 1-3 of the '530 Patent Obvious.

The alleged difference between the HTGrep program and the alleged invention,

according to Ablaise's expert, is that HTGrep offers the choice of bulleted list versus numbered

list instead of offering other HTML tags, such as centered text versus left-aligned text. See

Davis Decl., Ex. 10 at ¶ 51, 56 (HTML tags used in HTGrep are not "formatting types of data"

but center tag is). There is no dispute that the person of ordinary skill in the art would have been

familiar with the available HTML tags. See Davis Decl., Ex. 3 at 178-79 (person of ordinary

skill in the art would have had knowledge of HTML that affected the location of text). Indeed,

the use of such a tag was described in texts for lay users of HTML published in 1995. See Davis

Decl., Ex. 11 at 386. Mr. Mulligan has admitted that the <center> tag could have been used in

the same way the <dl> or <ol> tags were used and that the person of ordinary skill in the art

could modify HTGrep to use the center tag. See Davis Decl., Ex. 3 at 176-77. To create the

output as centered text would require that only two tags be included in the HTML. See id. at

174.

Even if one accepts the view propounded by Mr. Mulligan that the particular HTML tags

shown in HTGrep do not constitute formatting data or change the page format, it would have

been obvious to use an additional (and well-known) HTML tag that would do so. If one adopted

Ablaise's view that HTGrep's use of the ordered list (<ol>) and bulleted list (<bl>) tags did not make the use of the center (<center>) tag obvious, any change in the formatting of an HTML page could be a non-obvious invention. This is plainly not the law.

**VI.    The Thunderstone Bridge Program Invalidates Claims 1-3 Of The '530 Patent.**

    **A.    The Thunderstone Bridge Program was Sold and Used in the United States before May 15, 1995.**

There is no genuine dispute of fact that the Thunderstone Bridge program was sold and used in the United States before May 15, 1995. The uncontradicted testimony of the corporate representative of Thunderstone is that the Thunderstone Bridge program was used and commercially sold in the United States in 1994. See Davis Decl., Ex. 19 at 11 (establishing that Thunderstone was selling its Bridge product in 1994). The User's Guide, which describes the operation of that program, including the formatting options, is dated to indicate that the last revisions of that document were in December 1994. See Davis Decl., Ex. 18; Ex. 19 at 11-12. The sale of the Thunderstone Bridge program prior to May 15, 1995 was further corroborated by contemporaneous documents showing those sales. See Ex. 19 at 16-20, 22, 25. The purchase of the Thunderstone Bridge product was discussed on a Usenet posting dated November 21, 1994. Id. at 26-27. Mr. Turnbull confirmed that the Thunderstone Bridge product included the function of letting users select the format as part of the product being sold in January/February 1995. See Ex. 19 at 38-41.

Ablaise has no evidence that could create a genuine dispute of fact as to the sale of the Thunderstone Bridge program before May 15, 1995.

**B.     The Thunderstone Bridge Program Anticipates Claims 1-3
        of the '530 Patent.**

The disclosure of each and every element of Claims 1, 2 and 3 of the '530 patent is set

forth in detail in the claim charts in Dr. Bestavros expert report.  <u>See</u> Davis Decl., Ex. 7 at

¶¶ 132-37.  There is no dispute that the Thunderstone Bridge program offered users a choice of

receiving the same content with paragraph formatting or without paragraph formatting.  Davis

Decl., Ex. 3 at 160-61.  There is also no dispute that the Thunderstone program allowed users to

specify whether the records from the database would be formatted vertically or horizontally.  <u>See</u>

Davis Decl., Ex. 19 at 40-41; Ex. 3 at 165.  Ablaise concedes that the Thunderstone program

generated web pages on the fly, based on information included in the request concerning the

user's preferences in terms of paragraph formatting or vertical versus horizontal output.  <u>See</u>

Davis Decl., Ex. 10 at  ¶¶ 48, 53 (user can "ask to see a field . . . in paragraph formatting" and

Thunderstone "creates dynamic web pages"); Ex. 3 at 163.

The Thunderstone program thus indisputably allows the user to receive the same content

with two different sets of HTML tags (with paragraph formatting or without it).  <u>See</u> Davis

Decl., Ex. 3 at 161-163.  While Mr. Mulligan asserted in his expert report that the Paragraph tag

is not "formatting data" because it does not specify the location of text and/or graphics on a page

(<u>see</u> Davis Decl., Ex. 10 at ¶ 51), in his deposition testimony, Mr. Mulligan admitted that the

paragraph tag (<P>) was formatting data when used in the exact same way in the specification of

the '530 patent.  <u>See</u> Davis Decl., Ex. 3 at 81.  Indeed, Mr. Mulligan conceded at his deposition

that web developers as of May 15, 1995 would know that if they inserted paragraph tags into

text, they would get web pages with two different formats.  <u>Id</u>. at 85-86.  As Mr. Mulligan

himself admits, "[i]f you put paragraph tags in, the text will move, the same way as if you added

words to it." Id. at 164-65.  Inventor Ritchie also agreed that a paragraph break is a way of formatting content.  Davis Decl., Ex. 13 at 130.

In light of this undisputed evidence of Thunderstone's use of the paragraph formatting and non-paragraph formatting, and the admission that paragraph formatting does specify the location of text on the page, the Thunderstone program discloses each and every element of Claims 1, 2 and 3 of the '530 patent.

### C.      The Thunderstone Bridge Program Renders Claims 1-3 of the '530 Patent Obvious.

As with the HTGrep program, the only "difference" that Ablaise has identified is its assertion that the particular HTML tags used (in this case the paragraph tag) are not the tags that specify the location of the content.  It is plain – and Ablaise cannot dispute – that other HTML tags, including those that Ablaise concedes do specify the location of content, could be substituted seamlessly in the Thunderstone Bridge program.  As with the HTGrep program, it simply cannot be a patentable invention to choose different HTML tags than the specific HTML tags used in the prior art.  Therefore, the Thunderstone Bridge program renders Claims 1, 2 and 3 of the '530 patent obvious.

### CONCLUSION

For the foregoing reasons, Dow Jones requests that the Court declare Claims 1, 3. 4 and 6 of the '737 patent and Claims 1-3 of the '530 patent invalid.

Date: October 7, 2008                        Respectfully submitted,

By: _____

Steven Lieberman (439783)
Sharon Davis  (439223)
Brian Rosenbloom (461413)
Oliver Edwards (975833)
ROTHWELL, FIGG, ERNST & MANBECK
1425 K Street, NW
Suite 800
Washington, DC  20005
Tel: (202) 783-6040
Fax: (202) 783-6031

*Attorneys for Plaintiffs, Dow Jones & Company,
Inc. and  Dow Jones Reuters Business Interactive,
LLC d/b/a Factiva*