# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DOW JONES & COMPANY, INC.,

        Plaintiff,

        v.

ABLAISE LTD. and GENERAL
INVENTIONS INSTITUTE A, INC.

        Defendants.

Civil Action No. 1:06-CV-01014

Judge James Robertson

DOW JONES REUTERS BUSINESS
INTERACTIVE, LLC d/b/a FACTIVA,

        Plaintiff,

        v.

ABLAISE LTD. and GENERAL
INVENTIONS INSTITUTE A, INC.

        Defendants.

Civil Action No. 1:06-CV-01015

Judge James Robertson

## REPLY MEMORANDUM IN SUPPORT
## OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OF INVALIDITY

Steven Lieberman (439783)
Sharon L. Davis  (439223)
Brian Rosenbloom (461413)
Oliver Edwards (975833)
ROTHWELL, FIGG, ERNST & MANBECK
1425 K Street, NW, Suite 800
Washington, DC  20005
Tel: (202) 783-6040; Fax: (202) 783-6031

*Attorneys for Plaintiffs, Dow Jones & Company,
Inc. and  Dow Jones Reuters Business Interactive,
LLC d/b/a Factiva*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... iii

INTRODUCTION .................................................................................................................... 1

ARGUMENT ............................................................................................................................ 3

I.      FISHWRAP, HTGREP AND THUNDERSTONE ARE PRIOR ART .............................. 3

    A.      Fishwrap ............................................................................................................... 3

    B.      HTGrep ................................................................................................................. 8

    C.      Thunderstone ........................................................................................................ 10

II.     FISHWRAP INVALIDATES CLAIMS 1, 3, 4 AND 6 OF THE '737 PATENT ............ 10

    A.      Fishwrap Anticipates The Asserted Claims Of The '737 Patent ........................... 10

    B.      Fishwrap Renders The Asserted Claims Of The '737 Patent Obvious ................... 13

III.    THE BOBO PATENT ........................................................................................................ 17

    A.      The Bobo Patent Anticipates The Asserted Claims Of The '737 Patent ............... 17

    B.      The Bobo Patent Renders The Asserted Claims Of The '737 Patent
        Obvious ................................................................................................................. 19

IV.     CLAIMS 1, 3, 4 AND 6 OF THE '737 PATENT ARE AN OBVIOUS
    COMBINATION OF PERSONALIZED COMPUTER DISPLAY (i.e., THE
    REUTERS PATENT) AND WEB TECHNOLOGY FOR GENERATING HTML
    PAGES ON THE FLY (i.e., THE SUN MICROSYSTEMS PATENT) ........................... 20

V.      HTGREP INVALIDATES CLAIMS 1-3 OF THE '530 PATENT ................................. 22

    A.      HTGrep Invalidates Claims 1-3 Of The '530 Patent ............................................ 22

    B.      HTGrep Renders Claims 1-3 Of The '530 Patent Obvious ................................... 24

VI.     THUNDERSTONE INVALIDATES CLAIMS 1-3 OF THE '530 PATENT .................. 24

    A.      Thunderstone Anticipates Claims 1-3 Of The '530 Patent ................................... 24

## TABLE OF CONTENTS (cont'd.)

                                            **Page**

B.      Thunderstone Renders Claims 1-3 Of The '530 Patent Obvious ..........................25

CONCLUSION..............................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                                                  **Page**

Bruckelmyer v. Ground Heaters, Inc., 445 F.3d 1374 (Fed. Cir. 2006) ........................................9

Carroll v. United Steel Workers, 498 F. Supp. 976 (D. Md. 1980) ...............................................7

In re Klopfenstein, 380 F.3d 1345 (Fed. Cir. 2004) ........................................................................9

Iron Grip Barbell Co. v. USA Sports, Inc., 392 F.3d 1317 (Fed. Cir. 2004)...............................17

KSR Int'l Co. v. Teleflex, Inc., 127 S. Ct. 1727 (2007) ...........................................................2, 19

Laningham v. U.S. Navy, 813 F.2d 1236 (D.C. Cir. 1987) .............................................................7

Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318 (Fed. Cir. 2008) ........................................22

Price v. Symsek, 988 F.2d 1187 (Fed. Cir. 1993)............................................................................6

Ruiz v. A.B. Chance Co., 234 F.3d 654 (Fed. Cir. 2000).............................................................16

Sandt Technology, Ltd. v. Resco Metal and Plastics Corp.,
      264 F.3d 1344 (Fed. Cir. 2001).............................................................................................6

Springer v. Durflinger, 518 F.3d 479 (7th Cir. 2008).....................................................................7

Syntex LLC v. Apotex, Inc., 407 F.2d 1371 (Fed. Cir. 2005) .......................................................15

## INTRODUCTION

Plaintiffs Dow Jones & Company, Inc. and Dow Jones Reuters Business Interactive, LLC d/b/a Factiva ("Dow Jones") respectfully submit this Reply Memorandum in further support of their motion for summary judgment of invalidity of Claims 1, 3, 4 and 6 of U.S. Patent No. 6,961,737 ("the '737 patent") and Claims 1-3 of U.S. Patent No. 6,295,530 ("the '530 patent").

The prior art on which Dow Jones relies in support of its motion includes three computer systems that were in use and/or published before May 15, 1995 -- Fishwrap, HTGrep and Thunderstone. As explained in Dow Jones's Memorandum, Dow Jones obtained testimony from witnesses with personal knowledge of these systems and identified multiple contemporaneous documents that corroborate that testimony. Ablaise points to no evidence that the systems are not prior art or did not operate in the manner described by the witnesses.

Nonetheless, Ablaise devotes much of its opposition to attacking the sufficiency of proof concerning these systems by suggesting that it is possible that the witnesses' testimony (albeit corroborated by contemporaneous documents) is not reliable. Dow Jones has established the scope of the prior art by clear and convincing evidence and Ablaise has failed to establish any genuine dispute of material fact that would require these issues to be decided at trial.

In the face of the prior art identified by Dow Jones – none of which was before the Patent Examiner – Ablaise identifies only one or (as to Fishwrap) two elements of the patent claims that it contends are absent from the prior art. As discussed below, as to these elements Ablaise is incorrect.

With respect to the '737 patent, Ablaise seeks to avoid summary judgment by asserting that the prior art fails to disclose the use of "format identifiers." In its Opposition, Ablaise revisits the Court's claim construction in an effort to narrow the meaning of "format identifiers."

1

None of Ablaise's explanations for why Fishwrap and the Bobo patent fail to disclose "format identifiers" is supported by either the Court's claim construction or by the patent itself. Using the construction of "format identifiers" already adopted by the Court, there is no genuine dispute of material fact that both Fishwrap and the Bobo patent teach the use of "format identifiers."[1] Because Ablaise does not dispute that each of the other elements of Claims 1, 3, 4 and 6 of the '737 patent is taught in this prior art, Dow Jones is entitled to summary judgment.

Moreover, even as Ablaise construes the term, the use of "format identifiers" was known to a person of ordinary skill in the art. The alleged invention would have been obvious in light of either Fishwrap or the Bobo patent or in light of the well-developed prior art of personalized computer displays combined with web technology for generating HTML pages on the fly. Ablaise's Opposition also makes plain that it does not have sufficient evidence to establish a nexus between the alleged invention and any secondary indicia that would affect an obviousness analysis. Ablaise has not identified any material facts that are in dispute that factor into the obviousness analysis, and Dow Jones has established by clear and convincing evidence based on undisputed facts that it is entitled to summary judgment of obviousness.

With respect to Dow Jones' argument that it would have been obvious to combine the Reuters patent (which, Ablaise concedes, taught a non-Web and non-Internet based software product that allows a user to customize the format and style of content on the display) with known Internet technology (such as the Sun patent), Ablaise essentially argues that one of skill in the art would not have thought to take the known pre-Internet functions and combine them with known Internet technology. Under recent Federal Circuit cases following the Supreme Court's ruling in KSR Int'l Co. v. Teleflex, Inc., 127 S. Ct. 1727, 1731 (2007), Ablaise's argument fails.

---

[1]     Ablaise concedes that information identifying the order in which content is displayed is a format identifier. See Dow and Ablaise's Statement of Undisputed Facts at ¶ 47 (hereafter "Undisputed Facts") ("a format identifier could be, for example, a simple list of the content in order" . . . UNDISPUTED").

With respect to the '530 patent, Ablaise attempts to avoid summary judgment by asserting that the different HTML tags delivered by the prior art to different users are not "formatting data." There is no real factual dispute about what the prior art teaches. Instead, Ablaise seeks to narrow the meaning of "formatting data" to avoid what is taught in the prior art. Ablaise is reduced to arguing that the very same HTML tags are "formatting data" when used in Figure 8 of the '737 patent but are not "formatting data" when used in the prior art. Moreover, it cannot be a non-obvious advance over the prior art simply to switch from one known HTML tag to another known HTML tag. Ablaise does not assert that any secondary indicia of non-obviousness are applicable to Claims 1-3 of the '530 patent.

Because the scope and content of the prior art is an essential aspect of determining both the anticipation and obviousness claims, and because Ablaise challenges the sufficiency of the evidence with respect to three pieces of prior art on essentially the same grounds, Dow Jones will address that issue first in Section I. Dow Jones will then address the points made by Ablaise in response to Dow Jones's invalidity arguments, addressing in Sections II, III and IV the five (two anticipation and three obviousness) independent bases for holding the '737 patent invalid; and in sections V and VI the four independent bases (two anticipation and two obviousness) for holding the '530 patent invalid.

## ARGUMENT

## I.      FISHWRAP, HTGREP AND THUNDERSTONE ARE PRIOR ART.

### A.      Fishwrap.

There is no dispute that Fishwrap reordered the topics for individual users and delivered a personalized electronic newspaper before May 15, 1995. Ablaise admits that "some versions of Fishwrap in use prior to May 15, 1995 actually self-organized the order of topics generated by

the newspaper." Ablaise Opp. at 15. Nonetheless, Ablaise suggests that Dow Jones has not

sufficiently proven that (1) the source code produced in this case was the same source code in

use as of May 15, 1995 and (2) Fishwrap was a web-based system as of May 15, 1995. Id.

Mr. Chesnais, one of the developers of Fishwrap at MIT, produced numerous documents

relating to Fishwrap in this litigation, including source code that he retrieved from old computer

servers which served as Fishwrap servers in the mid to late 1990s.[2] See Chesnais Decl. at ¶ 6.

Mr. Chesnais confirms that the source code he retrieved from those servers reflected the way the

Fishwrap reordering process was implemented as of May 15, 1995. See, e.g., Chesnais Decl. at

¶¶ 6, 49, 50, 52-56. Ablaise has not identified a single piece of evidence suggesting otherwise.

Significantly, although Dow Jones identified Mr. Chesnais as a fact witness in its Rule

26(a)(1) disclosures served on October 10, 2007, and produced literally thousands of pages of

Fishwrap code and other documents from Mr. Chesnais' files of February 2008, Ablaise made a

strategic choice not to depose Mr. Chesnais. Thus, its response to the Fishwrap prior art consists

largely of attorney argument and unsupported speculation concerning Mr. Chesnais' reliability.

Mr. Chesnais' declaration on the specific issue of the code is corroborated by

contemporaneous documents, including the code itself. The source code that Ablaise references

has dates reflecting that it was edited ranging from December 1993 to June 1996, showing that it

was in existence by December 1993 and had "a long history before May 15, 1995." See

Chesnais Decl. at ¶ 53. Mr. Chesnais declares that the June 1996 change to the specific code

discussed in Ablaise's Opposition, did not relate to the functionality of Fishwrap at issue in this

case. See id. In fact, the code relating to the actual reordering of the topics is dated before May

15, 1995, with no revision date after May 15, 1995. See, e.g., Chesnais Decl. at ¶¶ 54-55 and Ex.

---

[2]     Ablaise alleges that there was some impropriety about Mr. Chesnais' reliance on the documents attached to his Declaration. See Ablaise Opp. at 12, fn. 1. To be clear, the documents referred to by Mr. Chesnais and attached to his Declaration were produced by February 2008 and did not come in any way as a surprise to Ablaise.

46. Mr. Chesnais reviewed the relevant code and the changes reflected therein for the relevant sections of Fishwrap and confirmed that those changes made after May 15, 1995 did not affect the functionality relied on by Dr. Bestavros. See Chesnais Decl. at ¶¶ 49-56. In contrast, Ablaise has not identified a single alleged post-May 15, 1995 change in the code that would have had any material impact on the operation of the self-organizing features of Fishwrap.

Mr. Chesnais' declaration is further corroborated by the fact that – as Ablaise admits – Fishwrap was performing the function of reordering topics for individual users based on that user's reading habits before May 15, 1995. As explained in Mr. Chesnais' Declaration, the Release Four version of Fishwrap launched in March 1995, expanded the use of the existing self-organizing feature to personalize the layout of Fishwrap. See id. at ¶¶ 48-49. The operation of that Release Four system is described in multiple contemporaneous documents identified by Mr. Chesnais. See, e.g., Chesnais Decl., Exs. 36 ("This release of Fishwrap will always reorganize the presentation of your table of contents to the way you read your news."); 37 (describing same functionability). These documents, totally apart from the source code, corroborate Mr. Chesnais' testimony as to how Fishwrap accomplished the self-organizing feature before May 15, 1995. It is hard to imagine how Fishwrap could have been performing those functions if the code used to perform those functions had not yet been written and implemented.

On the issue of internet accessibility, Dow Jones need not and does not rely solely on Mr. Chesnais' testimony because the contemporaneous documents establish that the system was Internet accessible before May 15, 1995. See, e.g., Chesnais Decl., Ex. 36 at 1 ("you can access [fishwrap] using the WWW browser of your choice with the URL: http://fishwrap-people.www.media.mit.edu."); Ex. 37 ("You can access Fishwrap using most popular World

Wide Web browsers from any machine connected to MIT net"). Ablaise has not identified any evidence suggesting that internet accessibility was added after May 15, 1995.[3]

Ablaise's reliance on cases concerning the use of uncorroborated testimony by a single witness to invalidate a patent is misplaced. The Federal Circuit has made clear that the requirements for corroboration vary depending on, inter alia, the interest of the witnesses. See Sandt Technology, Ltd. v. Resco Metal and Plastics Corp., 264 F.3d 1344, 1351 (Fed. Cir. 2001) (setting forth factors relied on by the Court to determine if testimony is sufficiently corroborated); Price v. Symsek, 988 F.2d 1187, 1195 (Fed. Cir. 1993). Here, Mr. Chesnais has no personal interest in this matter and, therefore, the high level of corroboration required in the cases cited by Ablaise is simply not applicable. See Chesnais Decl. at ¶ 12. Corroboration can be provided by multiple means, but the "most reliable proof" of corroboration is contemporaneous documentary or physical evidence. See Sandt, 264 F.3d at 1351. Here, Mr. Chesnais' testimony is corroborated by contemporaneous documents that describe in great detail the development and implementation of Fishwrap, including source code for the Fishwrap system, emails sent by Mr. Chesnais and others concerning Fishwrap, and published articles discussing Fishwrap. As set forth in Dow Jones' Memorandum at 23-24, the substance of Mr. Chesnais' testimony is consistent with these contemporaneous documents from both his own files and from publicly available sources.

In the absence of any actual evidence suggesting that Mr. Chesnais' testimony is inaccurate, Ablaise resorts to proposing various reasons why a fact finder might disbelieve Mr. Chesnais. A party cannot avoid summary judgment simply by asserting that the moving party's witnesses are not credible or should be subject to cross-examination. See Laningham v. U.S.

---

[3]      Ablaise also fails to identify what element of Claim 1 of the '737 patent would be missing even if Fishwrap were accessible only over the MIT network. Claim 1 of the '737 patent requires only use of "a network," – which the MIT network certainly was.

Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (summary judgment may not be defeated by assertion that jury might disbelieve denial); Springer v. Durflinger, 518 F.3d 479, 484 (7th Cir. 2008) (when non-movant relies solely on challenges to witness credibility and presents no independent facts, summary judgment is proper). For the opposing party to raise a fact issue based on witness credibility, he must produce "sufficient evidence to show the court that at trial he will be able to produce some fact to shake the credibility of the affiants." Carroll v. United Steel Workers, 498 F. Supp. 976, 978 (D. Md. 1980).

Here, Ablaise's multitude of attacks on Mr. Chesnais' credibility (which Ablaise itself characterizes as a "laundry list," see Ablaise Opp. at 15) are purely speculative. None of the issues raised by Ablaise creates a genuine issue of fact as to the operation of Fishwrap before May 15, 1995. Ablaise begins with the conclusory assertion that it is "unlikely" that Mr. Chesnais' memory "could be that sharp." Ablaise Opp. at 16. If such a conclusory assertion could avoid summary judgment, summary judgment would be virtually impossible to obtain.

Ablaise next asserts that the absence of a modification in the code of the appMain.c file relating to Release Four indicates that Mr. Chesnais' testimony is incorrect. As Mr. Chesnais explains, Release Four did not implement a new method for ordering articles in March 1995; it simply expanded the circumstances in which the already existing method was used. See Chesnais Decl. at Exs. 23 (describing self-organization in 1994); 35 (noting that Release Four is the first Fishwrap that is 100% self-organizing). Thus, there would be no reason to expect edits to that particular file in connection with Release Four, and there is no reason to doubt Mr. Chesnais' testimony on this point.

Ablaise next argues that the mere fact that Mr. Chesnais communicated with Dow Jones lawyers allows it to survive summary judgment and incorrectly states that Dow Jones is

employing Mr. Chesnais as a consultant in another case.[4]  Ablaise also mischaracterizes Mr. Chesnais' emails with a local newspaper reporter seeking to get copies of articles written about Fishwrap to try to manufacture a personal interest where none exists.  None of these conclusory allegations of bias are sufficient to create a genuine issue of material fact.

Ablaise's next argument – that Mr. Chesnais' testimony is "based on hearsay" – makes no sense.  It is particularly odd that Ablaise speculates about Mr. Chesnais' ability to testify on a topic that is undisputedly within his personal knowledge.  Whether or not Mr. Chesnais uses documents to assist his recollection, his testimony is not improperly "based on hearsay" and there is no legal basis for avoiding summary judgment.

Finally, Ablaise argues that a fact finder might disbelieve Mr. Chesnais because he was reimbursed for his time spent working on this matter.  Ablaise cites no authority suggesting that, under D.C. law, reimbursing Mr. Chesnais for his time is improper, especially given the amount of research involved to collect documents, etc.

Because Mr. Chesnais' testimony is unequivocal, corroborated and undisputed and Ablaise has failed to plead specific facts sufficient to raise a genuine issue of material fact with respect to the credibility of his testimony, Ablaise cannot avoid summary judgment based on the issue of what Fishwrap disclosed to the person of ordinary skill in the art.

**B.     HTGrep.**

As explained in Dow Jones's Memorandum at 42-43, HTGrep was a printed publication pursuant to §102 because it was made publicly available on the Web, and the link was disseminated to persons in the art.  Ablaise misstates the applicable legal standard applicable  by truncating a sentence to give the false impression that a prior publication must be indexed.   The

---

[4]      The redactions to which Ablaise refers were of one set of communications with Mr. Chesnais about another case, but Mr. Chesnais is not a consultant on that case.  See Second Davis Decl., at ¶ 1.

actual quote is that a reference is a prior printed publication "upon a satisfactory showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art exercising reasonable diligence, can locate it and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation." Bruckelmyer v. Ground Heaters, Inc., 445 F.3d 1374, 1378 (Fed. Cir. 2006) (emphasis added). To determine public accessibility (which is the "touchstone" of the analysis), the Court considers factors such as distribution, indexing, intended audience, and availability for copying. See In re Klopfenstein, 380 F.3d 1345, 1350-52 (Fed. Cir. 2004).

Here, the link to HTGrep was distributed to persons in the art and it was publicly available for copying or downloading to persons of skill in the art. Mr. Nierstrasz posted HTGrep on his public website in May 1994 and that it remained there at least through May 15, 1995. See Davis Decl., Ex. 20 at 33-34, 49-50. The undisputed evidence is that Mr. Nierstrasz intentionally publicized the existence of the HTGrep program on his website. Davis Decl., Ex. 20 at 49. Mr. Nierstrasz's testimony is corroborated by both documents from his own files and publicly available documents. See e.g., Davis Decl., Exs. 25, 28-32. The fact that Mr. Nierstrasz's posting was known to persons in the art is evidenced by multiple contemporaneous documents in which individuals refer to obtaining HTGrep from that website. See Davis Decl., Exs. 28-30. Mr. Nierstrasz further testified as to his communications with persons in the art who had downloaded HTGrep from his website and reviewed the source code. See Davis Decl., Ex. 20 at 46-47. Ablaise can identify no evidence to dispute the overwhelming evidence that HTGrep was known to multiple persons of ordinary skill in the art and publicly accessible through the Internet before May 15, 1995.

### C.    Thunderstone.

Ablaise admits that "a version of the [Thunderstone] product was sold prior to May 15, 1995" but claims that the proof is not sufficient that the product as sold actually had the anticipating features. See Ablaise Opp. at 37-39.  Once again, Ablaise offers no evidence disputing the testimony of Mr. Turnbull that the product sold in January and February 1995 included the function of letting users select the format. See Davis Decl., Ex. 19 at 38-41.[5]  Mr. Turnbull's testimony was corroborated by the documentary evidence establishing that the program as sold before May 15, 1995 contained the formatting features. See, e.g., Second Davis Decl. Ex. 33 (Usenet postings by Mr. Turnbull describing formatting features); Davis Decl., Ex. 18 at 327 (describing documentation as of May 1995) and 345 (documenting date of revisions).

Ablaise's reliance on cases concerning the high level of corroboration needed for interested witnesses is again misplaced.  Ablaise's assertion that Mr. Turnbull's testimony was "self-interested" makes no sense.  See Ablaise Opp. at 38.  Ablaise has no evidence and cites no facts suggesting that Mr. Turnbull or Thunderstone have any interest in this matter.  The contemporaneous documents presented are more than sufficient to corroborate Mr. Turnbull's testimony.

## II.    FISHWRAP INVALIDATES CLAIMS 1, 3, 4 AND 6 OF THE '737 PATENT.

### A.    Fishwrap Anticipates The Asserted Claims Of The '737 Patent.

Ablaise concedes that Fishwrap performs all of the steps of Claim 1 of the '737 patent, but disputes that Fishwrap uses a "format identifier."  During claim construction briefing in this

---

[5]     Ablaise contends that there was some equivocation in Mr. Turnbull's testimony that "I believe so, yes" when asked about the presence of features in the product sold.  See Ablaise Opp. at 39.  Read in context there is no ambiguity in Mr. Turnbull's testimony.  Moreover, Ablaise had the opportunity to cross-examine Mr. Turnbull at his deposition to clarify this testimony and chose not to do so.  Since Mr. Turnbull is outside the subpoena jurisdiction for trial, Ablaise will not have the opportunity for any additional cross-examination.   It would be unreasonable to require a trial so that Ablaise could argue that Mr. Turnbull's answer meant something other than "yes."

matter, the parties each proposed definitions of "format identifier," neither of which was adopted by the Court.  In its ruling, the Court explained that a format identifier "has two purposes in the claim: it is used for 'identifying the type of formatting required' and for 'selecting a set of stored functions'."  Markman Order at 9.  Those two purposes are quoted directly from the language of Claim 1 itself.  As explained in Dow Jones' Memorandum at 30, Ablaise argued extensively during claim construction briefing that the Court should construe "format identifier" to mean "an identifier corresponding to a type of formatting specified by a user from at least two types of formatting available to the user for specified content data" but the Court did not adopt that construction.[6]  Ablaise now asserts that the Court did hold that Claim 1 is limited to express user preferences.  See Ablaise Opp. at 22-23.  Ablaise's sole support for this assertion is the Court's quotation of the claim language that the formatting is "required."  Id.  Ablaise's attempt to read a limitation of express user preferences into that claim language fails.  For the reasons set forth in Dow Jones's Memorandum at 30-31, Ablaise's proposed construction has already been rejected by the Court and should not be reconsidered now.

Ablaise also seeks to rewrite the Court's Markman opinion to avoid invalidation by implicitly adding other limitations to the term "format identifier" that were never suggested in the Markman briefing and are not supported by the record.

First, Ablaise asserts that the recorded observations used in the reordering algorithm cannot be "format identifiers" because the user's past history is not the sole factor used in the reordering process.  See Ablaise Opp. at 18-19.  Ablaise does not dispute that the Fishwrap system provided users with a different layout (order) based on that individual user's preferences as reflected in his user history.  See Davis Decl., Ex. 3 at 102; Ex. 10 at ¶ 20.  Ablaise does not

---

[6]     Ablaise inexplicably argues that the claims require explicit user preference in the obviousness, rather than the anticipation section of the Opposition.  See Ablaise Opp. at 22.  Nonetheless because it appears to be a non-anticipation argument in substance, Dow Jones will address it as such.

dispute that Fishwrap accomplished this personalization of the format of the newspaper by using the reordering algorithm. See Davis Decl., Ex. 3 at 115-16.   Finally, Ablaise does not dispute that "the order determined by the algorithm determines the order (format) in which the content will be displayed on the HTML pages for that user." Undisputed Facts at ¶ 45.

There is nothing in the asserted claims or in the term "format identifier" as construed by the Court that requires that the format identifier be the sole factor used to determine the location of the content on the page.  In Fishwrap, the recorded observations of the user's past history determine in which order (format) that particular user receives the content and, therefore, identifies that format.  Nothing more is required to establish that Fishwrap uses a format identifier.  It is telling that Ablaise's expert did not make this argument as a ground for disputing Fishwrap's use of a format identifier and Ablaise cites no expert testimony supporting it.

Second, Ablaise asserts that the system used by Fishwrap does not use a "format identifier" because the recorded observations fail to "individually identify" a location in which the content should be placed on the page.  Ablaise Opp. at 19-20.  Nowhere in the Markman opinion construing the claims or in the claims themselves is there any requirement that the format identifier "individually identify" the location in which content should be placed on the page.  Indeed, it is not even clear what Ablaise means by its assertion that a format identifier must "individually identify" a location on the webpage.  Moreover, construing "format identifier" as something that specifically identifies a location on the webpage is directly at odds with Ablaise's broad application of that term when asserting infringement.  For example, Ablaise identifies as a format identifier a list of the content that simply gives the order in which that content is to appear.  See Undisputed Facts at ¶ 47.  Such a list does not individually identify the location on the page any more than Fishwrap's reordering algorithm (which creates an ordered

list of the content based on the user's past history). Ablaise cannot avoid summary judgment by grafting additional requirements onto the claim terms and then asserting that the prior art fails to meet those additional requirements.

Because there is no genuine dispute of fact that before May 15, 1995 Fishwrap incorporated all of the elements of the asserted claims of the '737 patent, Dow Jones' motion for summary judgment of invalidity should be granted.

**B.      Fishwrap Renders The Asserted Claims Of The '737 Patent Obvious.**

Unable to explain why Fishwrap – a system that Ablaise admits provides different web page formats to different users – does not render the alleged invention of the '737 patent obvious, Ablaise simply asserts without much explanation that use of a "format identifier" was somehow non-obvious. See Ablaise Opp. at 19-20. As was made plain in the Court's claim construction, a format identifier is nothing more than the mechanism used to indicate which format to deliver to a particular user and which functions to select. See Markman Order at 9. As Ablaise concedes, the format identifier can be simply a list of content in order or a number assigned to a particular location or format. See Undisputed Facts at ¶¶ 47-48. In claim construction, Ablaise argued, in opposing a narrower construction of format identifier proposed by Dow Jones, that an identifier was a broad term that could encompass many types of identifiers, as long as "it identifies something." See Ablaise's Responsive Brief at 30. It is absurd to suggest (and nothing in the '737 patent indicates) that Ablaise invented the idea of having an identifier for a format. It is telling that inventor Ritchie when asked to identify what was the "new and interesting" idea that constituted the invention, did not mention the use of format identifiers at all. See Second Davis Decl., Ex. 34 at 382-85.

As shown above, Fishwrap uses a format identifier because the use of the information in the reordering algorithm of Fishwrap (which Ablaise concedes determines the order in which content is presented – and thus its location) constitutes a format identifier. However, even if that information were not considered a "format identifier," the person of ordinary skill in the art would certainly know how to let the user expressly choose a format (order) of the articles in Fishwrap by identifying the format desired. As set forth in Dow Jones' Memorandum at 33, allowing a user to choose a format through, for example, an HTML form was well known. HTGrep and Thunderstone give plain examples of letting the user do exactly that.[7]

Ablaise fails to explain how, in light of the HTML forms used in these references, or the display options described in the Bobo patent, the use of such mechanisms to offer a choice of formats would have been non-obvious to the person of ordinary skill in the art. Tellingly, on this point Ablaise is forced to overstate its own expert's opinion in an effort to support its non-obviousness argument. Specifically, contrary to the arguments in Ablaise's opposition, Mr. Mulligan does not opine that the use of a format identifier in Fishwrap "would not work." See Ablaise Opp. at 21. In fact, the cited paragraph of Mr. Mulligan's report states only that "whether or not it is possible to do this [use a format identifier in Fishwrap] is irrelevant." See Davis Decl., Ex. 10 at ¶ 29.

To support its position that Fishwrap did not render the asserted claims of the '737 patent obvious, Ablaise relies primarily on: (1) an alleged "teaching away" in the prior art and (2) secondary indicia of non-obviousness. Neither argument is valid.

---

[7]  Ablaise's assertion that it is improper for Dow Jones to rely on the disclosure of HTGrep and Thunderstone in this analysis is ludicrous. Dr. Bestavros explained in his report that the use of forms would have been well known to persons of still in the art and all of the facts concerning the disclosure of HTGrep and Thunderstone are contained in his report. See Davis Decl., Ex. 7 at ¶¶ 56-57; 94.

Ablaise's reliance on a paper by one of the students working on Fishwrap as teaching away from the alleged invention is misplaced for two reasons.

First, a reference does not teach away from the obviousness of the patented invention if it describes the usability of the alleged invention but suggests a different or better approach to the alleged invention. See Syntex LLC v. Apotex, Inc., 407 F.2d 1371, 1380 (Fed. Cir. 2005) (statement that particular combination is not preferred embodiment does not teach away absent "clear discouragement of that combination"). The quoted language relied on by Ablaise recognizes the feasibility of using express user preferences and then explains that for non-technical users, implicit user preferences are preferred for the particular purpose of the MIT research project. Indeed, the fact that the student author assumed it was possible to use a format identifier supports the testimony of Dr. Bestavros that such a mechanism would have been obvious to a person of ordinary skill in the art. As described by Dr. Bestavros, the MIT students were working on developing a cutting edge system for determining implicit user preferences (a potential A thesis for an MIT computer science student) not a simple system for letting users choose the order for a list of items to be displayed on the page. See Davis Decl., Ex. 7 at ¶ 94.

Second, Ablaise states that the article "taught-away from using express user preferences." Ablaise Opp. at 21. This argument is based entirely on the premise that the asserted claims require the user explicitly to choose format, which as discussed above, is not a correct interpretation of the claims.

Ablaise also cannot rely on secondary indicia of non-obviousness to avoid summary judgment because it cannot establish the existence of even one such indicia. The law is clear that "a nexus between the merits of the claimed invention and evidence of secondary consideration is required in order for the evidence to be given substantial weight and none can overcome the

showing of obviousness." <u>Ruiz v. A.B. Chance Co.</u>, 234 F.3d 654, 668 (Fed. Cir. 2000).  As

explained in Dow Jones' Memorandum at 34, the Ablaise inventors (and Ablaise's Rule 30(b)(6)

witness) conceded that they were not aware of any long felt but unmet need met by the invention,

not aware of any skepticism of the invention, and could not identify any project having

commercial success using the patented technology.

     Even if one accepted Ablaise's interpretation of the Fishwrap documents that some

Fishwrap users thought it would be better if they could choose the order of articles themselves, it

would not demonstrate the existence of a long felt need for the alleged invention.  <u>First</u>, as

discussed above, the patent claims do not require that the user choose the format themselves and,

therefore, there is no aspect of the alleged invention that is being "unmet" by Fishwrap.  <u>Second</u>,

the quoted comments do not offer any evidence that the need was "long felt" or establish that it

was unmet in the art.   Indeed, the statements on which Ablaise relies were made very close in

time to the date of the alleged invention.  Ablaise cannot establish the existence of a long felt

unmet need or the required nexus.

     As explained in Dow Jones' Memorandum at 35-36, the single article on which Ablaise

purportedly relies to establish skepticism does not express skepticism of the Ablaise invention.

As explained by Dr. Bestavros, this article is simply addressing the inherent limitations of

HTML in terms of the ability of users to interact with the web page attainable using HTML

rather than Java technology.  Ablaise offers no evidence or testimony from its expert to support

its reading of the Krakatoa Chronicle article on which it relies.  Ablaise cannot establish the

existence of skepticism of its invention.

     Finally, Ablaise relies on what it groups together as licensing/commercial success.  In

order for commercial success or licensing to factor into the obviousness analysis, the patentee

must establish a nexus between that success and the potential invention.  See Iron Grip Barbell Co. v. USA Sports, Inc., 392 F.3d 1317, 1324 (Fed. Cir. 2004).  Here Ablaise has made no effort to do so.  Ablaise's own expert indicated that the license agreements entered by Ablaise do not reflect the value of the patent.  See Davis Decl., Ex. 24 at ¶ 90 (settlement payments "had little to do with actual value of the patented inventions").  The fact that a number of companies, as part of what Ablaise describes as a "coercive licensing program", paid amounts far below the cost of litigation for licenses says nothing about whether those entities accepted the patents as valid.  With respect to commercial success, Ablaise presents no evidence that the alleged invention has been commercially successful.  See Ablaise Opp. at 26-27.  Ablaise attempts to attribute a statement about the adoption of customization to Dow Jones' expert but actually cites to its own expert report.  See Ablaise Opp. at 27.  More important, however, is that Ablaise has come forward with no evidence whatsoever that, even if customized formatting is now "tremendously popular" as Ablaise asserts, that such customized formatting is within the scope of the asserted claims of the '737 patent.  Ablaise has not identified any evidence that would establish a nexus between any such commercial success and use of the alleged invention of the '737 patent.  In the absence of evidence establishing a nexus, the alleged secondary indicia cannot properly be weighed in the obviousness analysis.

III.    **THE BOBO PATENT.**

   A.    **The Bobo Patent Anticipates The Asserted Claims Of The '737 Patent.**

Ablaise does not dispute that the Bobo patent allowed users to choose a display option for their faxes to be displayed on a web page.  Ablaise does not dispute those display options "control what functions are selected to generate HTML."  Undisputed Facts at ¶ 58.  Ablaise does not identify a single fact about what the Bobo patent discloses that is in dispute.

Ablaise's sole argument opposing anticipation by the Bobo patent is that what the Bobo patent calls different "display options" are actually options for different content. As set forth in Dow Jones' Memorandum at 38, the Bobo patent repeatedly describes the choice it offers users as format or display options, not as different content. See, e.g., Davis Decl., Ex. 5 at Col. 5, lines 19-20 ("listing of the facsimile messages may be sent to the user in one of several formats"); Col. 7, lines 43-47 (request will include "display preferences"); Col. 8, line 5 (referring to "display options"). In support of its contrary interpretation of the teachings of the Bobo patent, Ablaise offers only the conclusory testimony of its expert that – directly contrary to what the Bobo patent itself says – Bobo offers only a choice of different content not different formats.

No ordinary understanding of the distinction between content and format would treat the different "display options" of the Bobo patent as being different "content." A user is given the choice of display options, including the choice of, for example, seeing a full size image of the first page of the fax, or a thumbnail sized image of the first page of the fax, or just the list of faxes without the images. See Davis Decl., Ex. 5 at Col. 5, lines 19-23. The "content" is the fax page itself and the "display option" is the format in which that content is delivered.

In an attempt to bolster its argument, Ablaise mischaracterizes certain aspects of the Bobo patent. Ablaise incorrectly asserts that the Bobo patent selects from two different images served on the server. In fact, the Bobo patent describes a mode of operation in which the images are created "on the fly," in the size needed based on the choice of display options. See Davis Decl., Ex. 5 at Col. 8, lines 49-53. Ablaise also incorrectly asserts (with no citation to the record) that the HTML for each of the display options described in the Bobo patent does not change when different display options are selected. To the contrary, the Bobo patent indicates

that the HTML files are generated "according to the user's preferences [i.e., display options]." Id. at Col. 8, lines 41-45.

Because Bobo uses "format identifiers" to identify the display options selected by the user and those display options generate different formats, there is no genuine dispute of material fact that the Bobo patent anticipates the asserted claims of the '737 patent.

### B.    The Bobo Patent Renders The Asserted Claims Of The '737 Patent Obvious.

Ablaise does not cite any facts in dispute relating to the determination of obviousness of the asserted claims of the '737 patent in light of the Bobo patent. Instead, Ablaise offers only conclusory criticisms of Dow Jones' argument and a single quote from its own expert on the advisability of using HTML to change the size of the image.

The following undisputed facts make a conclusion of obvious unavoidable:

- the Bobo patent teaches giving users a choice of how they want content displayed;

- the Bobo patent teaches a mechanism for identifying which format a particular user wants for his web page and selecting code (functions) based on that chosen format;

- the Bobo patent teaches using HTML to format the web page delivered to the user of the website; and

- the person of ordinary skill in the art was familiar with HTML, including the tags that in Ablaise's estimation change the location of the text or graphics on the web page. See Undisputed Facts at ¶ 5.

As the Supreme Court recently explained, "[i]f a person of ordinary skill in the art can implement a predictable variation, and would see the benefit of doing so, § 103 likely bars its patentability." KSR, 127 S. Ct. at 1731 (2007). Ablaise is essentially arguing that because, in its view, the Bobo patent did not use HTML to do precisely what the '737 patent describes, the

person of ordinary skill would not have recognized that he could also use other known HTML tags to implement additional display options using the same approach described in the Bobo patent. Indeed, the Bobo patent itself uses HTML, including some of the very same HTML tags that Ablaise concedes select format, not content. See Davis Decl., Ex. 5 at Table 1. The example of HTML code in the Bobo patent for one of the display options uses a paragraph tag to move text down to the following line. Id. The Bobo patent example also uses an HTML image tag, which Ablaise has admitted can control the location of content on a web page. Undisputed Facts at ¶ 12.

Thus, even if Bobo's teaching of different sized images were not considered a "format" change, the person of ordinary skill in the art would certainly understand that the Bobo system could be used to allow users to select different HTML tags for formatting in the same way. The same system that allowed the users choice of image to be selected based on the display option chosen and altered the HTML to reflect that choice would also allow for a choice of the location of the image or other formatting changes to the HTML.

For the same reasons set forth above, Ablaise has not presented evidence of any secondary indicia of non-obviousness that could be considered in the obviousness analysis.

**IV.   CLAIMS 1, 3, 4 AND 6 OF THE '737 PATENT ARE AN OBVIOUS COMBINATION OF PERSONALIZED COMPUTER DISPLAY (i.e., THE REUTERS PATENT) AND WEB TECHNOLOGY FOR GENERATING HTML PAGES ON THE FLY (i.e., THE SUN MICROSYSTEMS PATENT).**

In response to Dow Jones's explanation of obviousness based on the combination of pre-Web personalized computer displays and Web technology for generating HTML pages on the fly, Ablaise's primary argument is that the Reuters patent and the Sun Microsystems patent are "two incompatible technologies" and, therefore, would not have been combined by the person of ordinary skill in the art.

As Ablaise admits, the Reuters patent describes a "non-Web and non-Internet based software product that allows a user to customize the format and style of content on the display." Undisputed Facts at ¶ 84. There is no dispute that during the time frame of the alleged invention there was a push in the industry to move functionality onto the Web. In fact, even Ablaise's expert conceded that "in the mid-1990's companies were rushing to establish an online presence and developers were working fast and furiously to get clients up on the Web." Davis Decl., Ex. 10 at ¶ 65. During that time frame "people were constantly adding to and modifying their web pages." Davis Decl., Ex. 3 at 189-90. Given the close relationship between the displays of computer screens in non-Web settings and the development of web pages, it is only logical that the two technologies would have both been considered by the person of ordinary skill in the art looking to improve web pages. See Davis Decl., Ex. 7 at ¶¶ 42-47; 110-11.

Ablaise asserts that its invention "transforms the way that content can be viewed on the web" and suggests that the inventors solved certain problems associated with creating web pages. Ablaise Opp. at 31. Ablaise ignores the admission of its expert that nothing in the alleged Ablaise invention overcame any of those problems. Davis Decl., Ex. 3 at 87-91. Far from being technologically innovative, Ablaise admits that all of the web technology used in its invention was the standard web technology known at the time, including the use of HTML to format web pages and the use of CGI programs to generate web pages "on the fly" personalized for individual users. See id. at 33-34 (admitting that person of skill could provide different formats for different users with known web technology).

Ablaise asserts that the "lessons learned" from these pre-Web systems using customized formatting are "not transferable, or even useful" in the Web environment. Ablaise Opp. at 32. Ablaise's approach is overly rigid and ignores the skill of the person of ordinary skill in the art to

adapt Web technology to a new use of providing the same sorts of personalized formatting that had been created for other computer systems.  Ablaise appears to be suggesting that because the pre-Web personalized formatting is not on the Web, it cannot be adapted for use on the Web. See Ablaise Opp. at 32-33.  In determining obviousness, the person of ordinary skill in the art can adapt technologies to fit new uses, including moving technology to the Web.  See Muniauction, Inc. v. Thomson Corp., 532 F.3d 1318, 1326-27 (Fed. Cir. 2008) (finding obviousness based on showing that "adapting existing electronic processes to incorporate modern internet and web browser technology" was known).  Here, as in Muniauction, it was obvious to take known functions and, using technology within the abilities of the person of ordinary skill in the art, implement those same functions on the Web.  Indeed, one would have had to have been living in a cave not to have realized that virtually everyone else in the computer field was working to implement old functions on the Web.  Because there is no genuine dispute of material fact and under the applicable legal standards, the alleged invention of the '737 patent is obvious, Dow Jones is entitled to summary judgment of invalidity.

## V.      HTGREP INVALIDATES CLAIMS 1-3 OF THE '530 PATENT.

### A.      HTGrep Anticipates Claims 1-3 Of The '530 Patent.

Ablaise admits that HTGrep allowed users to receive the results of their searches in "different styles of lists."  Ablaise Opp. at 33.  Those lists use HTML tags to dictate how the search results are arranged on the page; such as whether the results are listed as plain HTML paragraphs or in a numbered or bulleted list.  Ablaise does not dispute that the HTML tags used in HTGrep cause the text to move because, for example, the text is indented by using the HTML tag. See Ablaise Opp. at 33-34; Davis Decl., Ex. 3 at 169.

Despite the fact that the HTML tags used in HTGrep cause the text to be displayed in a different place on the page, Ablaise asserts that they are not HTML tags that specify location and, therefore, are not "formatting data." Those tags specify location in the same way and to the same extent that the HTML tags that the inventors identify in the patent as being tags that specify location. In the '737 patent, the <P> Paragraph Tag is an example of an HTML tag that specifies the location. See Davis Decl., Ex. 1 at Example 8; Ex. 3 at 81. The paragraph tag simply moves the text down a line to create separate paragraphs. See Davis Decl., Ex. 3 at 82. Ablaise's expert also identified the <center> tag as an HTML tag that was "formatting data.". See id. at 179-180. As the name suggests, the <center> tag causes the text to be centered on the page rather than aligned on the left margin. See Davis Decl., Ex. 11 at 386.

There is no logical distinction between the movement of the text caused by inserting a paragraph tag or a center tag (which Ablaise and the '737 patent identify as formatting data) and the movement caused by inserting a list tag or a paragraph tag in HTGrep. The HTML tags known at the time of the invention (and therefore the only tags mentioned in the '737 patent) all "specify location" only to the extent they insert line breaks, centering, indents, and similar formatting. There was no HTML tag that could, for example, direct the browser to put a particular piece of content in the upper right hand corner of the page.

Ablaise's second argument – that HTGrep does not have two specified page formats – makes no sense. HTGrep provides customers with multiple choices of format, each of which uses HTML tags to create different formats. Ablaise does not explain why those different formats selected by the user are not "specified page formats." Indeed, HTGrep expressly offers users the choice of formats through an HTML form. See Davis Decl., Ex. 21 at DJ0003668.

23

**B.     HTGrep Renders Claims 1-3 Of The '530 Patent Obvious.**

Even if the list and paragraph tags used in HTGrep were not HTML tags that specify

location, Ablaise cannot reasonably take the position that it would be non-obvious to switch from

one HTML tag to another HTML tag.  Ablaise concedes that the person of ordinary skill in the

art would have been familiar with HTML and its capabilities as of May 15, 1995.  See

Undisputed Facts at ¶ 5.  HTGrep indisputably taught letting users select different display

options which would deliver content with different HTML tags based on that selection.  See

Davis Decl., Ex. 3 at 188-89.  The person of ordinary skill in the art would certainly have

recognized that HTGrep could also use other HTML tags.  Ablaise does not assert that there are

any secondary indicia to support a finding of non-obviousness of Claims 1-3 of the '530 patent.

**VI.    THUNDERSTONE INVALIDATES CLAIMS 1-3 OF THE '530 PATENT.**

**A.     Thunderstone Anticipates Claims 1-3 Of The '530 Patent.**

Ablaise's efforts to create distinctions where none exist reaches an apex in its argument

that the same paragraph tag when used in the '530 patent itself is "formatting data" but when

used in the Thunderstone program it is not.  See Ablaise Opp. at 41-42.  Ablaise's definition of

"formatting data" boils down to anything that is described in the prior art is not formatting data;

anything that is in the '737 patent is formatting data – even where it is the precise same HTML

tag.  Ablaise attempts to explain this difference by suggesting that the Paragraph tag is used

differently in the '737 patent than in the Thunderstone program.  This argument ignores that the

paragraph tag causes the same thing to happen in both cases:  it moves the text down to the

following line and leaves some white space.  See Second Davis Decl., Ex. 35.   Because the

paragraph tags inserted by Thunderstone change the location of the text and are, therefore,

"formatting data," there is no genuine dispute of material fact.

**B.      Thunderstone Renders Claims 1-3 Of The '530 Patent Obvious.**

Thunderstone indisputably teaches using different HTML tags for different users based on the users' selection of a format and Ablaise does not explain any theory as to why a person of ordinary skill in the art could not have substituted other HTML tags in that system. Ablaise admits that HTML tags and their functions were known to persons of ordinary skill in the art. See Davis Decl., Ex. 3 at 17, 32; Undisputed Facts at ¶ 5. The use of the paragraph tag to "separate" content on the web page that Ablaise claims is formatting was known. See Second Davis Decl., Ex. 35. Based on the disclosure of allowing a user to request two different formats (one with HTML paragraph tags and one without, for example), the person of ordinary skill would certainly be able to recognize that other choices of formatting based on simple HTML tags could be accomplished in the same way. Ablaise does not assert that there are any secondary indicia of non-obviousness applicable to the '530 patent.

## CONCLUSION

For the foregoing reasons, in addition those set forth in Dow Jones' Memorandum, Dow Jones' motion for summary judgment of invalidity should be granted.

Date:   November 26, 2008                    Respectfully submitted,


By:     /s/_____
        Steven Lieberman (439783)
        Sharon L. Davis  (439223)
        Brian Rosenbloom (461413)
        Oliver Edwards (975833)
        ROTHWELL, FIGG, ERNST & MANBECK
        1425 K Street, NW, Suite 800
        Washington, DC  20005
        Tel: (202) 783-6040; Fax: (202) 783-6031

        *Attorneys for Plaintiffs, Dow Jones & Company,
        Inc. and  Dow Jones Reuters Business Interactive,
        LLC d/b/a Factiva*